## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KEITH STANSELL,  et al.

     Plaintiffs,

     vs.

REVOLUTIONARY ARMED
FORCES OF COLOMBIA (FARC); et al.,

     Defendants,

     vs.

EQUINITI TRUST COMPANY.,

     Turnover Respondent/Garnishee.
_____/

EQUINITI TRUST COMPANY.,

     Third Party Plaintiff,

     vs.

KEITH STANSELL et al.;
OLIVIA PESCATORE et al.;
ANTONIO CABALLERO;
BANCO BANDES URUGUAY SA,
BANCO BICENTENARIO BANCO UNIVERSAL CA, and
BANCO DE VENEZUELA SA BANCO UNIVERSAL,

     Adverse Claimants.
_____/

CASE NO.: 1:16-mc-00405-LGS
Judge Lorna G. Schofield

### Plaintiffs' Amended Joint Answer and Affirmative Defenses to
### Third-Party Complaint and Amended Crossclaim Against Antonio Caballero

The Stansell and Pescatore Anti-Terrorism Act Judgment Creditors file this Amended

Joint Answer and Affirmative Defenses to Equiniti Trust Company's ("Equiniti") Third-Party

Complaint Seeking Relief in the Nature of Interpleader (Dkt. No. 208), and Amended Crossclaim

against Antonio Caballero, in compliance with this Court's April 16, 2021 Order Dkt. No. 214 that filings of the interpleader complaints be made only in the *Stansell* matter, and pursuant to Fed. R. Civ. P. 15(a)(1).

## AMENDED ANSWER

1.  Admitted that EQUINITI is a New York limited trust company subject to the jurisdiction of this Court, and is subject to general jurisdiction in New York.  Admitted that EQUINITI is holding assets blocked by the Dept. of the Treasury's Office of Foreign Assets Control ("OFAC") that are owned by BANCO BANDES URUGUAY SA, BANCO BICENTENARIO BANCO UNIVERSAL CA, and BANCO DE VENEZUELA SA BANCO UNIVERSALVENEZUELAN HEAVY INDUSTRIES C.A. (collectively the "Turnover Targets"). The Stansell and Pescatore Plaintiffs have established clear judgment lien priority over these blocked funds being held by EQUINITI.

2.  Admitted that the Stansell and Pescatore Judgment Creditors have been awarded judgments against the Revolutionary Armed Forces of Colombia ("FARC"), for damages under the Anti-Terrorism Act ("ATA"), without knowledge as to what is meant by "at least three sets of persons."  Admitted that the Turnover Targets have been determined to be an agency or instrumentality of the FARC after a review of substantial evidence.  Admitted that the Stansell and Pescatore Judgment Creditors seek to partially satisfy their respective ATA Judgments through turnover of the blocked assets owned by the Turnover Targets being held by EQUINITI.

3.  Admitted that Fed. R. Civ. P. 14 and 22 and 28 U.S.C. § 2361 apply to this filing. Denied that New York Civil Practice Law and Rules ("CPLR") sections 5239 and 1006; section 134 of the New York Banking Law; and 28 U.S.C. §1355 apply to this filing.

4.  Admitted.

5.      Admitted that Keith Stansell, Marc Gonsalves, Thomas Howes, Judith Janis, Christopher Janis, Michael Janis and Jonathan Janis (the "Stansell Judgment Creditors") have filed a motion for turnover of blocked assets owned by the Turnover Targets held by EQUINITI to enforce their ATA Judgment against the FARC.  Admitted that the Stansell Judgment Creditors obtained an ATA Judgment where the face of the judgment itself sets forth an award of $318,030,000 in compensatory damages.  *Stansell v. FARC* et al. Case No. 8:09-cv-2308 (MDFL 2010).  Admitted that at the time of the filing of the Stansell ATA action, the Stansell Judgment Creditors were citizens of Florida, Connecticut, Alabama, New York and Virginia, although the states of citizenship are now different.

6.      Admitted that Olivia Pescatore, Josh Pescatore, Jada Pescatore, Jarrod Pescatore, Jordan Pescatore, Carol Pescatore Harpster (individually and as the representative of the estate of Frank Pescatore Sr.), Richard Pescatore, and John Pescatore (the "*Pescatore* Judgment Creditors") have filed a motion for turnover of blocked assets owned by VENEZUELAN HEAVY INDUSTRIES C.A. and held by EQUINITI to enforce their ATA Judgment against the FARC. Denied that Carolyn Pescatore has a judgment against the FARC. [1] Admitted that the Pescatore Judgment Creditors have commenced a judgment enforcement action currently pending before this Court, captioned *Pescatore v. Palmera Pineda*, No. 18-mc-545 (S.D.N.Y.) (LGS). Admitted the Pescatore Judgment Creditors have obtained their judgment against the FARC in an action titled *Pescatore et al. v. Pineda, et al.*, No. 08-cv-02245 (D.D.C.) (the "*Pescatore* Action"), in the amount of $69,000,000. *See Pescatore et al. v. Pineda, et al.,* No. 18-mc-545 (S.D.N.Y.), ECF No. 1. Admitted that at the time of the filing of the Pescatore ATA action, the Pescatore Judgment Creditors were citizens of Alabama and New Jersey, although the states of citizenship are now different.

---

[1] Carolyn Pescatore was briefly the representative of the estate of Frank Pescatore Sr.

7.      Admitted that Antonio Caballero sought a pre-motion conference to intervene; set forth that he has a judgment õin the amount of $46,729,667.00 ó which was trebled pursuant to Section 18 U.S.C. § 2333 ó and which included post-judgment interest at the rate of 0.15% from that date.  Admitted that on information and belief Mr. Caballero is a citizen of Florida.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Admitted that on June 15, 2010 the Stansell Judgment Creditors obtained an ATA Judgment where the face of the judgment itself sets forth an award of $318,030,000 in compensatory damages.  *Stansell v. FARC* et al. Case No. 8:09-cv-2308 (MDFL 2010).

14.     Admitted.

15.     Admitted. *See Pescatore et al.,* No. 18-mc-545 (S.D.N.Y.), ECF No. 1.

16.     Admitted.

17.     Admitted, *see* Dkt. No. 124.

18.     Unable to admit or deny.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.  The Stansell and Pescatore writs of execution were issued on January 8, 2021 and delivered to the court appointed process server that same day, thereby creating an execution lien under New York law.  *Stansell* Dkt. No. 244; *Pescatore* Dkt. No. 110. The writs were served on EQUINITI on January 8, 2021 ô   strengthening the lien under New York law.

*Id.   See* C.P.L.R. 5202(a); David Gray Carlson, *Critique of Money Judgment Part Three: Restraining Notices*, 77 Alb. L. Rev. 1489, 1502 n. 108 (2014) ("an execution lien arises when the sheriff receives an execution").   In this regard, "the lien pre-exists the levy and arises when the execution is delivered to the sheriff." *Id.* at 1510 n. 182.   The service of the writ "constitutes the strengthening of a preexisting execution lien." *Id.*   Statutory notice of levy was timely provided to the Turnover Targets in compliance with CPLR §5232(c).   *Stansell* Dkt. No. 244; *Pescatore* Dkt. No. 110.   No other creditors have priority over these Plaintiffs.

23.   Admitted.

24.   Unable to admit or deny, but by January 25, 2021 (when the Minnnesota garnishment summons was issued), the Stansell and Pescatore plaintiffs had already created and perfected their judgment execution liens under New York law.

25.   Unable to admit or deny, but by February 1, 2021 (when the Minnnesota garnishment summons was served), the Stansell and Pescatore plaintiffs had already created and perfected their judgment execution liens under New York law 23 days before Caballero served his Minnesota garnishment summons on Equiniti.

Mr. Caballero's execution in Minnesota is defective and void because he failed to comply with governing federal law.   "The procedure on execution  and in proceedings supplementary to and in aid of judgment or execution  must accord with the procedure of the state where the court is located, <u>but a federal statute governs to the extent it applies</u>." Fed. R. Civ. P. 69(a)(1) (emphasis added).   After the Stansell and Pescatore judgment liens were perfected on January 8, 2021, Mr. Caballero filed a January 22, 2021 motion in the Minnesota district court for issuance of a garnishment summons to Equiniti for the subject Blocked Acconts.   **Ex. 1**.   The Minnesota district court issued a garnishment summons to Equiniti on January 25, 2021.   **Ex. 2.**   This

garnishment summons was served on February 1, 2021 by "Mark Miller, Process Server." **Ex. 3.** However, Mr. Caballero never moved for an Order specially appointing a process server in lieu of the U.S. Marshal, and no such appointment Order was ever entered as required by Fed. R. Civ. P. 4.1(a) which provides: "Process" other than a summons under Rule 4 or a subpoena under Rule 45" must be served by a United States marshal or deputy marshal or by a person specially appointed for that purpose."

Mr. Caballero's Minnesota garnishment summons to Equiniti is a form of "other process" governed by Fed. R. Civ. P. 4.1, not a summons "to a Defendant" governed by Rule 4. *See United States ex rel. Bunk v Gosselin Worldwide Moving, N.V.*, 2017 WL 4476846, at *8 (ED Va Aug. 22, 2017) ("Rule 4 pertains only to the service of the "summons" issued in connection with a complaint to initiate a civil action."). Mr. Caballero knows this and he has previously complied with Rule 4.1 in other jurisdictions by moving for and obtaining a court order specially appointing his process servers under Rule 4.1. *See Caballero v. FARC*, SDNY Case 20-mc-00249, January 28, 2021 Order Granting Motion to Appoint Special Process Server, Dkt. No. 21; *Caballero v. FARC,* DCT Case 20-cv-01939, October 22, 2020 Order, Dkt. No. 6. Accordingly, Mr. Caballero has not perfected his judgment lien on Equiniti because the Feb 1, 2021 service was invalid.

26.     Admitted.  Denied that Mr. Caballero's motion to intervene is relevant now that he is a third-party defendant formally joined in this interpleader.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.   Denied that CPLR 5239 applies in a federal interpleader action governed by 28 U.S.C. 1335 and/or FRCP 22.   The Stansell and Pescatores have no objection to a reasonable attorneys' fee being paid to Equiniti to resolve the competing claims of Mr. Caballero.

32.   *See* responses to Paragraphs 1-30.

33.   Denied that CPLR 5239 applies in a federal interpleader action governed by 28 U.S.C. §1335 and/or Fed. R. Civ. P. 22.   *See* FRCP 69(a) "a federal statute governs to the extent it applies."  Here the federal interpleader statute and/or Rule interpleader applies and therefore governs.

34.   Admitted that EQUINITI is entitled to an order determining the rights of the Stansell and Pescatore Judgment creditors and Mr. Caballero.  Denied that the Turnover Targets have a claim to the blocked account because they were provided statutory notice of the Stansell and Pescatore levies and turnover motions, failed to appear and are in default.  Denied as to the unidentified claims of "any other party claiming an entitlement to the Blocked funds."

35.   *See* responses to Paragraphs 1-34.

36.   Admitted.

37.   Admitted.

38.   Admitted that Equiniti is holding the Contested Assets in a blocked account. Denied that any OFAC license is required for Equiniti to turnover the blocked assets once the Court has ruled that TRIA applies.  The OFAC does not require a license for plaintiffs to execute on blocked assets under the TRIA. *Weininger v. Castro*, 462 F. Supp. 2d. 457, 499 (S.D.N.Y. 2006); *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) ("[I]n the event a court determines that blocked assets are subject to

TRIA, those funds may be distributed without a license from OFAC."); *Harrison v. Republic of Sudan*, 802 F.3d 399, 407 (2d Cir. 2015).

39.     Admitted.

40.     Denied that Equiniti is entitled to interplead parties who "may" have claims to or rights in the blocked assets.  Denied that New York Banking Law §134 or CPLR §1006 applies in a federal interpleader action.

41.     *See* responses to Paragraphs 1-40.

42.     Admitted.

43.     *See* responses to Paragraphs 1-42.

44(a).  Admitted.

44(b).  Denied that CPLR §5239 applies in a federal interpleader action, otherwise admitted, denied as to "any other applicable provision of law."

44(c).  Admitted.

44(d).  Admitted.

44(e).  Admitted, except denied as to "any other persons who may have claims to or an interest in, any Blocked Funds."

44(f).  Admitted.

44(g).  Admitted.

44(h).  Denied.

## AMENDED AFFIRMATIVE DEFENSES

45.     The Stansell and Pescatore plaintiffs have clear and absolute judgment execution lien priority via-a-vis Mr. Caballero.  *Stansell* Dkt. No. 244; *Pescatore* Dkt. No. 110.  Mr.

Caballero's Minnesota writ was not served on Equiniti until February 1, 2021, 23 days after the Stansell and Pescatore plaintiffs had already perfected their judgment liens under New York law.

Mr. Caballero's execution in Minnesota is defective and void because he failed to comply with governing federal law.  "The procedure on execution"  and in proceedings supplementary to and in aid of judgment or execution"  must accord with the procedure of the state where the court is located, <u>but a federal statute governs to the extent it applies</u>."  Fed. R. Civ. P. 69(a)(1) (emphasis added).  After the Stansell and Pescatore judgment liens were perfected on January 8, 2021, Mr. Caballero filed a January 22, 2021 motion in the Minnesota district court for issuance of a garnishment summons to Equiniti for the subject Blocked Acconts.  **Ex. 1**.  The Minnesota district court issued a garnishment summons to Equiniti on January 25, 2021.   **Ex. 2**.  This garnishment summons was served on February 1, 2021 by "Mark Miller, Process Server."  **Ex. 3**.   However, Mr. Caballero never moved for an Order specially appointing a process server in lieu of the U.S. Marshal, and no such appointment Order was ever entered as required by Fed. R. Civ. P. 4.1(a) which provides:  "Process" other than a summons under Rule 4 or a subpoena under Rule 45"  must be served by a United States marshal or deputy marshal or by a person specially appointed for that purpose."

Mr. Caballero's Minnesota garnishment summons to Equiniti is a form of "other process" governed by Fed. R. Civ. P. 4.1, not a summons "to a Defendant" governed by Rule 4.  *See United States ex rel. Bunk v Gosselin Worldwide Moving, N.V*., 2017 WL 4476846, at \*8 (ED Va Aug. 22, 2017) ("Rule 4 pertains only to the service of the "summons" issued in connection with a complaint to initiate a civil action.").  Mr. Caballero knows this and he has previously complied with Rule 4.1 in other jurisdictions by moving for and obtaining a court order specially appointing his process servers under Rule 4.1.  *See Caballero v. FARC*, SDNY Case 20-mc-

00249, January 28, 2021 Order Granting Motion to Appoint Special Process Server, Dkt. No. 21; *Caballero v. FARC,* DCT Case 20-cv-01939, October 22, 2020 Order, Dkt. No. 6. Accordingly, Mr. Caballero has not perfected his judgment lien on Equiniti because the Feb 1, 2021 service was invalid.

46.     BANCO BANDES URUGUAY SA, BANCO BICENTENARIO BANCO UNIVERSAL CA, and BANCO DE VENEZUELA SA BANCO UNIVERSAL, are not a "foreign state" or an "agency or instrumentality of a foreign state" under the FSIA.  28 U.S.C. §1603(a), (b).  Banco de Desarrollo Economico y Social de Venezuela ("BANDES") is a direct state-owned corporation, therefore, none of its corporate subsidiaries are a "foreign state" as defined in the FSIA.  A corporation does not qualify as a foreign state under the FSIA if its majority owner is another corporation, even if the parent corporation is majority-owned by an actual foreign state. As the Supreme Court has held, "[a] corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares."  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003).  Accordingly, none of the BANDES subsidiary Turnover Targets' blocked assets in the United States are immune from attachment under the FSIA.

47.     Antonio Caballero's Florida Anti-Terrorism Act ("ATA") judgment is void in its entirety for lack of subject matter jurisdiction because neither Mr. Caballero or his father was a U.S. national at the time of the terrorist acts, nor did the terrorist acts cause any injury to the person, property or business of a U.S. national as required by 18 U.S.C. §2333(a).  *See Doe v. Tapang*, 2019 WL 3576995 *6 (N.D.C.A. 2019) ("Furthermore, plaintiffs lack standing to sue in representative capacities on behalf of the estates of their loved ones because their family members were not United States nationals. The ATA states that any "national of the United

States injured in his person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue"— thus, because the decedents were not U.S. nationals, their estates lack standing to sue the ATA.1 18 U.S.C. § 2333.").  The Florida district court that entered Mr. Caballero's ATA judgment noted that "courts have held that U.S. nationals can state a claim under the ATA for the death of non-U.S. national family members." *Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2020 WL 7481302, at *3 (S.D. Fla. May 20, 2020).  However, the cases cited as supporting authorities therein all involved a claimant/heir who was a U.S. national at the time of the attack, even though the victims were foreign nationals.  Here, neither the claimant/heir or the victim/decedent was a U.S. national "injured in his or person, property or business."

48.     In the alternative, Antonio Caballero's Florida ATA judgment is void in part, and has now been fully satisfied.  The ATA expressly provides:

> (a)Action and Jurisdiction.—
> <u>Any national of the United States</u> <u>injured in his or her person, property, or</u>
> <u>business</u> by reason of an act of international terrorism, or his or her estate,
> survivors, or heirs, <u>may sue therefor</u> in any appropriate district court of the United
> States and shall recover threefold the damages he or she sustains and the cost of
> the suit, including attorney's fees.

18 U.S.C. §2333(a) (emphasis added).  Although Mr. Caballero's father was "injured in his person"— kidnapped for ransom and then murdered— <u>he was never a U.S. national</u>, and his son Plaintiff Caballero cannot "sue therefor."

Plaintiff Caballero did allege economic business losses that he personally sustained in 1999 in Colombia.  Assuming, arguendo, that 15 years later when he became a U.S. national those economic damages became recoverable under the ATA, at best Plaintiff Caballero was only injured in his "property or business," and that's the most he can sue for.  The Florida district court gave full faith and credit to the state court damages award for the economic losses for the

son's loss of his business when he left for the U.S., which included $1,729,667.00 "for actual compensatory, economic damages" which was trebled to $5,189,001.00.  Plaintiff Caballero is already satisfied because he has collected more than $10 million.  The $45 million award for "non-economic damages" is not recoverable where no U.S. national was ever "injured in his or person."

49.     Antonio Caballero's Florida ATA judgment is void for lack of general and specific personal jurisdiction over the Defendant FARC.  The FARC remains a designated Foreign Terrorist Organization and has always been "at home" in Colombia trying to overthrow the Colombian government, and it has never been essentially "at home" in the United States.  Mr. Caballero's father was not targeted as an American; he was a Colombian kidnapped for ransom and murdered in Colombia by an FTO in Colombia.  There were no ransom demands or proofs of life or prisoner exchange demands that were ever sent into the United States for Mr. Caballero.  Mr. Caballero's death did not "arise from or relate to" any of the FARC's in forum conduct in Florida or the U.S., and there is insufficient nexus to support specific personal jurisdiction.  Moreover, the FARC never purposefully availed itself of the privileges and protections of Florida or U.S. law by partnering with other cartels to traffick cocaine here to the United States, and, therefore, any such narcotics activity did not cause the FARC to reasonably anticipate being haled into a U.S. court for the kidnapping for ransom and murder of a Colombian national in Colombia.  This affirmative defense is addressed more fully in the crossclaim below.

50.     The Stansell and Pescatore Judgment Creditors did not expressly acknowledge the validity of Caballero's judgment, nor did they waive their rights to challenge Caballero's judgment as void for lack of subject matter jurisdiction or personal jurisdiction, by settling the

separate interpleader action in *Wells Fargo Bank v. Caballero et al*, S.D.F.L. Case No. 20-cv-20868-CMA.  That interpleader involved a blocked Kingpin account held by Wells Fargo Bank, N.A. in the name of Honduran Kingpin Banco Continental, S.A.  The account was also claimed by the OFAC licensed Honduran government appointed bank liquidator, Banco de los Trabajadores S.A. de C.V. ("BanTrab").  The settlement agreement in that interpleader between competing claimants BanTrab, Caballero, and Stansell/Pescatores specifically stated that: "**Nothing herein shall be deemed an admission by, or used against, any party with regard to any position taken in any litigation or proceeding**."  *See In Re: Banco Continental, S.A.*, S.D.F.L. Bankruptcy Court Case No. 20-10917, Dkt. No. 177 at ECF 7, ¶ 7.

## AMENDED CROSSCLAIM AGAINST ANTONIO CABALLERO
### INTRODUCTION

1.      In resolving this or any of the seven pending interpleader actions before this Court, the Court need not reach the issue of whether the ATA Judgment that was entered in favor of Interpleader Defendant Antonio Caballero is valid.  The reason why this Court need not reach that issue is that even assuming, *arguendo*, that his Judgment is valid, the Stansell and Pescatore Interpleader Defendants have established clear judgment execution lien priority over Mr. Caballero's claim on each and every garnishee and account.[2]  The Stansell and Pescatore Interpleader Defendants both have valid ATA Judgments, and both sets of victim families have clear chronological judgment execution lien priority over any possible claim by Mr. Caballero.  Thus, although the invalidity of Caballero's judgement is detailed below, it need not be decided by the Court.

2.      Nevertheless, if Mr. Caballero had chronological lien priority over the Stansell and Pescatore families— which he does not— his Florida default judgments are void and/or

---

[2] With the sole possible exception of one blocked account held by Citibank, N.A. for the Venezuelan Ministry of Finance which is at issue in Citibank's Third Party Complaint Dkt. No. 229.

unenforceable here because the Florida courts that entered them lacked general or specific personal jurisdiction over the FARC.  Thus, any claim he may assert in this interpleader cannot prevail.

3.      Before addressing why Mr. Caballero's Judgement is invalid, it is important to emphasize that that we do not view Mr. Caballero as our adversary.  As victims of FARC terrorism, we view any family that has suffered from FARC violence essentially as our brothers and sisters in grief.  "We are not enemies, but friends." A. Lincoln, First Inaugural Address, Mar. 4, 1861.  With that in mind, the Stansell Plaintiffs and the Pescatores were able to reach a Joint Prosecution and Sharing Agreement with one another, enabling the families to work collaboratively for Justice, and not at cross-currents.  We wish that similar efforts regarding Mr. Caballero had borne fruit.

4.      Be that is it may, Mr. Caballero simply never qualified to collect under the Anti-Terrorism Act.  At the time the FARC kidnapped his father for ransom in Colombia, and then murdered him when the ransom was not paid, he had essentially no nexus to the United States— he was not then an American citizen; he had not then applied for American citizenship; and he was not targeted *as an American* by the FARC.  Put simply, at the time of his murder by the FARC, Mr. Caballero was a Colombian national residing in Colombia— just like, tragically, tens of thousands of other victims of FARC violence against Colombians.  At least 15 years after his father's death in 1999, Mr. Caballero's son acquired U.S. citizenship and promptly filed his ATA action in 2019, seeking compensation in the American justice system for his father's murder by the FARC, even though he already held a 2014 Florida state court default against the FARC for over $146 million.

5.      As explained *infra*, that scenario does not fall under the ambit of the Anti-Terrorism Act.  Under its express language, and as the legislative history confirms, the ATA was designed to protect Americans *qua Americans*— *i.e.*, those who were targeted by terrorists specifically *because they are Americans*.  The Stansell and Pescatore victims squarely fall into that category.  Mr. Caballero and his deceased father (who was never a U.S. national) squarely do not.

6.      Thus, while Stansell and Pescatore families are sympathetic to the Caballero family for the tragic loss of their father, their efforts here— and in other courts in the American justice system— to gain compensation under the ATA (and the Terrorism Risk Insurance Act of 2002, which helps enable collections under the ATA) should not be viewed as legitimate.  Indeed, Caballero's efforts here are directly at odds with— rather than in furtherance of— Congress' objectives when it enacted the ATA, namely, to compensate Americans who were targeted because they were Americans, and to deter terrorists who specifically target Americans.  Every dollar that the Caballero family collects under their invalid ATA judgment— and at present, they have collected approximately over $10 million— is a dollar drawn from a limited pool of assets that rightfully should have gone to American victims holding proper ATA judgments.

7.      Accordingly, the Stansell and Pescatore families jumped through all the proper hoops and are proper ATA judgment holders.  But Mr. Caballero is not.  The following explains in greater detail why the law dictates Mr. Caballero's ATA Judgment be set aside as invalid.

### *Antonio Caballero's judgment is invalid & can be collaterally attacked*

8.      Caballero's Florida default judgments are void and/or unenforceable here, because the Florida courts that entered them lacked general or specific personal jurisdiction over

the FARC.  Unlike, for example, the hostage taking, torture, and murder of the *Stansell* and *Pescatore* plaintiffs—who were specifically targeted because they were Americans—the murder of Caballero's father (Antonio Caballero, Sr.) had no nexus to the United States.  Any connection at all was (at best) a mere fortuity, triggered by when—*more than 15 years after the murder*—the victim's son (Antonio Caballero, Jr.), became an American citizen, and then filed suit as an American against the FARC.  The district court that entered the Caballero Anti-Terrorism Act judgment in 2020—which Caballero now seeks to enforce here before this Court—never mentioned the issue of personal jurisdiction over the Defendant FARC in its Order entering default judgment, or any prior Orders. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2020 WL 7481302 (S.D. Fla. May 20, 2020).  Nor did Caballero ever even address the issue of personal jurisdiction in his motion for default judgment against the FARC.

9.      At the time the FARC kidnapped and then murdered Antonio Caballero, Sr. in 1999, Caballero Sr. and Caballero Jr. were both Colombian nationals, not Americans; neither resided at the time in America; neither had applied for American citizenship; and neither was targeted *as an American* by the FARC.  Put simply, at the time of his kidnap and murder by the FARC, Caballero Sr. was simply a Colombian national residing in Colombia—just like, tragically, tens of thousands of other victims of FARC violence against Colombians.

10.     In 2012—some 13 years after his father's death—Caballero Jr. filed a Florida state court lawsuit under the Alien Tort Statute, Civil RICO, and state law claims.  At the time he filed that suit, Caballero Jr. was *still* not an American citizen. Then, sometime between 2012 and 2018, Caballero Jr. acquired U.S. citizenship and filed his ATA action, seeking compensation for his father's murder by the FARC.  As detailed below, the law dictates Caballero's ATA Judgment be set aside as invalid.

A.     **STATEMENT OF FACTS**

1.     **Caballero's 2014 Florida state court alien national judgment**

11.     Caballero filed his initial Compliant against the FARC in Florida state court in 2012.  *Antonio Caballero vs. Fuerzas Armadas Revolucionarios de Colombia aka FARC-EP and Ejercito Liberacion Nacional aka ELN*, Miami-Dade Circuit Case No. 12-48803-CA-02.   In 2013, Caballero filed his Corrected Second Amended Complaint adding FARC trafficking partner the Norte del Valle Cartel (NVC) as a Defendant.  *See* Dkt. No. 250, Appendix Exhibit No. 1, Caballero 2nd Amended Complaint.  This was the operative Complaint upon which the Florida state court ultimately entered its default judgment in 2014.

12.     Caballero's state court Complaint alleged jurisdiction over claims arising from his father's kidnapping and murder in Colombia in 1999.  The Complaint alleged jurisdiction under:

> 12. This action is brought pursuant to the Alien Tort Statute ("ATS") 28 U.S.C. § 1350 (as a federal question subject to non-exclusive concurrent jurisdiction), the Civil Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. §§ 1961-1968 (as a federal question subject to non-exclusive concurrent jurisdiction), Colombia law (via Florida's "significant relationship" test), and Florida law (via Florida's long arm statute).

Dkt. No. 250, Ex. 1 at p. 4.  Caballero alleged that federal courts had non-exclusive jurisdiction over the ATS and RICO claims, and that the state court had concurrent jurisdiction over those claims.  *Id.* at 5.

13.      Although Caballero was able to disguise his Colombian law claim with improper ATS and RICO claims, this Court need not address the merits of his ATS or RICO claims because <u>all</u> of Caballero's claims fail for lack of personal jurisdiction over the FARC.

14.     Caballero's state court Complaint alleged the following facts:

59. At all times relevant to this Complaint, the Victim was a resident and citizen of Colombia.

69. The Victim remained in the custody of FARC and ELN forces who were working in conjunction to conspire and profit from kidnapping the Victim.

70. At the time of the Victim's kidnapping, Plaintiff, the Victim's son, was living in Barranquilla, Colombia.

72. The Victim was unlawfully detained and held captive for 184 days, over 6 months.

74. Throughout his captivity, the Plaintiff's family was contacted regularly by Defendants in an ongoing effort to compel them to pay a ransom for the Victim's safety and freedom. FARC and ELN forces demanded six million dollars ($6 Million) to secure the Victim's safety and release.

75. The Colombian government froze the assets of the Plaintiff's family upon hearing of the Victim's kidnapping.

79. Tragically, after six months of captivity and torture, Defendants assassinated the Victim by shooting him multiple times.

80. On August 15, 1999, the Victim's emaciated body was found discarded on a dirt road between the provinces of Magdalena and Cesar and brought to Valedupar, Cesar, where his body was eventually identified and confirmed as the Victim.

81 . At all times relevant to this Complaint, Defendants and others, acted directly and in concert through aiding and abetting and a conspiracy, to effect the kidnapping, unlawful detention, hostage-taking, trafficking, torture, and killing of the Victim.

82. The Victim was targeted because of his political affiliations, official anti-narcotics positions, and as a source of potential ransom funds to finance the Defendants' terrorist activities and criminal enterprises, including the Defendants' extensive narco-trafficking operations.  Additionally, the Victim's properties contained roads and paths through which processed drugs manufactured by the NDVC with product and chemicals supplied by FARC and ELN were transported through and that were used to facilitate drug trafficking logistics and transportation from production and cultivation centers in the southern areas of Colombia to ports on the Caribbean coast of Colombia and on to the United States.

*Id*. at pp. 14-18.

15.    The Complaint clearly shows that the FARC did not expressly aim their conduct

at any U.S. national, nor was the kidnapping and murder of the Victim a direct õbut forö result of

any FARC tort committed in Florida or the United States, nor did the kidnapping for ransom and murder in any way relate to the FARC¢s cocaine export activities in the forum.  It is beyond dispute that the Victim and his son were Colombian nationals residing in Colombia; therefore, they were not targeted by the FARC as Americans.

16.     The Florida state court default judgment incorporated jurisdictional findings from its prior default summary judgment order, including:

> The Court has specific jurisdiction over Defendants pursuant to Fla. Stat. 48.193(1)(a)(1) and 48.l93(1)(a)(6).[5] FARC, ELN and NDVC have individually and in concert engaged in narcotics manufacturing and trafficking of cocaine destined for Florida and the United States, shipped from Caribbean ports in Colombia into the United States primary through Florida.[6] At all times relevant to the Complaint, FARC, ELN and NDVC have been involved in narcotics production and trafficking.[7] Defendants' acts against Plaintiff and his father set forth in the Finding of Fact were a component part of Defendants' trafficking of illegal drugs into Florida and the United States. Florida is a primary point of entry and target market for Colombia's cocaine trafficking, including narcotics produced and trafficked by Defendants.[8] Consequently, Defendants were operating, conducting, engaging in, or carrying the business of narcotrafficking for distribution in Florida within the definition of Fla. Stat. §48.l93(1)(a)(1). In addition, Defendants have also caused injury to Florida persons arising out of the cocaine manufactured and narco-trafficked by Defendants which is being consumed within Florida.[9]
>
> Thus, personal jurisdiction over the defendants is also established pursuant to Fla. Stat. § 48.193(1)(a)(6).  Moreover, Defendants' narco-trafficking of illegal drugs into the United States were substantial, ongoing, and systematic and thus provide a basis for general jurisdiction under Fla. Stat. § 48.193(2). Because of Defendants' continuous narco-trafficking activities in furtherance of the movement of illegal drugs into Florida and the harm that has caused to citizens of this State and Nation, this Court has both "specific" and "general" jurisdiction over Defendants.[10]

Dkt. No. 250, App. Ex. No. 2, Summary Judgment Order at 22-23.[3]  (Also reported as *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 2014 Fla. Cir. LEXIS 51243, *31-33 (Fla. Cir. 2014)).

---

[3] The state court relied heavily on the testimony of former University of Miami Professor Bruce Bagley, who was convicted in 2020 on federal money laundering charges. *See* U.S. Dept. of Justice Press Release,

## 2.    Caballero's 2020 SDFL ATA judgment

17.    On December 19, 2018, Antonio Caballero — already holding a 2014 state court judgment for over $146 million — filed a new lawsuit under the ATA alleging that he had become, 19 years after his father's death, a U.S. national.  Caballero's ATA Complaint alleged the following as the basis for personal jurisdiction over the Defendant FARC:

> 10. This Court has personal jurisdiction over the Defendants pursuant to Florida Statute § 48.193, because the Defendants, through their agents and representatives, transacted business in this State and caused injury in this State, by their criminal activity and operations trafficking millions of dollars of illicit drugs into Florida and the United States for distribution throughout the United States. (FJ, ¶¶ 2, 3, 27, 41, 42.) As found by the State Court, Defendants kidnapping and eventual assassination of Ambassador Caballero was a necessary component part of the Defendants' overall criminal activity and scheme to traffic illicit drugs into South Florida and the United States for their profit and gain. (FJ, ¶ 27.) Defendants' actions against the Ambassador and Antonio Caballero were inextricably intertwined with, and a necessary component of, Defendants' trafficking of illegal drugs into and throughout South Florida and the United States for their profit and gain. *Id.*

*Caballero v FARC*, SDFL Case No. Case 1:18-cv-25337-KMM, DE 1 at 4-5.

18.    The Complaint also alleged that Caballero had obtained a prior Florida state court judgment that was res judicata and entitled to full faith and credit pursuant to 28 U.S.C. § 1738.  Dkt. No. 250, App. Ex. No. 15 (Complaint at 4).  The Complaint further **falsely** alleged that:

> The Final Judgment was collaterally attacked in post-judgment garnishment proceedings, which included attacks as to both the Florida Court's personal jurisdiction <u>over the Defendants</u> and the Florida Court's subject matter jurisdiction. The attacks on the Final Judgment were rejected by the trial court, which also entered a turnover judgment. The trial court's rulings were affirmed (per curiam) on appeal by the Florida Third District Court of Appeal. For purposes of a full faith and credit analysis, "[i]t has long been the rule that principles res judicata apply to jurisdictional determinations -- both subject matter and personal." Thus, "'a judgment is entitled to full faith and credit -- even as to questions of jurisdiction -- when the second court's inquiry discloses that those

---

*Professor Of International Studies Pleads Guilty To Money Laundering* (Jun. 1, 2020), https://www.justice.gov/usao-sdny/pr/professor-international-studies-pleads-guilty-money-laundering.  No federal court has ever reviewed Caballero's erroneous jurisdictional findings.  A Florida appellate court did decide an appeal in Caballero's favor, but on issues wholly unrelated to personal jurisdiction.

questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.'" *Weininger v. Castro*, 462 F. Supp. 2d 457, 472 (S.D.N.Y. 2006) (citations omitted).  The Final Judgment was also domesticated in the District Court of Utah, case number 2:17-cv-00315-PMW.

*Id.*, SDFL Complaint at 4 n.1 (emphasis added).

19.    However, Caballero apparently committed a fraud upon the Court by materially misrepresenting the state court record to Judge Moore.  There was never a collateral attack on the personal jurisdiction **over the Defendant FARC**, either in the state trial court or on appeal.  A non-party blocked account owner, Prodira Casa de Cambio, S.A. de C.V., did file a motion to dissolve a writ that challenged personal jurisdiction.  But Prodira's motion argued that *Prodira* was not subject to personal jurisdiction, and, therefore, its account could not be garnished.[4] Prodira also filed a Motion to vacate the judgment arguing that Caballero's service of process on the FARC was defective,[5] but *Prodira never once asserted in any motion that the Defendant FARC was not subject to personal jurisdiction in the United States.  See* Dkt. No. 250, App. Ex. Nos. 4, 6, 7.

20.    The state court Omnibus Order rejecting all of Prodira's motions noted that Prodira's notice of general appearance stated that it was õwithout waiver to Prodira's other defenses including but not limited to the Court's lack of personal jurisdiction *over Prodira*.ö Dkt. No. 250, App. Ex. No. 9 (Omnibus Order at 13) (emphasis added).  This is what Prodira referred to in its Appellant's Brief when it said õProdira challenged personal jurisdictionö in the trial court.  *Prodira Casa de Cambio vs. Caballero*, 2016 WL 5870668, No. 3D16-0487 (Aug.

---

[4] Prodira also argued that its blocked Kingpin account was not subject to TRIA execution, but this argument was rejected based on the testimony of Bruce Bagley that the account was really owned by Los Zetas, an IEEPA Transcriminal Organization, and, therefore, the account should have been blocked under IEEPA.  Mr. Bagley is now in federal prison having plead guilty and been convicted on money laundering charges for Venezuelan nationals.

[5] Caballero's opposition briefs in the state court argued that Prodira had no standing to challenge the validity of service of process on the FARC, which was a waivable defense personal to the Defendant FARC.

10, 2016 Appellant's Initial Brief).  The Appellant's Brief and Reply Brief on appeal never once challenged the court's personal jurisdiction over the Defendant FARC.  Dkt. No. 250, App. Ex. Nos. 11, 13. Caballero's own Appellee's Answer Brief clearly states that "Prodira filed its Motion to Dissolve by way of a "special appearance" contesting the trial court's jurisdiction *over it*." Dkt. No. 250, App. Ex. No. 12.

21.     Caballero's motion for default judgment against the FARC in the ATA action never once mentions the issue of personal jurisdiction over the FARC.  Dkt. No. 250, App. Ex. No. 16. The district court in entering the ATA judgment gave preclusive effect to the state court judgment's damages award, and the district court never once addressed the issue of the FARC's personal jurisdiction.[6]  *See* Dkt. No. 250,  App. Ex. No. 17, SDFL Order on Motion for Default Judgment, DE 62, at 7, which is reported as *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 1:18-CV-25337-KMM, 2020 WL 7481302 (S.D. Fla. May 20, 2020).

The Stansell and Pescatore Judgment Creditors did not expressly acknowledge the validity of Caballero's judgment, nor did they waive their rights to challenge Caballero's judgment as void for lack of subject matter jurisdiction or personal jurisdiction, by settling the separate interpleader action in *Wells Fargo Bank v. Caballero et al*, S.D.F.L. Case No. 20-cv-20868-CMA.  That interpleader involved a blocked Kingpin account held by Wells Fargo Bank, N.A. in the name of Honduran Kingpin Banco Continental, S.A.  The account was also claimed by the OFAC licensed Honduran government appointed bank liquidator, Banco de los Trabajadores S.A. de C.V. ("BanTrab").  The settlement agreement in that interpleader between competing claimants BanTrab, Caballero, and Stansell/Pescatores specifically stated that:  **"Nothing herein shall be deemed an admission by, or used against, any party with regard to**

---

[6] *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) ("a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

any position taken in any litigation or proceeding.ö  *See In Re: Banco Continental, S.A.*,
S.D.F.L. Bankruptcy Court Case No. 20-10917, Dkt. No. 177 at ECF 7, ¶ 7.

## B.   LEGAL STANDARDS FOR PERSONAL JURISDICTION OVER A FOREIGN TERRORIST ORGANIZATION

### 1.   Legal standard for general jurisdiction

22.     The constitutional due process standard for determining general jurisdiction
changed significantly with the Supreme Court's decisions in *Daimler AG v. Bauman*, 571 U.S.
117 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011). In
*Daimler*, the Court held that õapprov[ing] the exercise of general jurisdiction in every State in
which a corporation ÷engages in a substantial, continuous, and systematic course of businessø ...
[represents a] formulation [that is] unacceptably grasping.ö *Id.* at 761. Instead, *Daimler*
reaffirmed the principle announced earlier in *Goodyear*: õ[T]he inquiry under *Goodyear* is not
whether a foreign corporationøs in-forum contacts can be said to be in some sense õcontinuous
and systematic,ö it is whether that corporation's õaffiliations with the State are so ÷continuous
and systematicø as to render [it] **essentially at home in the forum State**.ö *Id.* at 761 (emphasis
added) (quoting *Goodyear*, 564 U.S. at 919); *Banco de los Trabajadores v. Cortez Moreno*, 237
So. 3d 1127, 1134 (Fla. 3d DCA 2018).  The Supreme Court in *Daimler* held that it is õthe
exceptional caseö for a corporation to be õessentially at homeö in a place other than its domicile.
*Id*. at 139, n.19.  This õcalls for an appraisal of the defendantøs activities in their entiretyôô
nationwide and worldwide. *Id*. at 1559. A corporation operating in multiple forums could
õscarcely be deemed at home in all of them.ö *Id.*

### 2.   Legal standard for exercising specific jurisdiction over non-resident defendant

23.     A courtøs specific jurisdiction is governed by the õeffects testö articulated by the
Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). Specific jurisdiction based on a

defendant's out-of-forum conduct requires that the defendant's "(1) intentional, tortious actions; (2) which were expressly aimed at the United States; (3) [caused] harm, the brunt of which is suffered— and which the defendant knows is likely to be suffered— in the United States; and (4) the injuries that are the subject of the litigation arise from or relate to defendant's subject conduct." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 478-79 (S.D.N.Y. 2010) (*citing Calder*, 465 U.S. at 789-90).

24.      The exercise of personal jurisdiction over any Defendant must comport with principles of constitutional due process. *See Waldman v. PLO*, 835 F.3d 317, 343 (2d Cir. 2016); *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007). Each Defendant must have "sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction," and the exercise of personal jurisdiction must "comport[] with ‗traditional notions of fair play and substantial justice‖ under the circumstances." *Waldman*, 835 F.3d at 331 (quoting *Daimler AG*, 571 U.S. at 126-27).

25.      To exercise *specific* personal jurisdiction consistent with due process, the Court must examine "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (citations omitted); *In re del Valle Ruiz*, 2019 WL 4924395 (2d Cir. Oct. 7, 2019).   *First*, "the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State." *U.S. Bank N.A. v. Bank of Am. N.A.* ("*U.S. Bank*"), 916 F.3d 143, 150 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1785 (2017).   *Second*, "the plaintiff's claim must arise out of or relate to the defendant's forum conduct." *U.S. Bank*, 916 F.3d at 150 (*quoting Bristol-Myers Squibb*, 137 S. Ct. at 1786). The allegations in the Caballero Complaint must establish that the FARC's' "suit-related

conduct—ô *i.e.*, ôconduct that could have subjected them to liability under the ATAö (the kidnapping for ransom and murder in Colombia)ô created a ôsubstantial connectionö with the United States. *Waldman*, 835 F.3d at 335 (quoting *Walden*, 571 U.S. at 284).

26.     The exercise of specific jurisdiction depends on in-state activity that ÷*gave rise to the episode-in-suit.*¿ö *Waldman*, 835 F.3d at 331 (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 923 (emphasis in original)). As the Second Circuit has held, ô[w]here the defendant has had only limited contacts with the [forum],ö it is appropriate to require proximate causationô not merely ôbut-forö causationô for personal jurisdiction. *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018); *see also Waldman*, 835 F.3d at 343 (explaining that personal jurisdiction over the defendant in *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002), was proper because the plaintiff hired the defendant ôas a result ofö defendant¿s in-forum activities).

27.     The United States Supreme Court has recently clarified the standard for specific personal jurisdiction in motor vehicle product liability actions where vehicles designed, manufactured and sold by Ford in other states years later caused injuries to Montana residents. *Ford Motor Co. v Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021).  The Court held that:

> our most common formulation of the rule demands that the suit ôarise out of *or relate* to the defendant¿s contacts with the forum.ö . . .  The first half of that standard asks about causation; but the back half, after the ôor,ö contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase ôrelate toö incorporates real limits, as it must to adequately protect defendants foreign to a forum.

*Id*. at 1026.

### 3.   Legal standard for specific jurisdiction under Florida's long arm statute

28.     Florida¿s long-arm statute allows for personal jurisdiction over a non-resident defendant who commits an out of state tort ôso long as the effect of the tort causes harm within

the state." *XN Fin. Services, Inc. v. Conroy*, 12-80143-CIV, 2012 WL 12873512, at *4 (S.D. Fla. Mar. 5, 2012) (*citing  Posner v. Essex Ins. Co., Ltd*., 178 F.3d 1209, 1216–17 (11th Cir. 1999)). Courts within Florida have "specific" personal jurisdiction for any cause of action "arising from" the activities within the state. Although the term "arising from" is broad, under Florida law there must nevertheless be some " ‑direct affiliation,' ‑nexus,' or ‑substantial connection" " between the cause of action and the activities within the state,  *Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman*, 635 So. 2d 79, 81 (Fla. 1st DCA 1994). This nexus requirement is often described as "connexity," and must be met before specific jurisdiction will attach under this subsection. *Bloom v. A.H. Pond Co., Inc*., 519 F. Supp. 1162, 1168 (S.D. Fla. 1981).

29.      A Court must determine whether a plaintiff's claim arises out of or relates to one of Defendants' contacts with Florida.  *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) (*citing Oldfield v. Pueblo De Bahia Lora, S.A.,* 558 F.3d 1210, 1222 (11th Cir. 2009)).  Courts must "look to the ‑affiliation between the forum and the underlying controversy,' focusing on any ‑activity or ... occurrence that [took] place in the forum State."  *Waite v. All Acquisition Corp*., 901 F.3d 1307, 1314 (11th Cir. 2018), *cert. denied sub nom. Waite v. Union Carbide Corp*., 139 S. Ct. 1384, 203 L. Ed. 2d 611 (2019) (*quoting  Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017)). In the absence of such a connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id*. at 1781. In the Eleventh Circuit, a tort arises out of or relates to the defendant's activity in a state only if the activity is a "but-for" cause of the tort.  *Waite*, 901 F.3d at 1314 (*citing  Oldfield*, 558 F.3d at 1222–23).  *See Natl. Indus. Sand Ass'n v Gibson*, 897 SW2d 769, 776 (Tex 1995), *citing Calder*, 465 U.S. at 789, 104 S. Ct. at 1486, (jurisdiction based upon the effects of extra-territorial

conduct within a particular forum is proper only when the extra-territorial conduct focuses upon a plaintiff residing in that forum).

## C.   THE VALIDITY OF CABALLERO'S JUDGMENT IS NOW DIRECTLY AT ISSUE IN THIS INTERPLEADER ACTION AND IS SUBJECT TO COLLATERAL ATTACK IN THIS COURT

30.   õ[T]here can be little doubt that if the judgment is void...a collateral attack upon the void judgment may be made in any proceeding in any court where the validity of the judgment comes in issue.ö *Collins v. Foreman*, 729 F.2d 108, 111 (2d Cir. 1984) (emphasis added, citation omitted); 12 Mooreøs Federal Practiceô Civil § 60.44[1][b] (2017 ed.).  As a void judgment is a legal nullity, it may be challenged not only directly but also by collateral attack in a proceeding in any court where that judgmentøs validity comes in issue.  *Graciette v. Star Guidance, Inc*., 66 F.R.D. 424, 426 n.1 (S.D.N.Y. 1975) *citing Pennoyer v. Neff*, 95 U.S. 714 (1877) (collateral attacks are permitted against default judgments that are void for a lack of personal jurisdiction); J. Moore, 7 Federal Practice ¶60.25[1].  õIf the Court rendering the challenged judgment never had jurisdiction over the person of the defendant or the res of the action, any such judgment is void and, therefore, subject to collateral attack. That attack may be made in any proceeding in any Court where the validity of the judgment comes in issue.ö *Sheiner v. City of New York*, 611 F. Supp. 172, 175 (E.D.N.Y.1985); 16 Coquillette, Moore's Federal Practice, § 108.03[2] at 108ó16 (3rd ed. 1998).  *See also Reefer Tek LLC v El Dorado Trailer Leasing, LLC*, 17 CIV. 1809 (ER), 2019 WL 5727315, at *3 (S.D.N.Y. Nov. 5, 2019) (õ[V]oidness of a judgment for lack of personal jurisdiction can be asserted on a collateral challenge after entry of a default judgment.ö *"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123 (2d Cir. 2008) (õvoidness of a judgment for lack of personal jurisdiction can be asserted on a collateral challenge after entry of a default judgmentö); *In re Choez*, No. 15 Bk. 45404 (ESS),

2017 WL 5604109, at *6 (E.D.N.Y. Nov. 20, 2017) ("[P]recedent exists supporting the proposition that Rule 60(b)(4) may be invoked in the registration court to obtain relief from a foreign default judgment attacked as void for lack of personal jurisdiction over the parties against whom it was rendered." (*quoting Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 734 (2d Cir. 1980).").

**D.     NO PRECLUSIVE EFFECT SHOULD BE AFFORDED TO CABALLERO'S DEFAULT JUDGMENTS WHERE THE ISSUES WERE NEVER FULLY AND FAIRLY LITIGATED**

31.     "A judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits— had jurisdiction, that is, to render the judgment." *Underwriters Nat'l Assurance Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) (*quoting Durfee v. Duke*, 375 U.S. 106, 110 (1963)). "Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." *Id*. at 705; *see also Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment." (footnote omitted)).

32.     Jurisdictional findings made as part of a default judgment rendered without an appearance by the defendant are not entitled to preclusive effect. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) (jurisdictional determinations made in a Florida state court default judgment are not entitled to res judicata effect if the defendant did not "actually appear[ ]" in the proceedings); *American Steel Bldg. Co. v. Davidson & Richardson Constr. Co*., 847

F.2d 1519, 1521 (11th Cir. 1988) ("[W]here the defendant does not appear, and judgment is by default, the state court judgment does not preclude the federal court from reviewing the jurisdictional issues.").

33.     In *Martinez v Republic of Cuba*, 221 F. Supp. 3d 276 (N.D.N.Y. 2016), Judge Kahn of the Northern District of New York voided a Florida default judgment against Cuba on subject matter jurisdiction grounds, emphasizing that such ruling protects the legal rights of victims who actually possess a valid judgment:

> The Court emphasizes that, in denying enforcement of Martinez's default judgment, it is not acting to protect assets of the Cuban government against plaintiffs who have claims to them. Indeed, <u>enforcing Martinez's jurisdictionally defective judgment would reduce the pool of such assets available to plaintiffs who have suffered wrongs at the hands of the Cuban government that are cognizable under the FSIA</u>. While the Court recognizes the efforts of the Florida state court to afford Martinez a remedy for the grievous harm inflicted on her by Roque and the Cuban government, the Court is simply unable to give legal redress for      her      sad      and      difficult      plight.

*Martinez*, 221 F. Supp. 3d at 289 (emphasis added).  Here, Caballero again seeks to improperly reduce the pool of blocked assets available to the sixteen Stansell and Pescatore FARC victims who— unlike Caballero— were all U.S. nationals at the time of their attacks and were specifically targeted as American citizens.

34.     In 2019, the Second Circuit reversed three SDNY TRIA turnover orders seeking to enforce U.S. national terrorism victims' Florida state court default judgments against Cuba because of a lack of subject matter jurisdiction.  The court expressly allowed the jurisdictional challenge "as a defense to Petitioners' enforcement action."  *Vera v Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 135 (2d Cir 2019), *cert denied sub nom. Fuller v Banco Bilbao Vizcaya Argentaria, S.A.*, 141 S. Ct. 364 (2020).  The *Vera* Court held:

> "[ [w]e need not consider a collateral attack on the Florida judgment [because] BBVA's principal argument ... is that the District Court lacked subject-matter

> jurisdiction." 867 F.3d at 320 n.9 (emphasis in original). Moreover, as described
> above, a district court may consider its jurisdiction when suggested by any party,
> "even if there is no reason to confer a special right of 'third-party standing' on
> that party." *Walters*, 651 F.3d at 293.

*Id*. at 135, n. 20.  The Court held that the Florida state court jurisdictional findings did not bar the

District Court from considering the jurisdictional question anew, nor relieve it of its obligation to

assure itself of its own jurisdiction, whether upon motion or sua sponte.  *Id*.

      35.     The *Vera* Court also held that "a finding of jurisdiction is preclusive only when

the jurisdictional issues 'have been fully and fairly litigated ... in the court which rendered the

original judgment."  *Id*. at 135-36, citing *Durfee v. Duke*, 375 U.S. 106, 111 (1963).  "Cuba's

failure to appear meant that, although the Florida courts heard relevant evidence, 'the

jurisdictional facts necessary to eliminate Cuba's sovereign immunity under the FSIA were not

fully and fairly litigated' in the Florida actions. . . . The Florida state courts' jurisdictional

conclusions could therefore 'neither bind the District Court ... nor ... be relied on by the parties.'"

*Id. See also Jerez v. Republic of Cuba*, 775 F.3d 419, 422‑23 (D.C. Cir. 2014) (refusing to

accord res judicata effect to similar Florida state default judgment entered against Cuba).  Here,

no Defendant ever appeared in either of Caballero's state or federal court cases, and the relevant

controlling authorities were never provided to either court.[7]  Thus, as the D.C. Circuit held in an

ATA default judgment case against Hezbollah, the defendants' "absence imposed an independent

obligation on the district court to satisfy itself of its personal jurisdiction before entering a

---

[7]  Caballero executed in state court on a blocked Kingpin asset held in the name of Prodira, a Colombian casa de cambio that OFAC had designated as a Tier II FARC money launderer.  Prodira challenged Caballero's standing to execute on a blocked Kingpin asset.  On appeal the Florida 3d DCA affirmed in a per curiam no opinion decision.  Dkt. No. 250, App. Ex. 14.  Prodira never challenged, nor did the Florida state trial or appellate court ever decide, any issues relating to personal jurisdiction <u>over the FARC</u>.  *See* Dkt. No.250, App. Ex. Nos. 10-13.

default judgment against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018).

## E.    LEGAL ANALYSIS

### 1.    Second Circuit has held that a foreign terrorist organization is not "at home" in the United States

36.    In *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 322 (2d Cir. 2016), the Second Circuit voided a $655 million jury verdict and ATA judgment awarded to 11 families who were all U.S. nationals at the time they were killed in Middle East bombings. The Second Circuit held that the defendants were not subject personal jurisdiction, and, therefore, the judgment was void and unenforceable. *Id.* The Court held that the district court's ruling that it had general jurisdiction over the defendants "relies on a misreading of the Supreme Court's decision in *Daimler*" and that:

> Pursuant to *Daimler*, the question becomes, where are the PA and PLO "fairly regarded as at home"? 134 S.Ct. at 761 (*quoting Goodyear*, 564 U.S. at 924, 131 S.Ct. 2846). The overwhelming evidence shows that the defendants are "at home" in Palestine, where they govern. Palestine is the central seat of government for the PA and PLO. The PA's authority is limited to the West Bank and Gaza, and it has no independently operated offices anywhere else. All PA governmental ministries, the Palestinian president, the Parliament, and the Palestinian security services reside in Palestine.

> As the District Court for the District of Columbia observed, "[i]t is common sense that the single ascertainable place where a government such a[s] the Palestinian Authority should be amenable to suit for all purposes is the place where it governs. Here, that place is the West Bank, not the United States." *Livnat*, 82 F.Supp.3d at 30; *see also Safra*, 82 F.Supp.3d at 48. The same analysis applies equally to the PLO, which during the relevant period maintained its headquarters in Palestine and Amman, Jordan. *See Klieman*, 82 F.Supp.3d at 245 ("Defendants' alleged contacts ... do not suffice to render the PA and the PLO 'essentially at home' in the United States.")

*Id.* at 332-33.

37.    The *Waldman* court explained the PLO had two diplomatic offices in the United States, employed more than a dozen individuals over a period of two years, engaged in diplomatic activities and "had a substantial commercial presence in the United States." *Id*. at 323.  Its mission to the United States in Washington D.C. "used dozens of telephone numbers, purchased office supplies, paid for certain living expenses for ... the chief PLO and PA representative in the United States, and engaged in other transactions." *Id.* Despite these ongoing connections to the United States, the court determined the evidence demonstrated the PA and PLO "are 'at home'" in Palestine, where these entities are headquartered, and from where they are directed."*Id*. at 334. The Court stated that the "PLO and PA have not transported their principle 'home' to the United States." *Id*. at 335.

## 2.    The FARC has never been "essentially at home" in the United States for purposes of general jurisdiction

38.    Caballero alleged in 2013 – 14 years after his father's murder – that "he currently lives in Florida as a resident alien" and that "all defendants are non-residents of Florida." Dkt. No. 250, App. Ex. No. 1 at ¶ 20. Caballero further alleged personal jurisdiction as follows:

> 21.    Furthermore, this Court has specific personal jurisdiction over the Defendants, pursuant to Fla. Stat. § 48.193(1), because Defendants have substantial, ongoing, and widespread narco-trafficking operations in Florida which have made this state a central transfer point in their drug distribution network.[2]
>
> 22. This Court has general personal jurisdiction over the Defendants pursuant to Fla. Stat. § 48.193(2), because the Defendants have engaged in substantial and not isolated activity within this state as a result of their extensive and ongoing narcotics trafficking in and through Florida.

*Id*. at pp. 6-7.[8]  But the FARC was never itself present or operating in Florida; it is and always has been domiciled in Colombia.  The FARC merely supplies the coca leaf, paste and/or

---

[8] The publication cited by Caballero's footnote 2 does not even mention the FARC. *See* U.S. Dept. of Justice, National Drug Intelligence Ctr., Abstract, "South Florida High Intensity Drug Trafficking Area: Drug Market Analysis 2009," available at, http://www.justice.gov/archivc/ndic1.

processed cocaine to its many different trafficking partner cartels and Drug Trafficking Organizations— like the NVC and the Cartel of the Suns— and they then handle the subsequent transport, distribution and trafficking activities that occur in the United States.

39.     Caballero's Complaint clearly alleges that "FARC operates in roughly one-third of Colombia's geographic territory." *Id.* at ¶ 35.  No FARC member has ever been captured on U.S. soil.  The many FARC members who have been incarcerated in U.S. prisons on narcotics trafficking charges, or hostage taking charges against the Stansell victims, were all captured in Colombia (or in the case of aka Simon Trinidad, a high raking FARC leader who was captured trying to negotiate a FARC prisoner exchange using the Stansell hostages who had been targeted as Americans, captured in Ecuador, and immediately deported to Colombia) and extradited to the United States.  The 2004 "FARC 50" indictment alleged that the FARC leaders were part of a conspiracy to "import into the United States <u>from a place outside thereof</u> a controlled substance — cocaine—" *See United States v. Pedro Antonio Marin et al*, D.D.C. Case No. Case 1:04-cr-00446-TFH, Indictment, ECF 9 at p. 6.[9]  The indictment describes how the FARC started taxing cocaine in the 1990s and then became a "broker between the cocaine paste producing campesinos and the cocaine transportation organizations that distributed the cocaine to the United States and elsewhere." *Id.* at 15-16.  "When the FARC brought the cocaine paste to one of its own laboratories, it converted the cocaine paste to cocaine, and then delivered the drugs to the cocaine transportation organizations that sent the cocaine out of Colombia to the United States and elsewhere." *Id.* at 17.  In the late 1990s, the FARC began operating its own cocaine labs in Colombia, and they "became directly involved in importation of cocaine into the United States" and "established direct ties with cocaine distribution organizations in the United States." *Id.* at 17-18.

---

[9] This "FARC 50" indictment was originally filed in Plaintiffs' initial Appendix Dkt. No. 15, Ex. 3.

40.     The FARC was "created in or about 1964 as a leftwing guerilla group dedicated to the violent overthrow of the Government of Colombia, South America's longest standing, democratically elected government." FARC 50 indictment at 9. The FARC "controls large areas of land in Colombia, primarily in coca growing and cocaine processing regions." *Id*. The FARC is a highly structured criminal organization with a Secretariat overseeing the Estado Mayor command that oversees 77 fronts and mobile columns operating throughout Colombia. *Id.* at 9-14. In 2004, the FARC was comprised "of approximately 12,000 to 18,000 members." *Id.* at 14. The United States "FARC 50" indictment describes the FARC extensive operations throughout Colombia. *Id.* at 14-21.

41.     Plaintiffs do not dispute that the FARC was and still is the world's largest supplier of cocaine, and that it exports cocaine into the United States using third party trafficking partners in the United States. But this conduct, and the FARC's role in this massive ongoing conspiracy, do not render the FARC "essentially at home" in the United States or Florida for the purposes of general jurisdiction under the Supreme Court's decision in *Daimler*.

42.     On March 5, 2020, the United States unsealed an indictment of Nicolas Maduro and several FARC leaders alleging additional narcotics conspiracy crimes as part of the Venezuelan Cartel of the Suns dating back to 1999. *See USA v. Nicolas Maduro et al,* S.D.N.Y. Case 1:11-cr-00205-AKH.[10] This indictment also clearly details that the FARC was operating in Colombia and Venezuela, and using other Cartel of the Suns members to transport the cocaine into the United States.

43.     There has never been an indictment or U.S. government finding that the FARC has ever had members physically present and operating in the United States, nor has the U.S.

---

[10] This indictment is filed in Plaintiffs' Supplemental Appendix, Venezuelan Cartel of the Suns Vol. 2, Dkt. No. 109, Exs. 1-5.

ever found the FARC to be essentially at home anywhere in the United States.  The FARC is and has always been "at home" in Colombia.  The FARC even had an "International Commission" but none of those leaders were ever present in the United States, and the FARC never had a US member.  *See* OFAC Chart FARC International Commission.[11]

**3.      The FARC's export of cocaine to the United States does not have the requisite causal connection to support specific jurisdiction for a kidnapping for ransom and murder of a Colombian national in Colombia**

44.      The Second Circuit in *Waldman* also analyzed the specific jurisdiction issue, noting the "random, fortuitous" nature of the attacks, and held that those acts "were not expressly aimed at the United States" and that "plaintiffs point us to no evidence that these indiscriminate terrorist attacks were <u>specifically targeted against United States citizens</u>."  835 F.3d at 338 (emphasis added).  The Court also rejected the U.S. victims' purposeful availment theory because "plaintiffs' claims did not arise from the defendants' purposeful contacts with the forum."  *Id.* at 343.

45.      The D.C. Circuit has also rejected personal jurisdiction over a Foreign Terrorist Organization in an action arising from terrorist gunfire that ambushed an Israeli public bus resulting in the death of an American.   *Estate of Kleiman v. Palestinian Authority*, 923 F.3d 1115 (D.C. Cir. 2019).  There the Court held:

> Finally, plaintiffs' invocation of our decision in *Mwani v. bin Laden* is unpersuasive. There defendants' contacts with the United States were manifest in the very act that had precipitated the suit— a "devastating truck bomb" outside the U.S. Embassy in Nairobi, Kenya, in 1998, which "killed more than 200 people, including 12 Americans." Mwani, 417 F.3d at 4. **In choosing their target, a U.S.-government building, Osama bin Laden and Al Qaeda had manifestly sought "purposefully [to] direct their terror at the United States,"** *id.* at 14, and "**not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States,**" *id.* at 13. **Given conduct "no doubt ... 'directed at [and]**

---

[11] U.S. Treasury Press Release, "*Treasury Designates FARC International Commission Members*" (Sept. 30, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1169.aspx.

**felt in' " the United States**, *id.* (alteration in original) (citation omitted), **defendants could "reasonably anticipate being haled into" court there**, *id.* at 14 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)), ... But whereas the *Mwani* defendants, in attacking a U.S. government outpost, indisputably aimed to kill Americans (at least in part), **here we have no basis for inferring that the terrorists who attacked an Israeli bus were instructed, or endeavored, to injure American nationals**.   And absent intentional targeting, the fact that an American died in a terrorist incident abroad would amount only to a 'random, fortuitous, or attenuated' contact 'ma[de] by interacting with ... persons affiliated with the' United States. *Walden*, 571 U.S. at 286, 134 S. Ct. 1115

46.    *Id.* at 1125-26 (emphasis added).  The *Kleiman* plaintiffs tried to connect the foreign murder to the activities allegedly targeted at the U.S. (affecting US foreign policy), but this connection was rejected as insufficient to support specific jurisdiction.  *Id.*, *citing Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018), ( 'a tort -arise[s] out of or relate[s] to' the defendant's activity in a [forum] only if the activity is a -but-for' cause of the tort.'); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318-619 (3d Cir. 2007) (describing the typically stricter proximate cause or 'legal cause' test).  Because the Caballero Colombian kidnapping was not 'specifically targeted against [an] United States citizen[], and it was  'not expressly aimed at the United States' it was a random and fortuitous attack on a Colombian national on Colombian soil, which does not support specific jurisdiction over the FARC. *Waldman v. PLO*, 835 F.3d 317, 338 (2d Cir. 2016).

**4.      The Florida state court findings on personal jurisdiction are clearly erroneous**

47.    The mere fact that the FARC exported massive quantities of cocaine to the United States in a conspiracy with many other cartels does not render the FARC 'at home' in the U.S. for purposes of general jurisdiction.  The kidnapping and murder of Mr. Caballero was not caused by any FARC conduct in the United States; there was only criminal activity that occurred wholly in Colombia against a Colombian national.  There was no direct 'but for' or other causal

relation between any FARC acts in the United States. Indeed, all of the FARC narcotics actions occurred in Colombia along with the kidnapping for ransom and subsequent murder of Mr. Caballero.

48.     Caballero's entire premise for personal jurisdiction over the FARC is essentially conspiracy-based: i.e., the FARC's role in a conspiracy to export massive amounts of cocaine to the U.S. in partnership with various conspiracy partner cartels and drug trafficking organizations operating within America.  Just a few years ago, S.D.N.Y Judge Andrew L. Carter, Jr. specifically refused to exercise personal jurisdiction under a similar conspiracy-based theory:

> As STASCO notes, there is reason to think that basing specific personal jurisdiction on the acts of a defendant's co-conspirators is questionable after *Walden*. ECF No. 400 ("Shell Reply"), at 13-14. In *Walden*, the Supreme Court emphasized that personal jurisdiction must be based on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." 134 S. Ct. at 1122. Stated differently, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. It therefore stands to reason that a defendant has not established minimum contacts with a forum on the basis of his co-conspirator's conduct in the forum state alone.

*In re: North Sea Brent Crude Oil Futures Litigation*, 2017 WL 2535731 *9 (S.D.N.Y. 2017). Judge Carter further noted that "courts in this Circuit generally require a causal connection between the defendant's conduct and the plaintiff's harm." *Id.* at *6, *citing In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-02262 (NRB), 2015 WL 6243526, at *28 & n.46 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR II*").

49.     Accordingly, conduct in Florida or other parts of the United States made by the North Valley Cartel ("NVC"), or made by other FARC trafficking partner cartels, cannot sustain personal jurisdiction over the FARC.  And the in-forum conduct of the NVC (or other FARC trafficking partners) was not a cause of Caballero's kidnapping for ransom and murder in Colombia.

50.     Caballero's state court Complaint does not allege that the FARC was incorporated or maintains its principal place of business in the United States or has other "exceptional" affiliations with the United States that are so continuous and systematic as to render the FARC "at home" here. *See Daimler AG*, 571 U.S. at 127. There is, thus, no general personal jurisdiction over the FARC.  Caballero's state court Complaint, and his federal ATA Complaint, also fail to allege facts plausibly showing that the FARC engaged in "intentional" conduct, "calculated to cause injury," and that any such conduct was "expressly aimed at [the United States]." *Calder v. Jones*, 465 U.S. 783, 789, 791 (1984). "[M]ere injury to a forum resident" is an insufficient basis to assert personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 278 (2014).

51.     It is undisputed that Antonio Caballero was a Colombian national when his father, also a Colombian national, was kidnapped for ransom in Colombia by the FARC, a Colombian Foreign Terrorist Organization.  The ransom was not paid and his father was killed in Colombia in 1999.  The FARC in committing this heinous crime never expressly aimed its kidnapping for ransom and murder conduct at the United States, nor did its kidnapping and murder of Mr. Caballero in Colombia cause any direct injury or harm in the United States.  In stark contrast, the FARC *did* specifically target the *Stansell* and *Pescatore* victims as American citizens, and the FARC expressly aimed those terrorist acts at the United States, including shooting down a U.S. counter-narcotics aircraft, kidnappings of U.S. citizens, murders, torture and hostage taking of U.S. citizens, with multiple proof of life, ransom demands and prisoner exchange demands sent into the United States.

52.     Caballero alleged that his father's "properties contained roads and paths through which processed drugs manufactured by the NDVC with product and chemicals supplied by FARC and ELN were transported ... to ports on the Caribbean coast of Colombia and on to the

United States.ö App. Ex. No. 1 at ¶ 82.  Caballero also alleged that his father was a vocal critic of narcotics trafficking activities. *Id.* at ¶ 63.

53.     If the FARC is subject to personal jurisdiction in the United States for kidnapping and murdering alien national Caballero in Colombia, then the FARC is also subject to personal jurisdiction here for the kidnappings and murder and torture of hundreds of thousands of other Colombian national FARC victims who suffered like the Caballeros.  If this Court upholds Caballero's personal jurisdiction claim and enforces his judgment, it risks opening the floodgates to thousands of Colombian victims who will follow the Caballero default judgment blueprint, alleging that they too opposed narcotics trafficking and owned land over which coca leaf was grown or transported, and, therefore, the FARC is also subject to personal jurisdiction in their lawsuits.  This tidal wave of lawsuits and judgments will then result in the depletion of the blocked asset pool available to U.S. national FARC victims who were *legitimately* targeted because they were Americans.  That would be directly contrary to Congressional will, as embodied in the ATA.

WHEREFORE the Stansell and Pescatore Cross-claimants request entry of an Order and judgment declaring that Antonio Caballero's judgment is void and unenforceable because the Florida courts lacked both general and specific personal jurisdiction over the Defendant FARC, and Mr. Caballero therefore cannot enforce his judgment in the subject Third Party Complaint interpleader action.

Respectfully submitted May 18, 2021

/s/ Newton P. Porter

NEWTON P. PORTER
(Florida Bar No. 833738)
(Admitted Pro Hac Vice DE 4)
nporter@porterandkorvick.com
PORTER & KORVICK, P.A.
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:     (305) 373-5040
Fax:              (305) 668-9154
Attorneys for the Stansell Plaintiffs

/s/  Tony Korvick

TONY KORVICK
(Florida Bar No. 768405)
(Admitted Pro Hac Vice DE 3)
tkorvick@porterandkorvick.com
PORTER & KORVICK, P.A.
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:     (305) 373-5040
Fax:              (305) 668-9154
Attorneys for the Stansell Plaintiffs

/s/ Nathaniel A. Tarnor

Hagens Berman Sobol Shapiro, LLP
322 8th Avenue, Suite 802
New York, NY 10001
Telephone: (646) 543-4992
Email: NathanT@hbsslaw.com
Counsel for the Pescatore
Plaintiffs/Judgment Creditors

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 18, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that I served the foregoing document by electronic mail or certified or registered mail to the following persons:

        OFFICE OF FOREIGN ASSETS CONTROL
        U.S. Department of the Treasury
        1500 Pennsylvania Ave. NW
        Washington DC
        *Via email to OFAC counsel in compliance with 31 CFR 501.605*

None of the FARC defendants have appeared and defaults were properly entered against them all prior to entry of the Default Judgment.  Accordingly, no further notice, service of pleadings, motions or writs is required to be served on the FARC or the individual FARC members identified in the ATA Judgment.  Fed. R. Civ. P. 5(a)(2).

        /s/ Tony Korvick
        TONY KORVICK
        (Florida Bar No. 768405)
        (Admitted Pro Hac Vice DE 3)
        Attorneys for Plaintiffs
        PORTER & KORVICK, P.A.
        9655 South Dixie Highway Suite 208
        Miami, Florida 33156
        Telephone:    (305) 373-5040
        Fax:        (305) 668-9154
        tkorvick@porterandkorvick.com