**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEITH STANSELL,  et al.

      Plaintiffs,

      v.

REVOLUTIONARY ARMED
FORCES OF COLOMBIA (FARC); et al.,      CASE NO.: 1:16-mc-00405-LGS-SN
      Judge Lorna G. Schofield
      Defendants,      Magistrate Judge Sarah Netburn

      v.

CITIBANK, N.A.,

      Turnover Respondent/Garnishee.
_____/

CITIBANK, N.A.,

      Third-Party Plaintiff,

      v.

KEITH STANSELL et al.;
OLIVIA PESCATORE et al.;
ANTONIO CABALLERO;
VENEZUELA MINISTRY OF FINANCE (aka MINISTERIO
DEL PODER POPULAR DE ECONOMIA Y FINANZAS);

      Adverse Claimants.
_____/

**Plaintiffs' Joint Answer and Affirmative Defenses to**
**Amended Third-Party Complaint and Crossclaim Against Antonio Caballero**

The Stansell and Pescatore Anti-Terrorism Act Judgment Creditors file this Amended Joint

Answer and Affirmative Defenses to Citibank, N.A.'s ("Citibank") Amended Third-Party

Complaint Seeking Relief in the Nature of Interpleader (Dkt. No. 280), and Crossclaim against

Antonio Caballero, in compliance with this Court's April 16, 2021 Order Dkt. No. 214 that filings of the interpleader complaints be made only in the *Stansell* matter.

## **ANSWER**

1.        Admitted that CITIBANK is a banking institution subject to the jurisdiction of this Court.  Admitted that CITIBANK is holding assets blocked by the Dept. of the Treasury's Office of Foreign Assets Control ("OFAC") that are owned by VENEZUELA MINISTRY OF FINANCE.   The Stansell and Pescatore Plaintiffs have established clear judgment lien priority over the blocked account being held by CITIBANK.

2.        Admitted.

3.        Admitted that the interpleader is necessary to join Antonio Caballero, even though the Stansell and Pescatores have clear judgment lien priority over Mr. Caballero's claim.  Denied that the "Account Holders" are necessary parties because they have been determined to be an agency or instrumentality of the FARC after a review of substantial evidence.  The Account Holders were provided statutory notice of the Stansell and Pescatore levies [*Stansell* Dkt. No. 247; *Pescatore* Dkt. No. 113] and turnover motions, failed to appear, and are in default.  *Stansell* Dkt. Nos. 197-198; *Pescatore* Dkt. Nos. 103-104.  Denied that NYBL §134 or NY CPLR §1006 and §5239 apply in a federal interpleader action governed by 28 U.S.C. §1335 and Fed. R. Civ. P. 22.

4.        Admitted.

5.        Admitted.

6.        Admitted.

7.        Admitted.

8.        Admitted.  Denied that Mr. Caballero holds a valid ATA judgment.

9.        Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted that the Stansell and Pescatore plaintiffs' have attached both of the referenced blocked accounts.

13.     Admitted that the Stansell and Pescatore judgment execution liens [on both of the referenced blocked accounts] were created under New York law on February 9, 2021 when the writ was delivered to the court appointed process server, and then perfected on February 12, 2021 when it was served on Citibank. *Stansell* Dkt. No. 247; *Pescatore* Dkt. No. 113. Citibank has not alleged the date when the Caballero WDNY writ or the SDNY was served.  Assuming that Caballero's WDNY writ was served prior to February 9, 2021, then the Stansell and Pecatores still have judgment lien priority vis-à-vis Mr. Caballero because his judgment is void for lack of subject matter and for lack of personal jurisdiction over the Defendant FARC as set forth in the Affirmative Defenses and Crossclaim below.

14.     Denied that Plaintiffs have alleged that the Ministry of Finance is an agency or instrumentality of Venezuela.  Plaintiffs allege that the Ministry of Finance is an "agency or instrumentality of a terrorist party"—the FARC—under TRIA which applies to terrorists, terrorist organizations and state sponsors of terrorism.  Under TRIA, the blocked assets of the Ministry of Finance are not immune from attachment or execution under TRIA.

15.     Unable to admit or deny.

16.     The states of residence alleged of the Stansell plaintiffs is DENIED.  Admitted that they hold a judgment against the FARC and seek to execute under TRIA.

17.     The states of residence alleged of the Pescatore plaintiffs are partially denied. Several of the Pescatore plaintiffs are no longer residents in one of the listed states. Admitted that they hold a judgment against the FARC and seek to execute under TRIA.

18.     Admitted, but denied that intervention is necessary now that Mr. Caballero has been joined as an interpleader third-party defendant.

19.     Unable to admit or deny.  Admitted that the Ministry of Finance is an agency or instrumentality of the terrorist party FARC under TRIA.

20.     Denied.

21.     Admitted that the Ministry of Finance owns the subject blocked accounts.

22.     Denied that New York Banking Law Section 134(4) applies to OFAC blocked accounts, and to the extent it conflicts with Plaintiffs' right to TRIA executions it is preempted thereby.

23.     Admitted.

24.     Admitted.  Denied that NYBL §134 or NY CPLR §1006 and 5239 apply in a federal interpleader action governed by 28 U.S.C. §1335 and Fed. R. Civ. P. 22.

25.     Unable to admit or deny.

26.     Admitted that the Ministry of Finance has already failed to appear after being provided notice of levy and the turnover motions, and that they are now long in default for failure to appear.

27.     Admitted.

28.     Admitted.

## **AFFIRMATIVE DEFENSES**

29.     The Stansell and Pescatore plaintiffs have clear and absolute judgment execution lien priority via-a-vis Mr. Caballero.  *Stansell* Dkt. Nos. 247, 197-198; *Pescatore* Dkt. Nos. 113, 103-104.  The Stansell and Pescatore judgment execution liens were perfected under New York law on February 9, 2021.    It appears that Mr. Caballero was issued a writ of execution upon Citibank, N.A. for the blocked assets of Venezuelan Ministry of Finance on January 29, 2021.  *See Caballero v. FARC*, W.D.N.Y. Case No. 1:20-mc- 00040-LJV.   The docket reflects a service return upon Citibank on February 3, 2021.  *Id*., Dkt. No. 46-1 at 2.  Nevertheless, the Stansell and Pescatore plaintiffs' have judgment lien priority because Mr. Caballero's judgment is void for the reasons set forth in ¶¶ 31-33 and Plaintiffs' Crossclaim against Mr. Caballero.

30.     The Venezuelan Ministry of Finance is an "agency or instrumentality of a terrorist party"—the FARC—under TRIA which applies to terrorists, terrorist organizations and state sponsors of terrorism.  Accordingly, its blocked assets in the United States are not immune from attachment under the Foreign Sovereign Immunities Act ("FSIA").

31.     Antonio Caballero's Florida Anti-Terrorism Act ("ATA") judgment is void in its entirety for lack of subject matter jurisdiction because neither Mr. Caballero or his father was a U.S. national at the time of the terrorist acts, nor did the terrorist acts cause any injury to the person, property or business of a U.S. national as required by 18 U.S.C. §2333(a).  *See Doe v. Tapang*, 2019 WL 3576995, *6 (N.D. Cal. Aug. 6, 2019), aff'd, 834 F. App'x 399 (9th Cir. 2021) ("Furthermore, plaintiffs lack standing to sue in representative capacities on behalf of the estates of their loved ones because their family members were not United States nationals. The ATA states that any 'national of the United States injured in his person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue'—thus, because the

decedents were not U.S. nationals, their estates lack standing to sue the ATA.[1] 18 U.S.C. § 2333.").  The Florida district court that entered Mr. Caballero's ATA judgment noted that "courts have held that U.S. nationals can state a claim under the ATA for the death of non-U.S. national family members." *Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2020 WL 7481302, at *3 (S.D. Fla. May 20, 2020).  However, the cases cited as supporting authorities therein all involved a claimant/heir who was a U.S. national at the time of the attack, even though the victims were foreign nationals.   Here, neither the claimant/heir or the victim/decedent was a U.S. national "injured in his or person, property or business."

32.     In the alternative, Antonio Caballero's Florida ATA judgment is void in part, and has now been fully satisfied.  The ATA expressly provides:

> (a)Action and Jurisdiction.—
> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. §2333(a) (emphasis added).   Although Mr. Caballero's father was "injured in his person"—kidnapped for ransom and then murdered—he was never a U.S. national, and his son Plaintiff Caballero cannot "sue therefor."

Plaintiff Caballero did allege economic business losses that he personally sustained in 1999 in Colombia.  Assuming, arguendo, that 15 years later when he became a U.S. national those economic damages became recoverable under the ATA, at best Plaintiff Caballero was only injured in his "property or business," and that's the most he can sue for.  The Florida district court gave full faith and credit to the state court damages award for the economic losses for the son's loss of his business when he left for the U.S., which included $1,729,667.00 "for actual compensatory, economic damages", which was trebled to $5,189,001.00.  Plaintiff Caballero is

already satisfied because he has collected more than $10 million.  The $45 million award for "non-economic damages" is not recoverable where no U.S. national was ever "injured in his or person."

33.     Antonio Caballero's Florida ATA judgment is also void for lack of general and specific personal jurisdiction over the Defendant FARC.  The FARC remains a designated Foreign Terrorist Organization ("FTO") and has always been "at home" in Colombia trying to overthrow the Colombian government, and it has never been essentially "at home" in the United States.  Mr. Caballero's father was not targeted as an American; he was a Colombian kidnapped for ransom and murdered in Colombia by an FTO in Colombia.  There were no ransom demands or proofs of life or prisoner exchange demands that were ever sent into the United States for Mr. Caballero.  Mr. Caballero's death did not "arise from or relate to" any of the FARC's in forum conduct in Florida or the U.S., and there is insufficient nexus to support specific personal jurisdiction.  Moreover, the FARC never purposefully availed itself of the privileges and protections of Florida or U.S. law by partnering with other cartels to traffick cocaine here to the United States, and, therefore, any such narcotics activity did not cause the FARC to reasonably anticipate being haled into a U.S. court for the kidnapping for ransom and murder of a Colombian national in Colombia.  This affirmative defense is addressed more fully in the crossclaim below.

34.     The Stansell and Pescatore Judgment Creditors did not expressly acknowledge the validity of Caballero's judgment, nor did they waive their rights to challenge Caballero's judgment as void for lack of subject matter jurisdiction or personal jurisdiction, by settling the separate interpleader action in *Wells Fargo Bank v. Caballero et al*, S.D.F.L. Case No. 20-cv-20868-CMA.  That interpleader involved a blocked Kingpin account held by Wells Fargo Bank, N.A. in the name of Honduran Kingpin Banco Continental, S.A.  The account was also claimed by the OFAC licensed Honduran government appointed bank liquidator, Banco de los Trabajadores S.A. de C.V.

("BanTrab").   The settlement agreement in that interpleader between competing claimants BanTrab, Caballero, and Stansell/Pescatores specifically stated that: "**Nothing herein shall be deemed an admission by, or used against, any party with regard to any position taken in any litigation or proceeding.**"   *See In Re: Banco Continental, S.A.*, S.D.F.L. Bankruptcy Court Case No. 20-10917, Dkt. No. 177 at ECF 7, ¶ 7.

## CROSSCLAIM AGAINST ANTONIO CABALLERO
## INTRODUCTION

1.      In resolving this or any of the seven pending interpleader actions before this Court, the Court need not reach the issue of whether the ATA Judgment that was entered in favor of Interpleader Defendant Antonio Caballero is valid.  The reason why this Court need not reach that issue is that even assuming, *arguendo*, that his Judgment is valid, the Stansell and Pescatore Interpleader Defendants have established clear judgment execution lien priority over Mr. Caballero's claim on each and every garnishee and account.[1]  The Stansell and Pescatore Interpleader Defendants both have valid ATA Judgments, and both sets of victim families have clear chronological judgment execution lien priority over any possible claim by Mr. Caballero. Thus, although the invalidity of Caballero's judgement is detailed below, it need not be decided by the Court.

2.      Nevertheless, if Mr. Caballero had chronological lien priority over the Stansell and Pescatore families—which he does not—his Florida default judgments are void and/or unenforceable here because the Florida courts that entered them lacked general or specific personal jurisdiction over the FARC.  Thus, any claim he may assert in this interpleader cannot prevail.

---

[1]      With the sole possible exception of the blocked accounts held by Citibank, N.A. for the Venezuelan Ministry of Finance which are at issue here.

3.      Before addressing why Mr. Caballero's Judgement is invalid, it is important to emphasize that that we do not view Mr. Caballero as our adversary.  As victims of FARC terrorism, we view any family that has suffered from FARC violence essentially as our brothers and sisters in grief.  "We are not enemies, but friends." A. Lincoln, First Inaugural Address, Mar. 4, 1861.  With that in mind, the Stansell Plaintiffs and the Pescatores were able to reach a Joint Prosecution and Sharing Agreement with one another, enabling the families to work collaboratively for Justice, and not at cross-currents.  We wish that similar efforts regarding Mr. Caballero had borne fruit.

4.      Be that as it may, Mr. Caballero simply never qualified to collect under the Anti-Terrorism Act.  At the time the FARC kidnapped his father for ransom in Colombia, and then murdered him when the ransom was not paid, he had essentially no nexus to the United States— he was not then an American citizen; he had not then applied for American citizenship; and he was not targeted *as an American* by the FARC.  Put simply, at the time of his murder by the FARC, Mr. Caballero was a Colombian national residing in Colombia—just like, tragically, tens of thousands of other victims of FARC violence against Colombians.  At least 15 years after his father's death in 1999, Mr. Caballero's son acquired U.S. citizenship and promptly filed his ATA action in 2019, seeking compensation in the American justice system for his father's murder by the FARC, even though he already held a 2014 Florida state court default against the FARC for over $146 million.

5.      As explained *infra*, that scenario does not fall under the ambit of the Anti-Terrorism Act.  Under its express language, and as the legislative history confirms, the ATA was designed to protect Americans *qua Americans—i.e.*, those who were targeted by terrorists specifically *because*

*they are Americans*.  The Stansell and Pescatore victims squarely fall into that category.  Mr. Caballero and his deceased father (who was never a U.S. national) squarely do not.

6.      Thus, while Stansell and Pescatore families are sympathetic to the Caballero family for the tragic loss of their father, their efforts here—and in other courts in the American justice system—to gain compensation under the ATA (and the Terrorism Risk Insurance Act of 2002, which helps enable collections under the ATA) should not be viewed as legitimate.  Indeed, Caballero's efforts here are directly at odds with—rather than in furtherance of—Congress' objectives when it enacted the ATA, namely, to compensate Americans who were targeted because they were Americans, and to deter terrorists who specifically target Americans.  Every dollar that the Caballero family collects under their invalid ATA judgment—and at present, they have collected approximately over $10 million—is a dollar drawn from a limited pool of assets that rightfully should have gone to American victims holding proper ATA judgments.

7.      Accordingly, the Stansell and Pescatore families jumped through all the proper hoops and are proper ATA judgment holders.  But Mr. Caballero is not.  The following explains in greater detail why the law dictates Mr. Caballero's ATA Judgment be set aside as invalid.

### *Antonio Caballero's judgment is invalid & can be collaterally attacked*

8.      Caballero's Florida default judgments are void and/or unenforceable here, because the Florida courts that entered them lacked general or specific personal jurisdiction over the FARC. Unlike, for example, the hostage taking, torture, and murder of the *Stansell* and *Pescatore* plaintiffs—who were specifically targeted because they were Americans—the murder of Caballero's father (Antonio Caballero, Sr.) had no nexus to the United States.  Any connection at all was (at best) a mere fortuity, triggered by when—*more than 15 years after the murder*—the victim's son (Antonio Caballero, Jr.), became an American citizen, and then filed suit as an

10

American against the FARC.  The district court that entered the Caballero Anti-Terrorism Act judgment in 2020—which Caballero now seeks to enforce here before this Court—never mentioned the issue of personal jurisdiction over the Defendant FARC in its Order entering default judgment, or any prior Orders. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2020 WL 7481302 (S.D. Fla. May 20, 2020). Nor did Caballero ever even address the issue of personal jurisdiction in his motion for default judgment against the FARC.

9.     At the time the FARC kidnapped and then murdered Antonio Caballero, Sr. in 1999, Caballero Sr. and Caballero Jr. were both Colombian nationals, not Americans; neither resided at the time in America; neither had applied for American citizenship; and neither was targeted *as an American* by the FARC.  Put simply, at the time of his kidnap and murder by the FARC, Caballero Sr. was simply a Colombian national residing in Colombia—just like, tragically, tens of thousands of other victims of FARC violence against Colombians.

10.     In 2012—some 13 years after his father's death—Caballero Jr. filed a Florida state court lawsuit under the Alien Tort Statute, Civil RICO, and state law claims.  At the time he filed that suit, Caballero Jr. was *still* not an American citizen. Then, sometime between 2012 and 2018, Caballero Jr. acquired U.S. citizenship and filed his ATA action, seeking compensation for his father's murder by the FARC.  As detailed below, the law dictates Caballero's ATA Judgment be set aside as invalid.

A.     STATEMENT OF FACTS

1.     Caballero's 2014 Florida state court alien national judgment

11.     Caballero filed his initial Compliant against the FARC in Florida state court in 2012.  *Antonio Caballero vs. Fuerzas Armadas Revolucionarios de Colombia aka FARC-EP and Ejercito Liberacion Nacional aka ELN*, Miami-Dade Circuit Case No. 12-48803-CA-02.  In 2013,

Caballero filed his Corrected Second Amended Complaint adding FARC trafficking partner the Norte del Valle Cartel (NVC) as a Defendant.  *See* Dkt. No. 250, Appendix Exhibit No. 1, Caballero 2nd Amended Complaint.  This was the operative Complaint upon which the Florida state court ultimately entered its default judgment in 2014.

12.     Caballero's state court Complaint alleged jurisdiction over claims arising from his father's kidnapping and murder in Colombia in 1999.  The Complaint asserted:

> 12. This action is brought pursuant to the Alien Tort Statute ("ATS") 28 U.S.C. § 1350 (as a federal question subject to non-exclusive concurrent jurisdiction), the Civil Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. §§ 1961-1968 (as a federal question subject to non-exclusive concurrent jurisdiction), Colombia law (via Florida's "significant relationship" test), and Florida law (via Florida's long arm statute).

Dkt. No. 250, Ex. 1 at p. 4.  Caballero alleged that federal courts had non-exclusive jurisdiction over the ATS and RICO claims, and that the state court had concurrent jurisdiction over those claims.  *Id*. at 5.

13.      Although Caballero was able to disguise his Colombian law claim with improper ATS and RICO claims, this Court need not address the merits of his ATS or RICO claims because <u>all</u> of Caballero's claims fail for lack of personal jurisdiction over the FARC.

14.     Caballero's state court Complaint alleged the following facts:

> 59. At all times relevant to this Complaint, the Victim was a resident and citizen of Colombia.

> 69. The Victim remained in the custody of FARC and ELN forces who were working in conjunction to conspire and profit from kidnapping the Victim.

> 70. At the time of the Victim's kidnapping, Plaintiff, the Victim's son, was living in Barranquilla, Colombia.

> 72. The Victim was unlawfully detained and held captive for 184 days, over 6 months.

74. Throughout his captivity, the Plaintiff's family was contacted regularly by Defendants in an ongoing effort to compel them to pay a ransom for the Victim's safety and freedom. FARC and ELN forces demanded six million dollars ($6 Million) to secure the Victim's safety and release.

75. The Colombian government froze the assets of the Plaintiff's family upon hearing of the Victim's kidnapping.

79. Tragically, after six months of captivity and torture, Defendants assassinated the Victim by shooting him multiple times.

80. On August 15, 1999, the Victim's emaciated body was found discarded on a dirt road between the provinces of Magdalena and Cesar and brought to Valedupar, Cesar, where his body was eventually identified and confirmed as the Victim.

81 . At all times relevant to this Complaint, Defendants and others, acted directly and in concert through aiding and abetting and a conspiracy, to effect the kidnapping, unlawful detention, hostage-taking, trafficking, torture, and killing of the Victim.

82. The Victim was targeted because of his political affiliations, official anti-narcotics positions, and as a source of potential ransom funds to finance the Defendants' terrorist activities and criminal enterprises, including the Defendants' extensive narco-trafficking operations.  Additionally, the Victim's properties contained roads and paths through which processed drugs manufactured by the NDVC with product and chemicals supplied by FARC and ELN were transported through and that were used to facilitate drug trafficking logistics and transportation from production and cultivation centers in the southern areas of Colombia to ports on the Caribbean coast of Colombia and on to the United States.

*Id*. at pp. 14-18.

15.     The Complaint clearly shows that the FARC did not expressly aim their conduct at any U.S. national, nor was the kidnapping and murder of the Victim a direct "but for" result of any FARC tort committed in Florida or the United States, nor did the kidnapping for ransom and murder in any way relate to the FARC's cocaine export activities in the forum.  It is beyond dispute that the Victim and his son were Colombian nationals residing in Colombia; therefore, they were not targeted by the FARC as Americans.

16.     The Florida state court default judgment incorporated jurisdictional findings from

its prior default summary judgment order, including:

> The Court has specific jurisdiction over Defendants pursuant to Fla. Stat.
> 48.193(1)(a)(1) and 48.l93(1)(a)(6).[5] FARC, ELN and NDVC have individually
> and in concert engaged in narcotics manufacturing and trafficking of cocaine
> destined for Florida and the United States, shipped from Caribbean ports in
> Colombia into the United States primary through Florida.[6] At all times relevant to
> the Complaint, FARC, ELN and NDVC have been involved in narcotics production
> and trafficking.[7] Defendants' acts against Plaintiff and his father set forth in the
> Finding of Fact were a component part of Defendants' trafficking of illegal drugs
> into Florida and the United States. Florida is a primary point of entry and target
> market for Colombia's cocaine trafficking, including narcotics produced and
> trafficked by Defendants.[8] Consequently, Defendants were operating, conducting,
> engaging in, or carrying the business of narcotrafficking for distribution in Florida
> within the definition of Fla. Stat. §48.l93(1)(a)(1). In addition, Defendants have
> also caused injury to Florida persons arising out of the cocaine manufactured and
> narco-trafficked by Defendants which is being consumed within Florida.[9]

> Thus, personal jurisdiction over the defendants is also established pursuant to Fla.
> Stat. § 48.193(1)(a)(6).  Moreover, Defendants' narco-trafficking of illegal drugs
> into the United States were substantial, ongoing, and systematic and thus provide a
> basis for general jurisdiction under Fla. Stat. § 48.193(2). Because of Defendants'
> continuous narco-trafficking activities in furtherance of the  movement of illegal
> drugs into Florida and the harm that has caused to citizens of this State and Nation,
> this Court has both "specific" and "general" jurisdiction over Defendants.[10]

Dkt. No. 250, App. Ex. No. 2, Summary Judgment Order at 22-23.[2]  (Also reported as *Caballero*

*v. Fuerzas Armadas Revolucionarias de Colombia*, 2014 Fla. Cir. LEXIS 51243, *31-33 (Fla.

Cir. 2014)).

### 2.     Caballero's 2020 SDFL ATA judgment

17.     On December 19, 2018, Antonio Caballero—already holding a 2014 state court

judgment for over $146 million—filed a new lawsuit under the ATA alleging that he had become,

---

[2]      The state court relied heavily on the testimony of former University of Miami Professor Bruce
Bagley, who was convicted in 2020 on federal money laundering charges. *See* U.S. Dept. of Justice Press
Release, *Professor Of International Studies Pleads Guilty To Money Laundering* (Jun. 1, 2020),
https://www.justice.gov/usao-sdny/pr/professor-international-studies-pleads-guilty-money-laundering.  No
federal court has ever reviewed Caballero's erroneous jurisdictional findings.  A Florida appellate court did
decide an appeal in Caballero's favor, but on issues wholly unrelated to personal jurisdiction.

19 years after his father's death, a U.S. national.  Caballero's ATA Complaint alleged the following

as the basis for personal jurisdiction over the Defendant FARC:

> 10. This Court has personal jurisdiction over the Defendants pursuant to Florida
> Statute § 48.193, because the Defendants, through their agents and representatives,
> transacted business in this State and caused injury in this State, by their criminal
> activity and operations trafficking millions of dollars of illicit drugs into Florida
> and the United States for distribution throughout the United States. (FJ, ¶¶ 2, 3, 27,
> 41, 42.) As found by the State Court, Defendants kidnapping and eventual
> assassination of Ambassador Caballero was a necessary component part of the
> Defendants' overall criminal activity and scheme to traffic illicit drugs into South
> Florida and the United States for their profit and gain. (FJ, ¶ 27.) Defendants'
> actions against the Ambassador and Antonio Caballero were inextricably
> intertwined with, and a necessary component of, Defendants' trafficking of illegal
> drugs into and throughout South Florida and the United States for their profit and
> gain. *Id.*

*Caballero v FARC*, SDFL Case No. Case 1:18-cv-25337-KMM, DE 1 at 4-5.

   18.   The Complaint also alleged that Caballero had obtained a prior Florida state court

judgment that was res judicata and entitled to full faith and credit pursuant to 28 U.S.C. § 1738.

Dkt. No. 250, App. Ex. No. 15 (Complaint at 4).  The Complaint further ***falsely*** alleged that:

> The Final Judgment was collaterally attacked in post-judgment garnishment
> proceedings, which included attacks as to both the Florida Court's personal
> jurisdiction <u>over the Defendants</u> and the Florida Court's subject matter jurisdiction.
> The attacks on the Final Judgment were rejected by the trial court, which also
> entered a turnover judgment. The trial court's rulings were affirmed (per curiam)
> on appeal by the Florida Third District Court of Appeal. For purposes of a full faith
> and credit analysis, "[i]t has long been the rule that principles res judicata apply to
> jurisdictional determinations -- both subject matter and personal." Thus, "'a
> judgment is entitled to full faith and credit -- even as to questions of jurisdiction --
> when the second court's inquiry discloses that those questions have been fully and
> fairly litigated and finally decided in the court which rendered the original
> judgment.'" *Weininger v. Castro*, 462 F. Supp. 2d 457, 472 (S.D.N.Y. 2006)
> (citations omitted). The Final Judgment was also domesticated in the District Court
> of Utah, case number 2:17-cv-00315-PMW.

*Id.*, SDFL Complaint at 4 n.1 (emphasis added).

   19.   However, Caballero apparently committed a fraud upon the Court by materially

misrepresenting the state court record to Judge Moore.  There was never a collateral attack on the

personal jurisdiction **over the Defendant FARC**, either in the state trial court or on appeal.  A non-party blocked account owner, Prodira Casa de Cambio, S.A. de C.V., did file a motion to dissolve a writ that challenged personal jurisdiction.  But Prodira's motion argued that *Prodira* was not subject to personal jurisdiction, and, therefore, its account could not be garnished.[3]  Prodira also filed a Motion to vacate the judgment arguing that Caballero's service of process on the FARC was defective,[4] but *Prodira never once asserted in any motion that the Defendant FARC was not subject to personal jurisdiction in the United States*.  *See* Dkt. No. 250, App. Ex. Nos. 4, 6, 7.

20.     The state court Omnibus Order rejecting all of Prodira's motions noted that Prodira's notice of general appearance stated that it was "without waiver to Prodira's other defenses including but not limited to the Court's lack of personal jurisdiction *over Prodira*."  Dkt. No. 250, App. Ex. No. 9 (Omnibus Order at 13) (emphasis added).  This is what Prodira referred to in its Appellant's Brief when it said "Prodira challenged personal jurisdiction" in the trial court.  *Prodira Casa de Cambio vs. Caballero*, 2016 WL 5870668, No. 3D16-0487 (Aug. 10, 2016 Appellant's Initial Brief).  The Appellant's Brief and Reply Brief on appeal never once challenged the court's personal jurisdiction over the Defendant FARC.  Dkt. No. 250, App. Ex. Nos. 11, 13. Caballero's own Appellee's Answer Brief clearly states that "Prodira filed its Motion to Dissolve by way of a 'special appearance' contesting the trial court's jurisdiction *over it*."  Dkt. No. 250, App. Ex. No. 12 (emphasis added).

---

[3]     Prodira also argued that its blocked Kingpin account was not subject to TRIA execution, but this argument was rejected based on the testimony of Bruce Bagley that the account was really owned by Los Zetas, an IEEPA Transcriminal Organization, and, therefore, the account should have been blocked under IEEPA.  Mr. Bagley is now in federal prison having plead guilty and been convicted on money laundering charges for Venezuelan nationals.

[4]     Caballero's opposition briefs in the state court argued that Prodira had no standing to challenge the validity of service of process on the FARC, which was a waivable defense personal to the Defendant FARC.

21.     Caballero's motion for default judgment against the FARC in the ATA action never once mentions the issue of personal jurisdiction over the FARC.  Dkt. No. 250, App. Ex. No. 16. The district court in entering the ATA judgment gave preclusive effect to the state court judgment's damages award, and the district court never once addressed the issue of the FARC's personal jurisdiction.[5]  *See* Dkt. No. 250,  App. Ex. No. 17, SDFL Order on Motion for Default Judgment, DE 62, at 7, which is reported as *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 1:18-CV-25337-KMM, 2020 WL 7481302 (S.D. Fla. May 20, 2020).

The Stansell and Pescatore Judgment Creditors did not expressly acknowledge the validity of Caballero's judgment, nor did they waive their rights to challenge Caballero's judgment as void for lack of subject matter jurisdiction or personal jurisdiction, by settling the separate interpleader action in *Wells Fargo Bank v. Caballero et al*, S.D.F.L. Case No. 20-cv-20868-CMA.   That interpleader involved a blocked Kingpin account held by Wells Fargo Bank, N.A. in the name of Honduran Kingpin Banco Continental, S.A.  The account was also claimed by the OFAC licensed Honduran government appointed bank liquidator, Banco de los Trabajadores S.A. de C.V. ("BanTrab").   The settlement agreement in that interpleader between competing claimants BanTrab, Caballero, and Stansell/Pescatores specifically stated that: "**Nothing herein shall be deemed an admission by, or used against, any party with regard to any position taken in any litigation or proceeding**."   *See In Re: Banco Continental, S.A*., S.D.F.L. Bankruptcy Court Case No. 20-10917, Dkt. No. 177 at ECF 7, ¶ 7 (emphasis added).

---

[5] *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) ("a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

## B.   LEGAL STANDARDS FOR PERSONAL JURISDICTION OVER A FOREIGN TERRORIST ORGANIZATION

### 1.   Legal standard for general jurisdiction

22.     The constitutional due process standard for determining general jurisdiction changed significantly with the Supreme Court's decisions in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011). In *Daimler*, the Court held that "approv[ing] the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business' ... [represents a] formulation [that is] unacceptably grasping." *Id*. at 761. Instead, *Daimler* reaffirmed the principle announced earlier in *Goodyear*: "[T]he inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense "continuous and systematic," it is whether that corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] **essentially at home in the forum State**." *Id*. at 761 (emphasis added) (quoting *Goodyear*, 564 U.S. at 919); *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1134 (Fla. 3d DCA 2018).   The Supreme Court in *Daimler* held that it is "the exceptional case" for a corporation to be "essentially at home" in a place other than its domicile. *Id*. at 139, n.19.   This "calls for an appraisal of the defendant's activities in their entirety"—nationwide and worldwide. *Id*. at 1559. A corporation operating in multiple forums could "scarcely be deemed at home in all of them." *Id*.

### 2.   Legal standard for exercising specific jurisdiction over non-resident defendant

23.     A court's specific jurisdiction is governed by the "effects test" articulated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). Specific jurisdiction based on a defendant's out-of-forum conduct requires that the defendant's "(1) intentional, tortious actions; (2) which were expressly aimed at the United States; (3) [caused] harm, the brunt of which is

suffered—and which the defendant knows is likely to be suffered—in the United States; and (4)

the injuries that are the subject of the litigation arise from or relate to defendant's subject conduct."

*In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 478-79 (S.D.N.Y. 2010) (*citing*

*Calder*, 465 U.S. at 789-90).

24.     The exercise of personal jurisdiction over any Defendant must comport with

principles of constitutional due process. *See Waldman v. PLO*, 835 F.3d 317, 343 (2d Cir. 2016);

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007). Each Defendant must have "sufficient

minimum contacts with the forum to justify the court's exercise of personal jurisdiction," and the

exercise of personal jurisdiction must "comport[] with 'traditional notions of fair play and

substantial justice' under the circumstances." *Waldman*, 835 F.3d at 331 (quoting *Daimler AG*,

571 U.S. at 126-27).

25.     To exercise *specific* personal jurisdiction consistent with due process, the Court

must examine "the relationship among the defendant, the forum, and the litigation." *Walden v.*

*Fior*e, 571 U.S. 277, 283-84 (2014) (citations omitted); *In re del Valle Ruiz*, 2019 WL 4924395

(2d Cir. Oct. 7, 2019).  *First*, "the defendant must have purposefully availed itself of the privilege

of conducting activities within the forum State or have purposefully directed its conduct into the

forum State." *U.S. Bank N.A. v. Bank of Am. N.A.* ("*U.S. Bank*"), 916 F.3d 143, 150 (2d Cir. 2019)

(quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1785 (2017).

*Second*, "the plaintiff's claim must arise out of or relate to the defendant's forum conduct." *U.S.*

*Bank*, 916 F.3d at 150 (*quoting Bristol-Myers Squibb*, 137 S. Ct. at 1786). The allegations in the

Caballero Complaint must establish that the FARC's' "suit-related conduct"—*i.e.*, "conduct that

could have subjected them to liability under the ATA" (the kidnapping for ransom and murder in

Colombia)—created a "substantial connection" with the United States. *Waldman*, 835 F.3d at 335

(quoting *Walden*, 571 U.S. at 284).

26.     The exercise of specific jurisdiction depends on in-state activity that '*gave rise to*

*the episode-in-suit*.'" *Waldman*, 835 F.3d at 331 (quoting *Goodyear Dunlop Tires Operations,*

*S.A.*, 564 U.S. at 923 (emphasis in original)). As the Second Circuit has held, "[w]here the

defendant has had only limited contacts with the [forum]," it is appropriate to require proximate

causation—not merely "but-for" causation—for personal jurisdiction. *SPV OSUS, Ltd. v. UBS AG*,

882 F.3d 333, 344 (2d Cir. 2018); *see also Waldman*, 835 F.3d at 343 (explaining that personal

jurisdiction over the defendant in *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305

F.3d 120 (2d Cir. 2002), was proper because the plaintiff hired the defendant "as a result of"

defendant's in-forum activities).

27.     The United States Supreme Court has recently clarified the standard for specific

personal jurisdiction in motor vehicle product liability actions where vehicles designed,

manufactured and sold by Ford in other states years later caused injuries to Montana residents.

*Ford Motor Co. v Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021).  The Court held that:

> our most common formulation of the rule demands that the suit "arise out of *or relate* to the
> defendant's contacts with the forum." . . .  The first half of that standard asks about
> causation; but the back half, after the "or," contemplates that some relationships will support
> jurisdiction without a causal showing. That does not mean anything goes. In the sphere of
> specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately
> protect defendants foreign to a forum.

*Id*. at 1026.

### 3.   Legal standard for specific jurisdiction under Florida's long arm statute

28.     Florida's long-arm statute allows for personal jurisdiction over a non-resident

defendant who commits an out of state tort "so long as the effect of the tort causes harm within the

state." *XN Fin. Services, Inc. v. Conroy*, 12-80143-CIV, 2012 WL 12873512, at *4 (S.D. Fla. Mar.

5, 2012) (*citing Posner v. Essex Ins. Co., Ltd*., 178 F.3d 1209, 1216–17 (11th Cir. 1999)).  Courts within Florida have "specific" personal jurisdiction for any cause of action "arising from" the activities within the state. Although the term "arising from" is broad, under Florida law there must nevertheless be some " 'direct affiliation,' 'nexus,' or 'substantial connection' " between the cause of action and the activities within the state,  *Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman*, 635 So. 2d 79, 81 (Fla. 1st DCA 1994). This nexus requirement is often described as "connexity," and must be met before specific jurisdiction will attach under this subsection.  *Bloom v. A.H. Pond Co., Inc*., 519 F. Supp. 1162, 1168 (S.D. Fla. 1981).

29.     A Court must determine whether a plaintiff's claim arises out of or relates to one of Defendants' contacts with Florida.  *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) (*citing Oldfield v. Pueblo De Bahia Lora, S.A.,* 558 F.3d 1210, 1222 (11th Cir. 2009)).  Courts must "look to the 'affiliation between the forum and the underlying controversy,' focusing on any 'activity or ... occurrence that [took] place in the forum State.'"  *Waite v. All Acquisition Corp*., 901 F.3d 1307, 1314 (11th Cir. 2018), *cert. denied sub nom. Waite v. Union Carbide Corp*., 139 S. Ct. 1384, 203 L. Ed. 2d 611 (2019) (*quoting  Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017). In the absence of such a connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id*. at 1781. In the Eleventh Circuit, a tort arises out of or relates to the defendant's activity in a state only if the activity is a "but-for" cause of the tort.  *Waite*, 901 F.3d at 1314 (*citing  Oldfield*, 558 F.3d at 1222–23).  *See Natl. Indus. Sand Ass'n v Gibson*, 897 SW2d 769, 776 (Tex 1995), *citing Calder*, 465 U.S. at 789, 104 S. Ct. at 1486, (jurisdiction based upon the effects of extra-territorial conduct within a particular forum is proper only when the extra-territorial conduct focuses upon a plaintiff residing in that forum).

**C.     THE VALIDITY OF CABALLERO'S JUDGMENT IS NOW DIRECTLY AT ISSUE IN THIS INTERPLEADER ACTION AND IS SUBJECT TO COLLATERAL ATTACK IN THIS COURT**

30.     "[T]here can be little doubt that if the judgment is void...a collateral attack upon the void judgment may be made <u>in any proceeding in any court where the validity of the judgment comes in issue</u>." *Collins v. Foreman*, 729 F.2d 108, 111 (2d Cir. 1984) (emphasis added, citation omitted); 12 Moore's Federal Practice—Civil § 60.44[1][b] (2017 ed.).  As a void judgment is a legal nullity, it may be challenged not only directly but also by collateral attack in a proceeding in any court where that judgment's validity comes in issue.  *Graciette v. Star Guidance, Inc.*, 66 F.R.D. 424, 426 n.1 (S.D.N.Y. 1975) *citing Pennoyer v. Neff*, 95 U.S. 714 (1877) (collateral attacks are permitted against default judgments that are void for a lack of personal jurisdiction); J. Moore, 7 Federal Practice ¶60.25[1].   "If the Court rendering the challenged judgment never had jurisdiction over the person of the defendant or the res of the action, any such judgment is void and, therefore, subject to collateral attack. That attack may be made in any proceeding in any Court where the validity of the judgment comes in issue." *Sheiner v. City of New York*, 611 F. Supp. 172, 175 (E.D.N.Y.1985); 16 Coquillette, Moore's Federal Practice, § 108.03[2] at 108–16 (3rd ed. 1998).  *See also Reefer Tek LLC v El Dorado Trailer Leasing, LLC*, 17 CIV. 1809 (ER), 2019 WL 5727315, at *3 (S.D.N.Y. Nov. 5, 2019) ("[V]oidness of a judgment for lack of personal jurisdiction can be asserted on a collateral challenge after entry of a default judgment." *"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123 (2d Cir. 2008) ("voidness of a judgment for lack of personal jurisdiction can be asserted on a collateral challenge after entry of a default judgment"); *In re Choez*, No. 15 Bk. 45404 (ESS), 2017 WL 5604109, at *6 (E.D.N.Y. Nov. 20, 2017) ("[P]recedent exists supporting the proposition that Rule 60(b)(4) may be invoked in the registration court to obtain relief from a foreign default judgment attacked as void for lack of

personal jurisdiction over the parties against whom it was rendered." (*quoting Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 734 (2d Cir. 1980).").

## D.   NO PRECLUSIVE EFFECT SHOULD BE AFFORDED TO CABALLERO'S DEFAULT JUDGMENTS WHERE THE ISSUES WERE NEVER FULLY AND FAIRLY LITIGATED

31.   "A judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." *Underwriters Nat'l Assurance Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) (*quoting Durfee v. Duke*, 375 U.S. 106, 110 (1963)). "Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." *Id.* at 705; *see also Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment." (footnote omitted)).

32.   Jurisdictional findings made as part of a default judgment rendered without an appearance by the defendant are not entitled to preclusive effect. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) (jurisdictional determinations made in a Florida state court default judgment are not entitled to res judicata effect if the defendant did not "actually appear[ ]" in the proceedings); *American Steel Bldg. Co. v. Davidson & Richardson Constr. Co.*, 847 F.2d 1519, 1521 (11th Cir. 1988) ("[W]here the defendant does not appear, and judgment is by default, the state court judgment does not preclude the federal court from reviewing the jurisdictional issues.").

33.     In *Martinez v Republic of Cuba*, 221 F. Supp. 3d 276 (N.D.N.Y. 2016), Judge Kahn

of the Northern District of New York voided a Florida default judgment against Cuba on subject

matter jurisdiction grounds, emphasizing that such ruling protects the legal rights of victims who

actually possess a valid judgment:

> The Court emphasizes that, in denying enforcement of Martinez's default judgment,
> it is not acting to protect assets of the Cuban government against plaintiffs who
> have claims to them. Indeed, <u>enforcing Martinez's jurisdictionally defective
> judgment would reduce the pool of such assets available to plaintiffs who have
> suffered wrongs at the hands of the Cuban government that are cognizable under
> the FSIA</u>. While the Court recognizes the efforts of the Florida state court to afford
> Martinez a remedy for the grievous harm inflicted on her by Roque and the Cuban
> government, the Court is simply unable to give legal redress for her sad and difficult
> plight.

*Martinez*, 221 F. Supp. 3d at 289 (emphasis added).  Here, Caballero again seeks to improperly

reduce the pool of blocked assets available to the sixteen Stansell and Pescatore FARC victims

who—unlike Caballero—were all U.S. nationals at the time of their attacks and were specifically

targeted as American citizens.

34.     In 2019, the Second Circuit reversed three SDNY TRIA turnover orders seeking to

enforce U.S. national terrorism victims' Florida state court default judgments against Cuba

because of a lack of subject matter jurisdiction.  The court expressly allowed the jurisdictional

challenge "as a defense to Petitioners' enforcement action."  *Vera v Banco Bilbao Vizcaya

Argentaria, S.A.*, 946 F.3d 120, 135 (2d Cir 2019), *cert denied sub nom. Fuller v Banco Bilbao

Vizcaya Argentaria, S.A.*, 141 S. Ct. 364 (2020).  The *Vera* Court held:

> "…[w]e need not consider a collateral attack on the Florida judgment [because]
> BBVA's principal argument … is that the District Court lacked subject-matter
> jurisdiction." 867 F.3d at 320 n.9 (emphasis in original). Moreover, as described
> above, a district court may consider its jurisdiction when suggested by any party,
> "even if there is no reason to confer a special right of 'third-party standing' on
> that party." *Walters*, 651 F.3d at 293.

*Id*. at 135, n. 20.  The Court held that the Florida state court jurisdictional findings did not bar the District Court from considering the jurisdictional question anew, nor relieve it of its obligation to assure itself of its own jurisdiction, whether upon motion or sua sponte.  *Id.*

35.     The *Vera* Court also held that "a finding of jurisdiction is preclusive only when the jurisdictional issues "have been fully and fairly litigated ... in the court which rendered the original judgment."  *Id*. at 135-36, citing *Durfee v. Duke*, 375 U.S. 106, 111 (1963).  "Cuba's failure to appear meant that, although the Florida courts heard relevant evidence, 'the jurisdictional facts necessary to eliminate Cuba's sovereign immunity under the FSIA were not fully and fairly litigated' in the Florida actions. . . . The Florida state courts' jurisdictional conclusions could therefore 'neither bind the District Court ... nor ... be relied on by the parties.'" *Id. See also Jerez v. Republic of Cuba*, 775 F.3d 419, 422–23 (D.C. Cir. 2014) (refusing to accord res judicata effect to similar Florida state default judgment entered against Cuba).  Here, no Defendant ever appeared in either of Caballero's state or federal court cases, and the relevant controlling authorities were never provided to either court.[6]  Thus, as the D.C. Circuit held in an ATA default judgment case against Hezbollah, the defendants' "absence imposed an independent obligation on the district court to satisfy itself of its personal jurisdiction before entering a default judgment against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018).

---

[6]  Caballero executed in state court on a blocked Kingpin asset held in the name of Prodira, a Colombian casa de cambio that OFAC had designated as a Tier II FARC money launderer.  Prodira challenged Caballero's standing to execute on a blocked Kingpin asset.  On appeal the Florida 3d DCA affirmed in a per curiam no opinion decision.  Dkt. No. 250, App. Ex. 14.  Prodira never challenged, nor did the Florida state trial or appellate court ever decide, any issues relating to personal jurisdiction over the FARC.  *See* Dkt. No.250, App. Ex. Nos. 10-13.

E.      **LEGAL ANALYSIS**

1.      **The Second Circuit has held that a foreign terrorist organization is not "at home" in the United States**

36.      In *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 322 (2d Cir. 2016), the

Second Circuit voided a $655 million jury verdict and ATA judgment awarded to 11 families who

were all U.S. nationals at the time they were killed in Middle East bombings. The Second Circuit

held that the defendants were not subject personal jurisdiction, and, therefore, the judgment was

void and unenforceable. *Id.*   The Court held that the district court's ruling that it had general

jurisdiction over the defendants "relies on a misreading of the Supreme Court's decision in

*Daimler*" and that:

> Pursuant to *Daimler*, the question becomes, where are the PA and PLO " 'fairly
> regarded as at home' "? 134 S.Ct. at 761 (*quoting Goodyear*, 564 U.S. at 924, 131
> S.Ct. 2846). The overwhelming evidence shows that the defendants are "at home"
> in Palestine, where they govern. Palestine is the central seat of government for the
> PA and PLO. The PA's authority is limited to the West Bank and Gaza, and it has
> no independently operated offices anywhere else. All PA governmental ministries,
> the Palestinian president, the Parliament, and the Palestinian security services
> reside in Palestine.
>
> As the District Court for the District of Columbia observed, "[i]t is common sense
> that the single ascertainable place where a government such a[s] the Palestinian
> Authority should be amenable to suit for all purposes is the place where it governs.
> Here, that place is the West Bank, not the United States." *Livnat*, 82 F.Supp.3d at
> 30; *see also Safra*, 82 F.Supp.3d at 48. The same analysis applies equally to the
> PLO, which during the relevant period maintained its headquarters in Palestine and
> Amman, Jordan. *See Klieman*, 82 F.Supp.3d at 245 ("Defendants' alleged contacts
> ... do not suffice to render the PA and the PLO 'essentially at home' in the United
> States.")

*Id*. at 332-33.

37.      The *Waldman* court explained the PLO had two diplomatic offices in the United

States, employed more than a dozen individuals over a period of two years, engaged in diplomatic

activities and "'had a substantial commercial presence in the United States.'" *Id*. at 323.   Its

mission to the United States in Washington D.C. "used dozens of telephone numbers, purchased office supplies, paid for certain living expenses for ... the chief PLO and PA representative in the United States, and engaged in other transactions." *Id.* Despite these ongoing connections to the United States, the court determined the evidence demonstrated the PA and PLO "are 'at home' in Palestine, where these entities are headquartered, and from where they are directed." *Id.* at 334. The Court stated that the "PLO and PA have not transported their principle 'home' to the United States." *Id.* at 335.

### 2.    The FARC has never been "essentially at home" in the United States for purposes of general jurisdiction

38.    Caballero alleged in 2013—14 years after his father's murder—that "he currently lives in Florida as a resident alien" and that "all defendants are non-residents of Florida." Dkt. No. 250, App. Ex. No. 1 at ¶ 20. Caballero further alleged personal jurisdiction as follows:

> 21.    Furthermore, this Court has specific personal jurisdiction over the Defendants, pursuant to Fla. Stat. § 48.193(1), because Defendants have substantial, ongoing, and widespread narco-trafficking operations in Florida which have made this state a central transfer point in their drug distribution network.[2]
> 22. This Court has general personal jurisdiction over the Defendants pursuant to Fla. Stat. § 48.193(2), because the Defendants have engaged in substantial and not isolated activity within this state as a result of their extensive and ongoing narcotics trafficking in and through Florida.

*Id.* at pp. 6-7.[7]  But the FARC was never itself present or operating in Florida; it is and always has been domiciled in Colombia.  The FARC merely supplies the coca leaf, paste and/or processed cocaine to its many different trafficking partner cartels and Drug Trafficking Organizations—like the NVC and the Cartel of the Suns—and they then handle the subsequent transport, distribution and trafficking activities that occur in the United States.

---

[7] The publication cited by Caballero's footnote 2 does not even mention the FARC. *See* U.S. Dept. of Justice, National Drug Intelligence Ctr., Abstract, "South Florida High Intensity Drug Trafficking Area: Drug Market Analysis 2009," available at, http://www.justice.gov/archivc/ndic1.

39.     Caballero's Complaint clearly alleges that "FARC operates in roughly one-third of Colombia's geographic territory." *Id.* at ¶ 35.  No FARC member has ever been captured on U.S. soil.  The many FARC members who have been incarcerated in U.S. prisons on narcotics trafficking charges, or hostage taking charges related to the Stansell victims, were all captured in Colombia or elsewhere in South America and extradited to the United States.  The 2004 "FARC 50" indictment alleged that the FARC leaders were part of a conspiracy to "import into the United States from a place outside thereof a controlled substance … cocaine…"  *See United States v. Pedro Antonio Marin et al*, D.D.C. Case No. Case 1:04-cr-00446-TFH, Indictment, ECF 9 at p. 6.[8]  The indictment describes how the FARC started taxing cocaine in the 1990s and then became a "broker between the cocaine paste producing campesinos and the cocaine transportation organizations that distributed the cocaine to the United States and elsewhere." *Id.* at 15-16.  "When the FARC brought the cocaine paste to one of its own laboratories, it converted the cocaine paste to cocaine, and then delivered the drugs to the cocaine transportation organizations that sent the cocaine out of Colombia to the United States and elsewhere." *Id.* at 17.  In the late 1990s, the FARC began operating its own cocaine labs in Colombia, and they "became directly involved in importation of cocaine into the United States" and "established direct ties with cocaine distribution organizations in the United States." *Id.* at 17-18.

40.     The FARC was "created in or about 1964 as a leftwing guerilla group dedicated to the violent overthrow of the Government of Colombia, South America's longest standing, democratically elected government."  FARC 50 indictment at 9.  The FARC "controls large areas of land in Colombia, primarily in coca growing and cocaine processing regions." *Id*.  The FARC is a highly structured criminal organization with a Secretariat overseeing the Estado Mayor

---

[8] This "FARC 50" indictment was originally filed in Plaintiffs' initial Appendix Dkt. No. 15, Ex. 3.

command that oversees 77 fronts and mobile columns operating throughout Colombia. *Id.* at 9-14. In 2004, the FARC was comprised "of approximately 12,000 to 18,000 members." *Id.* at 14. The United States "FARC 50" indictment describes the FARC's extensive operations throughout Colombia. *Id.* at 14-21.

41. Plaintiffs do not dispute that the FARC was and still is the world's largest supplier of cocaine, and that it exports cocaine into the United States using third-party trafficking partners in the United States. But this conduct, and the FARC's role in this massive ongoing conspiracy, do not render the FARC "essentially at home" in the United States or Florida for the purposes of general jurisdiction under the Supreme Court's decision in *Daimler*.

42. On March 5, 2020, the United States unsealed an indictment of Nicolas Maduro and several FARC leaders alleging additional narcotics conspiracy crimes as part of the Venezuelan Cartel of the Suns dating back to 1999. *See USA v. Nicolas Maduro et al,* S.D.N.Y. Case 1:11-cr-00205-AKH.[9] This indictment also clearly details that the FARC was operating in Colombia and Venezuela, and using other Cartel of the Suns members to transport the cocaine into the United States.

43. There has never been an indictment finding that the FARC has ever had members physically present and operating in the United States, nor has the U.S. ever found the FARC to be essentially at home anywhere in the United States. The FARC is and has always been "at home" in Colombia. The FARC even had an "International Commission" but none of those leaders were ever present in the United States. *See* OFAC Chart FARC International Commission.[10]

---

[9] This indictment is filed in Plaintiffs' Supplemental Appendix, Venezuelan Cartel of the Suns Vol. 2, Dkt. No. 109, Exs. 1-5.
[10] U.S. Treasury Press Release, "*Treasury Designates FARC International Commission Members*" (Sept. 30, 2008), https://www.treasury.gov/press-center/press-releases/Pages/hp1169.aspx.

3. **The FARC's export of cocaine to the United States does not have the requisite causal connection to support specific jurisdiction for a kidnapping for ransom and murder of a Colombian national in Colombia**

44.     The Second Circuit in *Waldman* also analyzed the specific jurisdiction issue, noting the "random, fortuitous" nature of the attacks, and held that those acts "were not expressly aimed at the United States" and that "plaintiffs point us to no evidence that these indiscriminate terrorist attacks were <u>specifically targeted against United States citizens</u>."  835 F.3d at 338 (emphasis added).  The Court also rejected the U.S. victims' purposeful availment theory because "plaintiffs' claims did not arise from the defendants' purposeful contacts with the forum."  *Id*. at 343.

45.     The D.C. Circuit has also rejected personal jurisdiction over a Foreign Terrorist Organization in an action arising from terrorist gunfire that ambushed an Israeli public bus resulting in the death of an American.  *Estate of Kleiman v. Palestinian Authority*, 923 F.3d 1115 (D.C. Cir. 2019).  There the Court held:

> Finally, plaintiffs' invocation of our decision in *Mwani v. bin Laden* is unpersuasive. There defendants' contacts with the United States were manifest in the very act that had precipitated the suit—a "devastating truck bomb" outside the U.S. Embassy in Nairobi, Kenya, in 1998, which "killed more than 200 people, including 12 Americans." Mwani, 417 F.3d at 4. **In choosing their target, a U.S.-government building, Osama bin Laden and Al Qaeda had manifestly sought "purposefully [to] direct their terror at the United States**," *id*. at 14, and "**not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States**," *id*. at 13. **Given conduct "no doubt ... 'directed at [and] felt in' " the United States**, *id*. (alteration in original) (citation omitted), **defendants could "reasonably anticipate being haled into" court there**, *id*. at 14 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)), … But whereas the *Mwani* defendants, in attacking a U.S. government outpost, indisputably aimed to kill Americans (at least in part), **here we have no basis for inferring that the terrorists who attacked an Israeli bus were instructed, or endeavored, to injure American nationals**. And absent intentional targeting, the fact that an American died in a terrorist incident abroad would amount only to a "random, fortuitous, or attenuated" contact "ma[de] by interacting with ... persons affiliated with the" United States. *Walden*, 571 U.S. at 286, 134 S. Ct. 1115

46.     *Id*. at 1125-26 (emphasis added).  The *Kleiman* plaintiffs tried to connect the foreign murder to the activities allegedly targeted at the U.S. (affecting US foreign policy), but this connection was rejected as insufficient to support specific jurisdiction.  *Id*., *citing Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314 (11th Cir. 2018), ( "a tort 'arise[s] out of or relate[s] to' the defendant's activity in a [forum] only if the activity is a 'but-for' cause of the tort."); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318–19 (3d Cir. 2007) (describing the typically stricter proximate cause or "legal cause" test).  Because the Caballero Colombian kidnapping was not "specifically targeted against [a] United States citizen[], and it was "not expressly aimed at the United States," it was a random and fortuitous attack on a Colombian national on Colombian soil, which does not support specific jurisdiction over the FARC.  *Waldman v. PLO*, 835 F.3d 317, 338 (2d Cir. 2016).

### 4.      The Florida state court findings on personal jurisdiction are clearly erroneous

47.     The mere fact that the FARC exported massive quantities of cocaine to the United States in a conspiracy with many other cartels does not render the FARC "at home" in the U.S. for purposes of general jurisdiction.  The kidnapping and murder of Mr. Caballero was not caused by any FARC conduct in the United States; there was only criminal activity that occurred wholly in Colombia against a Colombian national.  There was no direct "but for" or other causal relation between any FARC acts in the United States. Indeed, all of the FARC narcotics actions occurred in Colombia along with the kidnapping for ransom and subsequent murder of Mr. Caballero.

48.     Caballero's entire premise for personal jurisdiction over the FARC is essentially conspiracy-based: i.e., the FARC's role in a conspiracy to export massive amounts of cocaine to the U.S. in partnership with various conspiracy partner cartels and drug trafficking organizations

operating within America.  Just a few years ago, S.D.N.Y Judge Andrew L. Carter, Jr. specifically

refused to exercise personal jurisdiction under a similar conspiracy-based theory:

> As STASCO notes, there is reason to think that basing specific personal jurisdiction on the acts of a defendant's co-conspirators is questionable after *Walden*. ECF No. 400 ("Shell Reply"), at 13-14. In *Walden*, the Supreme Court emphasized that personal jurisdiction must be based on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  134 S. Ct. at 1122. Stated differently, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Id*. at 1123. It therefore stands to reason that a defendant has not established minimum contacts with a forum on the basis of his co-conspirator's conduct in the forum state alone.

*In re: North Sea Brent Crude Oil Futures Litigation*, 2017 WL 2535731 *9 (S.D.N.Y. 2017).

Judge Carter further noted that "courts in this Circuit generally require a causal connection between

the defendant's conduct and the plaintiff's harm."  *Id.* at *6,  *citing In re LIBOR-Based Fin.

Instruments Antitrust Litig.*, No. 11-md-02262 (NRB), 2015 WL 6243526, at *28 & n.46

(S.D.N.Y. Oct. 20, 2015) ("*LIBOR II*").

49.     Accordingly, conduct in Florida or other parts of the United States made by the

North Valley Cartel ("NVC"), or made by other FARC trafficking partner cartels, cannot sustain

personal jurisdiction over the FARC.  And the in-forum conduct of the NVC (or other FARC

trafficking partners) was not a cause of Caballero's kidnapping for ransom and murder in

Colombia.

50.     Caballero's state court Complaint does not allege that the FARC was incorporated

or maintains its principal place of business in the United States or has other "exceptional"

affiliations with the United States that are so continuous and systematic as to render the FARC "at

home" here. *See Daimler AG*, 571 U.S. at 127. There is, thus, no general personal jurisdiction over

the FARC.  Caballero's state court Complaint, and his federal ATA Complaint, also fail to allege

facts plausibly showing that the FARC engaged in "intentional" conduct, "calculated to cause

injury," and that any such conduct was "expressly aimed at [the United States]." *Calder v. Jones*, 465 U.S. 783, 789, 791 (1984). "[M]ere injury to a forum resident" is an insufficient basis to assert personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 278 (2014).

51.     It is undisputed that Antonio Caballero was a Colombian national when his father, also a Colombian national, was kidnapped for ransom in Colombia by the FARC, a Colombian Foreign Terrorist Organization.  The ransom was not paid and his father was killed in Colombia in 1999.  The FARC in committing this heinous crime never expressly aimed its kidnapping for ransom and murder conduct at the United States, nor did its kidnapping and murder of Mr. Caballero in Colombia cause any direct injury or harm in the United States.  In stark contrast, the FARC *did* specifically target the *Stansell* and *Pescatore* victims as American citizens, and the FARC expressly aimed those terrorist acts at the United States, including shooting down a U.S. counter-narcotics aircraft, kidnappings of U.S. citizens, murders, torture and hostage taking of U.S. citizens, with multiple proof of life, ransom demands and prisoner exchange demands sent into the United States.

52.     Caballero alleged that his father's "properties contained roads and paths through which processed drugs manufactured by the NDVC with product and chemicals supplied by FARC and ELN were transported ... to ports on the Caribbean coast of Colombia and on to the United States." App. Ex. No. 1 at ¶ 82.  Caballero also alleged that his father was a vocal critic of narcotics trafficking activities. *Id.* at ¶ 63.

53.     If the FARC is subject to personal jurisdiction in the United States for kidnapping and murdering alien national Caballero in Colombia, then the FARC is also subject to personal jurisdiction here for the kidnappings and murder and torture of hundreds of thousands of other Colombian national FARC victims who suffered like the Caballeros.  If this Court upholds

Caballero's personal jurisdiction claim and enforces his judgment, it risks opening the floodgates to thousands of Colombian victims who will follow the Caballero default judgment blueprint, alleging that they too opposed narcotics trafficking and owned land over which coca leaf was grown or transported, and, therefore, the FARC is also subject to personal jurisdiction in their lawsuits. This tidal wave of lawsuits and judgments will then result in the depletion of the blocked asset pool available to U.S. national FARC victims who were *legitimately* targeted because they were Americans. That would be directly contrary to Congressional will, as embodied in the ATA.

WHEREFORE the Stansell and Pescatore Cross-claimants request entry of an Order and judgment declaring that Antonio Caballero's judgment is void and unenforceable because the Florida courts lacked both general and specific personal jurisdiction over the Defendant FARC, and Mr. Caballero therefore cannot enforce his judgment in the subject Third-Party Complaint interpleader action.

Respectfully submitted June 16, 2021

/s/ Newton P. Porter                          
NEWTON P. PORTER
(Florida Bar No. 833738)
(Admitted Pro Hac Vice DE 4)
nporter@porterandkorvick.com
PORTER & KORVICK, P.A.
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:    (305) 373-5040
Attorneys for the Stansell Plaintiffs


/s/ Nathaniel A. Tarnor
Hagens Berman Sobol Shapiro, LLP
322 8th Avenue, Suite 802
New York, NY 10001
Telephone: (646) 543-4992
Email: NathanT@hbsslaw.com
Counsel for the Pescatore
Plaintiffs/Judgment Creditors

/s/  Tony Korvick                              
TONY KORVICK
(Florida Bar No. 768405)
(Admitted Pro Hac Vice DE 3)
tkorvick@porterandkorvick.com
PORTER & KORVICK, P.A.
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:    (305) 373-5040
Attorneys for the Stansell Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 16, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I further certify that I served the foregoing document by electronic mail or certified or registered mail to the following persons:

> OFFICE OF FOREIGN ASSETS CONTROL
> U.S. Department of the Treasury
> 1500 Pennsylvania Ave. NW
> Washington DC
> *Via email to OFAC counsel in compliance with 31 CFR 501.605*

None of the FARC defendants have appeared and defaults were properly entered against them all prior to entry of the Default Judgment.  Accordingly, no further notice, service of pleadings, motions or writs is required to be served on the FARC or the individual FARC members identified in the ATA Judgment.  Fed. R. Civ. P. 5(a)(2).

> /s/ Newt Porter
> NEWTON P. PORTER
> (Florida Bar No. 833738)
> (Admitted Pro Hac Vice Dkt No. 4)
> Attorneys for Plaintiffs
> PORTER & KORVICK, P.A.
> 9655 South Dixie Highway Suite 208
> Miami, Florida 33156
> Telephone:     (305) 373-5040
> nporter@porterandkorvick.com