UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

KEITH STANSELL, et al.,

                                        Plaintiffs,

                    -against-

REVOLUTIONARY ARMED FORCES OF
COLOMBIA (FARC), et al.,

                                        Defendants.
------------------------------------------------------------ X
------------------------------------------------------------ X
OLIVIA PESCATORE, et al.,

                                        Plaintiffs,

                    -against-

JUVENAL OVIDIO RICARDO PALMERA
PIENDA, et al.,

                                        Defendants.

------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/29/2022___
```

16-MC-00405 (LGS)(SN)

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE LORNA G. SCHOFIELD:**

For more than a decade, Antonio Caballero, the Stansell family, and the Pescatore family

have sought redress for the abuses inflicted on them and their families by Fuerzas Armadas

Revolucionarias de Colombia ("FARC"), the Ejercito de Liberacion Nacional (the "ELN"), and

the El Norte del Valle Cartel (the "NDVC"). They have obtained judgments against these groups

under the Antiterrorism Act ("ATA") and now seek to satisfy those judgments. These efforts

have brought these judgment holders into conflict.

The Stansells and Pescatores (who have combined their collection efforts)[1] registered

---

[1] Not all of these plaintiffs are members of the Stansell or Pescatore family. However, their eponymous cases have
been consolidated into a single proceeding and they have worked together to collect their judgments. Accordingly,
the Court refers to this group as the "Stansells and Pescatores" for simplicity.

their judgments in this District and, through the Terrorism Risk Insurance Act ("TRIA"), sought the turnover of assets of purported FARC agents and instrumentalities. Caballero intervened, also seeking to satisfy his judgment with these assets. In response, the third parties holding those accounts sought interpleader relief, naming the Stansells, Pescatores, and Caballero as defendants. They, in turn, answered and crossclaimed against each other. Each judgment holder seek a declaratory judgment finding that their ATA judgment is valid while their opponents' is not. Their arguments also implicate issues raised by Samark Jose Lopez Bello and the Yakima Trading Corporation ("Yakima"), third party asset holders affected by the turnovers.

Both sides succeed in defending their own judgments but fail in attacking their opponents'. Accordingly, the Court recommends entering a declaratory judgment that Caballero's judgment is not void as a matter of law, that Caballero is entitled to collect both the economic and non-economic compensatory damages awarded to him, and that Stansells and Pescatores may collect their entire ATA judgments as compensatory damages under TRIA's provisions. To the degree that the parties' crossclaims are inconsistent with this judgment, the Court recommends that they be dismissed.

## BACKGROUND

Two elements are necessary to understand this matter's intertwined procedural and factual background: the history of the parties' judgments and the present proceeding that brought these judgment creditors into conflict. The Court addresses each in turn. The relevant facts are uncontested. The Court has, where appropriate, taken judicial notice of the court records of the cases related to this one. See, e.g., Jianjun Lou v. Trutex, Inc., 872 F. Supp. 2d 344, 350 (S.D.N.Y. 2012)("In the Rule 12(b)(6) context, a court may take judicial notice of prior

pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case sub judice.") (quoting Ferrari v. Cnty. of Suffolk, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011)) (internal quotations omitted).

## I.    The Judgments

### A.  The Stansells' and Pescatores' Judgments

The Stansells and Pescatores were both victims of FARC's brutality. In February 2003, Keith Stansell, Marc Gonsalves, Thomas Howes, and Thomas Janis were flying an anti-drug mission in Colombia when they were shot down by FARC. All four survived, but Janis was killed by FARC shortly after landing. Stansell, Gonsalves, and Howes were held hostage for more than five years. Stansell v. Revolutionary Armed Forces of Colombia, No. 09-cv-2308 (RAL), 2010 WL 11507790, at *1 (M.D. Fla. June 14, 2010) ("Stansell I").

They and their families sued FARC under the private cause of action created by the ATA. See 18 U.S.C. § 2333(a) ("§ 2333(a)"). In June 2010, they obtained a judgment in the Middle District of Florida after FARC defaulted. After trebling the damages as required by the ATA, Stansell, Gonsalves, and Howes each received awards of $74,010,000. Janis's spouse Judith was awarded $36,000,000, and each of Janis's four children was awarded $15,000,000. The total judgment is $318,030,000. Id. at *4.

The Stansell Plaintiffs later received a declaratory judgment in the Southern District of Florida finding that the full Stansell I award was "for compensatory damages." Stansell v. Revolutionary Armed Forces of Columbia, No. 19-cv-20896 (RNS), 2020 WL 4692748, at *2 (S.D. Fla. July 16, 2020) ("Stansell II"). A few months later, Lopez Bello intervened in the original Stansell proceeding in the Middle District of Florida "to remove references to compensatory damages" through a motion under Federal Rule of Civil Procedure 60(a). Stansell

3

et al. v. Revolutionary Armed Forces of Colombia et al., No. 09-cv-2308 (CEH), ECF No. 1222 at 5 ("Stansell III"). That motion was denied. Id. at 5.

Frank Pescatore was kidnapped by FARC forces commanded by Palmera Pineda in 1996. They sought to ransom him, but later killed him when he attempted to escape. Undeterred, FARC applied make-up to make him appear alive and continued to seek a ransom. When it was not paid, they disposed of his body. Pescatore et al., v. Palmera Pineda et al., 345 F. Supp. 3d 68, 70 (D.D.C. 2018). His family obtained a default judgment in which his widow received $5,000,000, his father and four children received $3,000,000 each, and his three siblings received $1,000,000 each. The total award, after each of these were trebled, came to $69,000,000. Id. at 78.

**B. Caballero's Judgments**

Like the Stansells and Pescatores, Caballero's family was devastated by FARC violence. Caballero's father, Carlos, was a leading Columbian politician, former ambassador to the United Nations, and outspoken critic of drug trafficking. He also owned land along a trafficking route, so to deter resistance among local landowners, the ELN kidnapped him. FARC and the ELN then tortured him for six months before executing him. They made threats against Caballero as well, forcing him to flee to the United States. Caballero v. FARC, No. 18-cv-25337 (KMM), 2020 WL 7481302, at *1 (S.D. Fla. May 20, 2020) ("Caballero III").

On these tragic facts, Caballero secured two judgments. First, in 2012, he sued FARC, the ELN, and the NDVC, in the Eleventh Judicial Circuit Court of Florida, alleging violations of the Alien Tort Statute ("ATS"), the federal and Florida versions of the Civil Racketeer Influenced and Corrupt Organizations ("RICO") statutes, and Columbian law. Caballero v. FARC et al., No. 12-48803-CA-02 (LSW), 2014 WL 12956651, at *1 (Fla. Cir. Ct. May 02, 2014) ("Caballero I"). The defendants did not appear, and a default was entered in December

2013. Id. Five months later, the defendants were found liable for every violation alleged. Id. A final judgment was issued in November 2014. Caballero v. FARC et al., No. 12-48803-CA-02, 2014 WL 12956652 (Fla. Cir. Ct. Nov. 18, 2014) ("Caballero II"). At the time, Caballero was a resident alien. Caballero I, 2014 WL 12956651, at *3.

Then, in 2018, Caballero, now a U.S. citizen, brought claims against FARC and the NDVC under the ATA. Caballero III, 2020 WL 7481302, at *2. Again, neither FARC nor the NDVC appeared, and, drawing on the facts of his state court action, Caballero secured a default judgment against both. Id. at *7. The Caballero III court followed Caballero II on the question of damages as well, awarding $45,000,000 in non-economic damages, and $1,729,667 in economic damages, both of which were trebled as required by the ATA. Id. The Stansells and Pescatores attempted to intervene in that proceeding, but their motion was denied. Caballero v. ELN et al., No. 18-cv-25337 (KMM), 2019 WL 11505371 (S.D. Fla. June 27, 2019) ("Caballero IV").

Since then, Caballero has obtained turnover motions based on this judgment in other courts. See, e.g., Caballero v. FARC et al., No. 21-cv-11393 (IT), 2021 WL 4477436 (D. Mass. Sept. 30, 2021).

## II.    This Proceeding

The present dispute arose after the Stansells and Pescatores registered their judgments in this District and sought to initiate turnover proceedings. Their targets are several accounts held by third-party garnishees Citibank, N.A. ("Citibank"), Sumitomo Mitsui Banking Corporation ("Sumitomo Mitsui"), and Equiniti Trust Company ("Equiniti"). These accounts are blocked by the United States Department of the Treasury Office of Foreign Assets Control ("OFAC"). Blocked assets of foreign terrorist organizations (e.g., FARC) as well as their agencies and

instrumentalities[2] are subject to attachment and execution under Section 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, codified at 28 U.S.C. § 1610 note ("TRIA § 201(a)").

The Stansells registered their judgment in this District on November 11, 2016. ECF No. 5.[3] The Pescatores followed two years later. Pescatore, ECF No. 1. After registering their judgments, they filed turnover motions under TRIA § 201(a)).

Caballero entered the picture on December 30, 2020, and announced his intention to seek the same assets. ECF No. 124. With multiple parties targeting these accounts, the garnishees sought interpleader relief. Equiniti filed the first interpleader complaint, then Citibank and Sumitomo Mitsui followed suit. Some of these complaints were later amended. Caballero and the Stansells and Pescatores answered, crossclaiming against each other, and answering their crossclaims. The full set of complaints, with their associated answers and crossclaims is catalogued in Table 1 in Appendix A.

Despite the volume of activity, the claims and counterclaims of the Stansells, Pescatores, and Caballero turn on similar arguments. The Stansells and Pescatores (whether in their original answers and crossclaims, ECF Nos. 251 at 42, 252 at 37, 253 at 37, 254 at 36, 255 at 34, 256 at 40, 257 at 33, 310 at 34, or subsequent amended answers and crossclaims, ECF Nos. 268 at 39, 269 at 43, 270 at 38, 271 at 38, 272 at 35, 273 at 41, 279 at 15, 318 at 15, 390 at 15) assert that Caballero's judgment is void because the Caballero III court lacked personal and subject matter jurisdiction. Alternatively, they argue that Caballero has satisfied his judgment based on what

---

[2] Some third parties are challenging their designation as agencies and instrumentalities of FARC. ECF No. 294 at 2 n.3. The Court takes no opinion on those designations or challenges at this time.

[3] Unless otherwise noted, all ECF citations are to Stansell v. FARC, No. 16-mc-0405.

damages he may collect under the ATA. They seek a declaratory judgment that confirms these points and that holds, as did <u>Stansell II</u>, that their ATA judgments are entirely for compensatory damages.

Caballero, meanwhile, asserts that he has not attached the assets at issue in certain instances, ECF Nos. 258 at 8, but primarily argues that the Stansells and Pescatores have obtained all the compensatory damages they may collect under TRIA. ECF Nos. 261 at 21, 262 at 23, 263 at 22, 264 at 22, 266 at 21, 301 at 21, 376 at 23. Based on that, he seeks a declaratory judgment that the Stansells and Pescatores have exhausted what they may collect and that he is the only party who may attached and execute his judgment on the accounts.

The Stansells and Pescatores brought the dispute to a head in July 2021, filing a motion to resolve their claims for declaratory judgment. ECF No. 330. Caballero, in addition to defending against those claims, filed a motion to dismiss the crossclaims. ECF No. 348; <u>see also</u> ECF No. 367. The parties exchanged one further salvo of letters over the import of a decision on Caballero's judgments in the Central District of California. <u>See</u> ECF Nos. 421, 422, 433.

## DISCUSSION

The Court addresses these claims and crossclaims by beginning with the preliminaries, satisfying itself of its own subject matter jurisdiction and determining the proper procedural framework. Then, it turns to the Stansells' and Pescatores' challenges to Caballero's judgment. It finishes with Caballero's challenges to the Stansells' and Pescatores' judgments. Where necessary, this last analysis incorporates Lopez Bello's challenges as well.

## I.    The Court Has Subject Matter Jurisdiction Over This Dispute

Before delving into the parties' claims, the Court must satisfy itself that it has subject matter jurisdiction over this proceeding. Caballero has argued that the Stansells and Pescatores

"cannot credibly allege that this Court has subject matter jurisdiction over their Crossclaims," ECF No. 348 at 14, and in any case, courts have an independent obligation to ensure their jurisdiction. <u>Henderson ex rel. Henderson v. Shinseki</u>, 562 U.S. 428, 434 (2011).

This, however, need not delay the Court long. The federal question jurisdiction grant at 28 U.S.C. § 1331 supports subject matter jurisdiction here. The Stansells and Pescatore have alleged a federal law claim under TRIA § 201(a) to support their turnover motions. <u>See, e.g.</u>, <u>Doe v. ELN et al.</u>, No. 15-cv-8652 (LTS), 2017 WL 591193, at *1 (S.D.N.Y. Feb. 14, 2017), aff'd sub nom. <u>Doe v. JPMorgan Chase Bank, N.A.</u>, 899 F.3d 152 (2d Cir. 2018) (finding that 28 U.S.C. § 1331 provides jurisdiction over turnover proceedings brought under TRIA). Their crossclaims against Caballero also seeks a declaratory judgment based on federal law claims: the interpretation of the validity and scope of Caballero's judgment under 18 U.S.C. § 2333(a) of the ATA. Claims premised on that federal statute are sufficient to invoke federal question jurisdiction.

## II.   Motions for Judgment on the Pleadings and Failure to State a Claim Provide the Proper Framework for Adjudicating This Dispute

With subject matter jurisdiction addressed, the next step is to identify the proper procedural framework for resolving this dispute. Caballero moves to dismiss the claims against him under Rule 12(b)(6). The Stansells and Pescatores have proffered four procedural mechanisms for relief: a declaratory judgment under the Declaratory Judgment Act (codified at 28 U.S.C. §§ 2201 et seq.), relief from a judgment under Rule 60(b)(4), judgment on the pleadings under Federal Rule 12(c), or summary judgment under Federal Rule 56. ECF No. 331 at 14–15. Practicality and economy urges that their motion be treated as one for judgment on the pleadings under Federal Rule 12(c).

The first two mechanisms the Stansells and Pescatores suggest cannot supply the necessary procedural framework. "An action for a declaratory judgment is 'an ordinary civil action.'" Int'l Bhd. of Teamsters v. E. Conf. of Teamsters, 160 F.R.D. 452, 455–56 (S.D.N.Y. 1995) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2768 (1983)). "Because an action for a declaratory judgment is an ordinary civil action, a party may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment." Int'l Bhd. of Teamsters, 160 F.R.D. at 456. Federal Rule 57, in turn, subjects declaratory judgment actions to the normal Federal Rules of Civil Procedure. Thus, an action for a declaratory judgment supplies the destination, but not the procedural framework to get there.

Rule 60(b) is not the proper vehicle either. This Rule permits a court to "relieve *a party* or its legal representative from a final judgment . . . ." Fed. R. Civ. P. 60(b) (emphasis added). The Stansells and Pescatores do not and could not claim that they were parties to Caballero III. Alternatively, Rule 60(b) relief is available to a nonparty in "extraordinary circumstances in which a non-party had interests on which the outcome of the proceedings had significant consequences . . . yet those interests had not been adequately represented during litigation, because of the peculiar structure of [the] case." Irvin v. Harris, 944 F.3d 63, 70 (2d Cir. 2019) (quoting Federman v. Artzt, 339 F. App'x 31, 34 (2d Cir. 2009)) (internal quotations omitted) (alteration in original).

The Stansells and Pescatores do not claim that extraordinary circumstances are present nor does the Court find any. At its root, this proceeding is about two parties who hold judgments against the same debtor. This is common; it is not an "extraordinary circumstance" that permits a nonparty to bring a Rule 60(b) motion.

That leaves Rule 12(c) or Rule 56. Since actions for declaratory judgments are ordinary civil actions, either may be appropriate. See, e.g., Lucas v. Plan. Bd. of Town of LaGrange, 7 F. Supp. 2d 310, 319 (S.D.N.Y. 1998) ("[A]s a threshold matter, we must determine whether Rule 56 or Rule 12 should govern defendants' motion for declaratory judgement.") Caballero's argument otherwise is unavailing. He suggests that neither mechanism is viable because they cannot be used to adjudicate "pre-judgment" issues such as the validity of his judgment, only "post-judgment" issues such as the priority of creditors. ECF No. 348 at 9–11. He offers no authority for the proposition that the scope of Rules 12 and 56 are so limited. This argument is further undercut by Weininger v. Castro, where a court in this District used summary judgment as a vehicle to assess the validity of underlying judgments in a TRIA proceeding. 462 F. Supp. 2d 457, 467, 467 (S.D.N.Y. 2006).

The availability of these procedural mechanisms is also a necessary implication of a court's ability to test foreign courts' subject matter jurisdiction. "[B]efore a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree." Underwriters Nat. Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n, 455 U.S. 691, 705 (1982). Indeed, in certain cases, such as proceedings against foreign sovereigns, district courts are obligated to test the jurisdictional sufficiency of foreign courts' default judgments. See, e.g., Vera v. Republic of Cuba, 867 F.3d 310, 318 (2d Cir. 2017) ("The District Court thus erred . . . in relying on the Florida court's findings of fact as the basis for its jurisdiction . . . those findings would not bind or aid the District Court, which was required to analyze the record independently . . . .")

Since the obligation to test jurisdiction exists, there must be a mechanism parties can use to bring such a challenge. Rule 60(b), as noted, could not be employed for this purpose without

the "exceptional circumstances" exception swallowing the rule. Instead, Rules 12 and 56 provide the appropriate procedure for a party to make a collateral attack on jurisdiction in an interpleader proceeding like this. The practice of courts in this District further confirms the analysis. See, e.g., Levin v. Bank of New York Mellon, No. 09-cv-5900 (JPO), 2019 WL 564341, at *2 (S.D.N.Y. Feb. 12, 2019) (plaintiffs and third-party defendants in TRIA interpleader case used motion for summary judgment to resolve the dispute); Weininger, 462 F. Supp. 2d at 467 (same).

The question then is whether Rule 12 or 56 is the appropriate framework here, as the Stansell and Pescatores have moved under both. Practicality urges that this be treated as a Rule 12 motion. In the first place, "the standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 301 (2d Cir. 2021) (quoting Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020)).

Treating this as a Rule 12(c) motion thus permits the motions of Caballero, the Stansells, and Pescatores to be dealt with under the same rubric. This is desirable because these motions are basically mirror images of the same legal questions on the same set of uncontested facts. The Stansells and Pescatores want a judgment declaring that they can collect the full scope of their judgments and that Caballero's judgment is invalid. Caballero wants to dismiss their crossclaims as a matter of law on the grounds that his judgment is valid and that the Stansells and Pescatores have collected what they can under TRIA §201(a). Resolving the legal questions in one motion answers them for the other so it makes sense to handle them in comparable frameworks.

Other considerations further urge the use of Rule 12. Where a court has the choice of proceeding under Rule 12 or Rule 56 "converting a Rule 12(c) motion to one for summary judgment is particularly inappropriate where material factual disputes remain, and relevant facts

may be unearthed during discovery." <u>Delgado v. City of New York</u>, No. 19-cv-6320 (JPC), 2021

WL 2473817, at *6 (S.D.N.Y. June 17, 2021), 2021 WL 2473817, at *6. The parties have not

suggested a need for additional discovery but, as both their underlying judgments will be intact at

the end of this Report and Recommendation, it is possible that they will have further disputes for

which discovery is useful. Finally, Judge Schofield's individual rules provide that "[a]bsent good

cause, the Court ordinarily will not have summary judgment practice in a non-jury case."

Individual Rules and Procedures For Civil Cases, Lorna G. Schofield, § III.C.6. Given the

availability of Rule 12, the Court does not find good cause to have summary judgment practice

here.

Having determined that judgment on the pleadings is the appropriate framework, the

question remains whether the Court ought to, in its discretion, exercise jurisdiction over this

declaratory judgment action. It answers the question in the affirmative. "The Declaratory

Judgment Act by its express terms vests a district court with discretion to determine whether it

will exert jurisdiction over a proposed declaratory action or not." <u>Dow Jones & Co. v. Harrods</u>

<u>Ltd.</u>, 346 F.3d 357, 359 (2d Cir. 2003). Determining whether to exercise this discretion involves:

> [A] simple test that asks . . . whether the judgment will serve a useful
> purpose in clarifying or settling the legal issues involved . . . whether
> a judgment would finalize the controversy and offer relief from
> uncertainty . . . whether the proposed remedy is being used merely
> for procedural fencing or a race to res judicata . . . whether the use
> of a declaratory judgment would increase friction between sovereign
> legal systems or improperly encroach on the domain of a state or
> foreign court; and . . . whether there is a better or more effective
> remedy.

<u>Id.</u> at 359–60 (internal quotations omitted).

These factors urge that this declaratory judgment action be entertained. This case is about

whether Caballero, the Stansells, and the Pescatores are entitled to various funds held by third

parties and, if so, the priority and amount of their entitlements. This declaratory judgment will

clarify these entitlements and remove uncertainty about who may maintain claims on these accounts. There is no better or more effective way to address the issue so requesting its resolution is no frivolous act of procedural sparing. Since it is only federal judgments, and not Caballero's state judgment, being inquired into, the Court need not fear offending Florida's sovereignty either.

In sum, the appropriate procedural framework for the declaratory judgment sought by the Stansells and Pescatores is a motion for judgment on the pleadings under Rule 12(c) while Caballero's motion will be one for dismissal for failure to state a claim under Rule 12(b)(6). Exercising jurisdiction over this declaratory judgment action is an appropriate use of the Court's discretion.

All that remains to flesh out the procedural framework is to recall the standard for these motions, which are the inverse of each other. "To survive a Rule 12(c) motion, [the plaintiff's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Lively, 6 F.4th at 301. (quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)) (alteration in original) (internal quotations in original). Conversely, under Rule 12(b)(6), a "complaint may be dismissed where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Oteze Fowlkes v. Adamec, 432 F.3d 90, 95 (2d Cir. 2005) (quoting Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994)) (internal quotations omitted). As noted, there are no material factual disputes here, only legal ones.

III.     **Caballero Holds a Valid or Otherwise Unchallengeable ATA Judgment**

      The preliminaries handled, the Court turns to the challenges to Caballero's judgment. It begins with the applicability of *res judicata*, followed by the jurisdictional challenges, and concluding with the argument that Caballero's judgment has been satisfied.

      Before addressing those points, the Court notes that Caballero also requested to be dismissed from one of the specific interpleader actions on the grounds that he has not attached the assets associated that complaint. ECF No. 348 at 50. His dismissal from that action is properly addressed in a later opinion considering the rights and obligations of the parties in that action. Moreover, there is no practical impact to dismissing the Stansells' and Pescatores' claims against him for that specific complaint. The Stansells and Pescatores have raised identical challenges to Caballero's judgments in each of their crossclaims, and those challenges do not turn on the attributes of the underlying complaint. Or, to put it another way, it does not matter whether the Court opines on the validity of <u>Caballero III</u> eight times or nine. Accordingly, the Court does not reach Caballero's dismissal argument here.

    **A.  Res Judicata Cannot Resolve this Dispute**

      The Court cannot invoke *res judicata* to short-circuit this dispute. "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" <u>Taylor v. Sturgell</u>, 553 U.S. 880, 892 (2008). "Issue preclusion," the doctrine relevant here, "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." <u>Id.</u> (quoting <u>New Hampshire v. Maine</u>, 532 U.S. 742, 748–49 (2001)) (internal quotations omitted).

But "[a] person who was not a party to a suit generally has not had [the] 'full and fair opportunity to litigate' the claims and issues settled in that suit" necessary to bring this doctrine to bear. Sturgell, 553 U.S. at 892. Caballero, the Stansells, and the Pescatores have never actually litigated the validity of Caballero III against each other: the Stansells' and Pescatores' attempt to intervene in that proceeding was denied. Caballero IV, 2019 WL 11505371 at *4.

There are exceptions to this rule that permit a nonparty to be bound by a judgment, such as an agreement by the nonparty or a "substantive legal relationship" between the party to be bound and the party to a judgment. Sturgell, 553 U.S. at 894. The parties have not proffered any such exceptions here. Without them, the Court hews to the general rule that issue preclusion is not applicable where, as here, the party to bound (i.e., the Stansells and Pescatores) was not party to the original Caballero III judgment.

## B.  The Caballero III Court Had Subject Matter Jurisdiction Over Caballero's Suit

The parties spend considerable time on whether the Caballero III court had subject matter jurisdiction under 18 U.S.C. § 2333(a) based on a dispute over the statutory element that the victim or claimant must a U.S. national. Lost in this debate is the grant of federal question subject matter jurisdiction at 28 U.S.C. § 1331. This provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" regardless of whether the plaintiff can prove each element of the federal claim.

Caballero III is a "civil action[] arising under the . . . laws . . . of the United States." As the Court of Appeals for the Seventh Circuit noted, where a "claim rests on a federal cause of action in § 2333(a) . . . [it] therefore arises under federal law within the meaning of 28 U.S.C. § 1331. That is enough to confer federal subject matter jurisdiction on the district court." Boim v. Am. Muslims for Palestine, 9 F.4th 545, 557 (7th Cir. 2021) (internal citation omitted). Courts in

this District have found likewise. See, e.g., O'Sullivan v. Deutsche Bank AG, No. 17-cv-8709 (LTS)(GWG), 2019 WL 1409446, at *1 (S.D.N.Y. Mar. 28, 2019).

The Court is aware of no decision in the Eleventh Circuit or the Southern District of Florida that would have either outright barred or compellingly challenged a decision by the Caballero III court to rest on the same jurisdictional grant. Indeed, multiple courts in the Southern District of Florida have used 28 U.S.C. § 1331 as the basis for their subject matter jurisdiction over ATA actions. See, e.g., Weinstock v. Abu Marzook, No. 17-cv-23202 (RNS), 2019 WL 1470245, at *2 (S.D. Fla. Apr. 3, 2019)("Plaintiffs bring this civil action for damages under a federal statute, 18 U.S.C. § 2333 . . . Thus, this Court has original subject matter jurisdiction under 28 U.S.C. § 1331.") ("Weinstock I"); Weinstock v. Islamic Republic of Iran, No. 17-cv-23272 (RNS), 2019 WL 1993778, at *1 (S.D. Fla. May 6, 2019) (same) ("Weinstock II"). The Court of Appeals for the Eleventh Circuit has not conclusively opined on the question but in Bernath v. Am. Legion, it analyzed subject mattered jurisdiction for an ATA claim based, in part, on the viability of federal question jurisdiction at 28 U.S.C. § 1331 without any suggestion that such jurisdiction is impermissible, even if it was unavailable to the specific claimant before them. 704 F. App'x 917, 917 (11th Cir. 2017).

Accordingly, the Court finds no reason to challenge the Caballero III court's subject matter jurisdiction. Because subject matter jurisdiction is available under 28 U.S.C. § 1331, the Court need not consider whether it is separately available under § 2333(a).[4] Even after confirming jurisdiction based on 28 U.S.C § 1331, the Court finally considers whether its subject

---

[4] Courts in this District and elsewhere have used the ATA as the basis for subject matter jurisdiction. See, e.g., Sokolow v. Palestine Liberation Org., 583 F. Supp. 2d 451, 455 (S.D.N.Y. 2008) ("The ATA bestows subject matter jurisdiction upon the federal courts . . ."); Rubin v. Hamas-Islamic Resistance Movement, No. CIV.A. 02-0975 (RMU), 2004 WL 2216489, at *2 (D.D.C. Sept. 27, 2004) ("The applicable statue to determine subject matter jurisdiction is the Anti-Terrorism Act . . . .")

matter jurisdiction is statutorily limited to cases where each of the elements of a § 2333(a) claim—such as the U.S. national status of a claimant—are satisfied.

The Supreme Court's guidance strongly counsels against finding such a limitation. It has consistently "insisted that statutory limitations should not be understood to limit the subject matter jurisdiction of the courts unless that is the 'clearly' stated intention of the statute." United States v. Prado, 933 F.3d 121, 135 (2d Cir. 2019) (citing Shinseki, 562 U.S. 428, Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010), and Arbaugh v. Y&H Corp., 546 U.S. 500 (2006)). This "requirement of a clear statement is justified by the 'unfairness and waste of judicial resources . . . entailed in tying [a] requirement to subject–matter jurisdiction.'" Prado, 933 F.3d at 135 (quoting Arbaugh, 546 U.S. at 515) (alterations in original). "When a statutory requirement is treated as an obstacle to the court's subject matter jurisdiction, the court's jurisdiction may be challenged for the first time and new arguments raised long after the court has entered judgment." Prado, 933 F.3d at 135.

Nothing in § 2333(a) contains this clear jurisdictional limitation. It provides that:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). In Prado, the Second Circuit noted that, where Congress intended to cabin federal courts' subject matter jurisdiction, one would expect text like "notwithstanding [the relevant subject matter statute]" or "notwithstanding any other provision of law." 933 F.3d at 135. None of those phrases, nor anything resembling them, exists in § 2333(a).

Indeed, the only clear limitation on subject matter jurisdiction contained in the ATA is at 18 U.S.C. § 2338, which gives federal district courts exclusive jurisdiction over ATA actions.

Far from cabining subject matter jurisdiction under 28 U.S.C. § 1331 though, courts in this District and the Southern District of Florida have read the two in concert so that the combination of these statutes grants federal question subject matter jurisdiction. See, e.g., Deutsche Bank AG, 2019 WL 1409446, at *1, Weinstock I, 2019 WL 1470245, at *2, Weinstock II, 2019 WL 1993778, at *1.

Moreover, the ATA lacks the familiar text conferring subject matter jurisdiction: "[t]he district courts . . . shall have . . . jurisdiction of [a specified category of case] . . . . " Prado, 933 F.3d at 141 n.11 (collecting statues conferring subject matter jurisdiction). Without this language, and given the Supreme Court's guidance not to find subject matter jurisdiction limitations without a clear statutory command, the Court finds that the ATA does not limit a court's ability to obtain subject matter jurisdiction under 28 U.S.C. § 1331. Since this also provides a jurisdictional basis for Caballero III, the Court finds that Caballero III is not void for lack of subject matter jurisdiction.

The Stansells and Pescatores argue unpersuasively that this interpretation renders § 2333(a) absurd. ECF No. 422 at 3. True, "[a]ll laws should receive a sensible construction" and "general terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence." United States v. Kirby, 74 U.S. 482, 486 (1868). Yet "where, as here, the words of the statute are unambiguous, the judicial inquiry is complete." Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003) (quoting Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254 (1992)) (internal quotations omitted). Nothing in the text suggests that Congress intended § 2333(a) to limit subject matter jurisdiction.

The statutory framework, moreover, is quite sensible. The apparent irrationality flagged by the Stansells and Pescatores is that refusing to ascribe jurisdictional significance to § 2333(a):

absurdly allows foreign nationals to sue for a terrorist attack after they become American nationals even if other American nationals that were harmed from the same act of terrorism are barred by the statute of limitations in 18 U.S.C. § 2335. For example, if a mother was murdered by terrorists and had two children, one with American citizenship and one without, the American child would be barred from bringing claims after 10-years. Yet, according to Caballero's reasoning, the foreign sibling would not be barred from bringing an ATA claim for the same murder as long as the foreign sibling brought claims within 10-years after becoming an American, even if this occurred decades later.

ECF No. 422 at 3.

There is nothing particularly absurd about this. The intimation is that a naturalized foreigner is better treated because they have *more* time to bring an ATA claim than someone who is an American national. Yet, the party arguably facing the most stinging injustice is the child without American citizenship who would be unable to use the ATA to sue the terrorists for the harms he has suffered from the death of his mother. See, e.g., Lelchook v. Islamic Republic of Iran, No. 16-cv-7078 (ILG), 2020 WL 12656283, at *4 (E.D.N.Y. Nov. 23, 2020) ("The ATA does not include language authorizing foreign nationals to bring ATA claims in a U.S. court for their own injuries caused by an act of international terrorism.")

Certainly, if that child eventually became an American, he would have more time from the date of the incident than the child who started as a citizen, but given the challenge of suing as years pass (fading memory, lost witnesses, missing documents) it does not seem outrageous that they have more time to remedy these gaps. The American child, by contrast, could sue the very day the attack occurs or anytime in the next decade. There is no absurdity in this result, much less absurdity so significant that the Court need read jurisdictional significance into § 2333(a).

**C.  The Stansells and Pescatores Lack Standing to Challenge to <u>Caballero III</u> on Personal Jurisdiction Grounds**

The Stansells and Pescatores lack standing to challenge <u>Caballero III</u> for lack of personal jurisdiction. Subject matter jurisdiction is nearly *sui generis* in its capacity to be "raised at any time, even on appeal, and even by the court sua sponte." <u>Guggenheim Cap., LLC v. Birnbaum</u>, 722 F.3d 444, 449 (2d Cir. 2013) (quoting <u>Cave v. E. Meadow Union Free Sch. Dist.</u>, 514 F.3d 240, 250 (2d Cir. 2008)) (internal quotations omitted). Also, "because [subject matter jurisdiction] involves a court's power to hear a case, [it] can never be forfeited or waived." <u>United States v. Cotton</u>, 535 U.S. 625, 630 (2002).

Conversely, "[t]he requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an *individual liberty interest*." <u>Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 702 (1982) (emphasis added). Thus, unlike subject matter jurisdiction, "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." <u>Id.</u>

The individual nature of this right limits who may challenge a judgment for lack of personal jurisdiction. A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." <u>Sec'y of State of Md. v. Joseph H. Munson Co.</u>, 467 U.S. 947, 955 (1984) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975)) (internal quotation omitted). Thus, the right to assert or waive the defense of personal jurisdiction rests with the <u>Caballero III</u> defendants: FARC and the NDVC.

This limit on third party standing is, admittedly, prudential. <u>Joseph H. Munson Co.</u>, 467 U.S. at 956. Thus, there are "exceptions [which] permit third-party standing where the plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured

party's ability to assert its own interests." W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 109 (2d Cir. 2008).

The Stansells and Pescatores cannot demonstrate the first prong. Their relationship with FARC and the NDVC is entirely adversarial. They excoriate FARC for its "unspeakable brutality" and "horrible acts." ECF No. 331 at 7. If the Court permitted this challenge, the quixotic result would be that the Stansells and Pescatores would effectively ally with FARC by asserting its rights to defeat Caballero's judgment, only to immediately turn on it to fulfill their own judgment. "Keep your enemies closer" may be sound strategic counsel, but it is not the kind of "close relationship" that supports third party standing.

The Court has not identified any case that counsels departing from this prohibition against third party standing in a collateral proceeding. Vera v. Banco Bilbao Vizcaya Argentaria, S.A., 946 F.3d 120 (2d Cir. 2019), on which the Stansells and Pescatores rely, is inapposite for two reasons. First, it addresses when subject matter, not personal jurisdiction can be challenged. Id. at 135. Second, it involved proceedings against foreign sovereigns, which are accorded special considerations under the Foreign Sovereign Immunity Act even if they do not appear. See, e.g., Walters v. Indus. & Com. Bank of China, Ltd., 651 F.3d 280, 293 (2d Cir. 2011) ("[T]he FSIA, by its terms, authorizes consideration of sovereign immunity from both jurisdiction and execution even in the absence of an appearance by the sovereign.") FARC is entitled to no such regard.

It is true that "before a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant . . . ." Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp., 619 F.3d 207, 213 (2d Cir. 2010). "[T]he Second Circuit has noted" however, 'that it is an open question 'whether a district court *must* investigate its personal

jurisdiction over a defendant before entering a default judgment . . . .'" Hood v. Ascent Med.

Corp., No. 13-cv-628 (RWS), 2016 WL 3453656, at *1 (S.D.N.Y. June 20, 2016), aff'd, 691 F.

App'x 8 (2d Cir. 2017) (quoting City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114,

133 (2d Cir. 2011)) (emphasis in original).

But, the Caballero III court has, even if implicitly, already satisfied itself that it had

jurisdiction to enter the default judgment. C.f., Nemaizer v. Baker, 793 F.2d 58, 65 (2d Cir.

1986) ("When a district court has not explicitly noted why it assumed jurisdiction over a suit,

appellate courts will independently examine the record to determine whether a reasonable basis

existed for the lower court's implicit finding that it had jurisdiction.") What the Stansells and

Pescatores ask then, is that this Court overturn Caballero III's personal jurisdiction

determination. They do not have standing to make this challenge.

"R" Best Produce, Inc. v. DiSapio, is equally inapposite because there, the defendant

(i.e., not a third party) sought to challenge the default judgment as void under Rule 60(b). 540

F.3d 115, 123 (2d Cir. 2008). It does not suggest that a *nonparty* may assert a defendant's

personal jurisdiction defense. Indeed, as noted, nonparties cannot generally mount a collateral

attack using Rule 60. Rather, DiSapio vindicates the well-established principle that "[a]

defendant is always free to ignore the judicial proceedings, risk a default judgment, and then

challenge that judgment on jurisdictional grounds in a collateral proceeding." Ins. Corp. of

Ireland, 456 U.S. at 706. That option is not available to the Stansells and Pescatores, who are

nonparties to the Caballero III judgment.

### D.  Caballero's Recovery is Not Restricted to Non-Economic Damages

Caballero may recover for both the economic and non-economic damages awarded in

Caballero III. He was awarded $45,000,000 "in actual compensatory non-economic damages"

and $1,729,667.00 "in actual compensatory economic damages," both of which were then trebled under the ATA. Caballero III, 2020 WL 7481302, at *7. The Stansells and Pescatores argue that, at most, Caballero is entitled only to the latter, not the former, since it was his father (who was not a U.S. national), who was kidnapped and murdered, rather than him. Accordingly, he was not a "national of the United States injured in his or her person . . . ." ECF No. 331 at 30.

Setting aside whether the Stansells and Pescatores even have standing to collaterally challenge a damage award, this argument is without merit. The Caballero III court relied on Caballero II's findings to render its damage judgment. 2020 WL 7481302, at *5. That state court, in turn, awarded non-economic damages after hearing "excruciating testimony from Antonio Caballero and [his expert] Dr. Diaz regarding the emotional distress and psychological trauma that Antonio Caballero has suffered." Caballero II, 2014 WL 12956652, at *4. It "accept[ed] Dr. Diaz's opinion that Antonio Caballero has, ever since the ordeal of his father's kidnapping and assassination, suffered, and continues to suffer, from depression, severe depressive disorder, and post traumatic stress disorder." Id.

Nothing in the ATA bars a U.S. national like Caballero from recovering for such wrongs. Linde v. Arab Bank, PLC, for example, found that the ATA covered "U.S. citizens suing for various non-physical injuries, such as emotional distress and loss of consortium, after their family members, who were not U.S. nationals, became victims of acts of international terrorism. 384 F. Supp. 2d 571, 589–90 (E.D.N.Y. 2005). Other courts have held likewise. See, e.g., Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 182 (D.D.C. 2004); Ests. of Ungar ex rel. Strachman v. Palestinian Auth., 304 F. Supp. 2d 232, 266–67 (D.R.I. 2004); see also Lelchook v. Commerzbank AG, No. 10-cv-5795 (AKH), 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011) ("[P]ermitting Plaintiffs to pursue claims for solatium damages is consistent with

both the purpose of the ATA, and Congress's intention to incorporate traditional tort-law principles into the statute.")

The Stansells and Pescatores proffer nothing in the text or history of the ATA that suggests a reason to depart from these rulings. Nor do they suggest that Caballero has collected enough to satisfy both the economic and non-economic damages awarded in Caballero III. The Court thus does not find that his judgment has been satisfied.[5]

## IV.   The Stansells' and Pescatores' Full ATA Judgments Are For Compensatory Damages Collectible Under TRIA

The Court now turns to Caballero's arguments about the validity of the Stansells' and Pescatores' collections under TRIA §201(a). He argues that these parties obtained all the compensatory damages that they may collect under TRIA, and that their crossclaims against him should accordingly be dismissed. Stansells' and Pescatores' crossclaims, conversely, request that the Court declare that "[t]reble damages under the ATA are compensatory damages in nature as a matter of law" and that the Stansell I award was entirely for compensatory damages. See, e.g., ECF No. 390 at 15.

There is one further consideration. The Stansells' and Pescatores' ability to collect the full scope of their damages has also been challenged in a separate motion by intervenors Lopez Bello and Yakima. See ECF Nos. 86, 87, 90, 102, 105, 106. They proffer some different arguments from Caballero but he, Lopez Bello, and Yakima all assert that the Stansells and

---

[5] An alternative reading of the Stansells' and Pescatores' challenge here could be that Caballero cannot be "injured in his person" because he was not a U.S. national at the time he suffered these injuries. Caballero III, however, considered and rejected this argument. 2020 WL 7481302, at *3 (S.D. Fla. May 20, 2020) ("[A] reading of the ATA permitting individuals who were not U.S. nationals at the time of the injury but subsequently become U.S. nationals to state a claim is consistent with Congress' intention and furthers the ATA's purpose.") Nothing in the Stansells' and Pescatores' papers undermines or even addresses Caballero III's reasoning on this point. Similarly, nothing suggests that they could mount a collateral challenge to that decision here.

Pescatores have exhausted what they may collect under TRIA. Accordingly, the Court has also considered Lopez Bello's and Yakima's arguments where relevant.

The parties' dispute turns on the meaning and application of "compensatory damages" in TRIA § 201(a) as applied to the treble damages provision of § 2333(a). TRIA § 201(a) provides that:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to *satisfy such judgment to the extent of any compensatory damages* for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added). Thus, "§ 201(a) of the TRIA . . . permit[s] execution *only* 'to the extent of any compensatory damages.'" Bank Markazi v. Peterson, 578 U.S. 212, 220 n.7 (2016) (quoting TRIA § 201(a))(emphasis added).

The ATA does not label its damages as compensatory or punitive. Rather, it states that those who prevail on a claim "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a). It is, in short, a treble damages remedy. The question is what portion of those treble damages is collectable given that TRIA permits the recovery only of "compensatory damages."

The Supreme Court has "placed different statutory treble-damages provisions on different points along the spectrum between purely compensatory and strictly punitive awards." PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 405 (2003). Thus, treble damages in the False Claims Act (FCA) were characterized (with some later revision) as "essentially punitive in nature . . . ." Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 784 (2000). In the Clayton Act, however, treble damages are "in essence a remedial provision." Brunswick

Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 485 (1977). As well, "the treble-damages provision contained in RICO itself is remedial in nature." Book, 538 U.S. at 406. In short, "the tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation . . . . " Cook Cty., Ill. v. U.S. ex rel. Chandler, 538 U.S. 119, 130 (2003).

Two points emerge from this guidance. The first is that while the status of treble damages as punitive or compensatory may vary from statute to statute, or even perhaps depending on the purpose for which the statute is invoked, the Supreme Court's references to a "tipping point" and ultimate formulation of various treble damages statutes as "essentially" punitive *or* compensatory demonstrates that, in each case where the challenge arises, a court must determine, if not generally, then at least for a given purpose, whether a particular treble damages provision has a punitive or compensatory function.

Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp., is instructive. 456 U.S. 556 (1982). There, a company brought antitrust claims against a professional society on an agent theory of liability. The society responded that treble damages were punitive and under traditional principles of agency law principals cannot be held liable for punitive damages based on the acts of their agents. But, while Am. Soc. of Mech. Engineers, Inc. acknowledged "that antitrust treble damages were designed in part to punish" antitrust violations, they were "created primarily as a remedy for the victims of antitrust violations." Id. at 575. Thus, it was "in accord with both the purposes of the antitrust laws and principles of agency law to hold ASME liable for the acts of agents" by treating the treble damages provision as compensatory. Id. at 576.

The second point is that to determine which category a treble damages award belongs in, the Court must look to both the operation of the treble damages statute and particularities of the

litigation resulting in that award. <u>Chandler</u>, 538 U.S. at 130. The Court thus addresses each of these tests in turn.

### A.  The ATA's Treble Damages Provision is Compensatory

The text and structure of the ATA demonstrate that its treble damages are compensatory for the purposes of TRIA. As in any act of statutory interpretation, the "starting point must be the language of the statute[]." <u>Albernaz v. United States</u>, 450 U.S. 333, 336 (1981).

The text of ATA's treble damages provision is very similar to those in the federal RICO statute, 18 U.S.C. § 1964(c), and § 4 of the Clayton Act, codified at 15 U.S.C. § 15(a).[6] These two treble damages provisions have been found to be essentially compensatory and remedial. <u>Brunswick Corp.</u>, 429 U.S. at 485 (Clayton Act); <u>PacifiCare Health Sys., Inc.</u>, 538 U.S. at 406 (RICO).

It shares less in common with the treble damages text of the False Claims Act[7], whose function has seen somewhat more frequent revision. <u>Compare</u> <u>Vermont Agency of Nat. Res</u>., 529 U.S. at 784 ("[T]he current version of the FCA imposes damages that are essentially punitive in nature …") <u>with</u> <u>Chandler</u>, 538 U.S. at 130. ("[T]he facts about the FCA show that the damages multiplier has compensatory traits along with the punitive.") Thus, on a textual level, the ATA's

---

[6] <u>Compare</u> 18 U.S.C. § 2333(a) ("Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism. . . shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.") <u>with</u> 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.") <u>and</u> 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.")

[7] 31 U.S.C. § 3729(a)(1)("Any person who [makes various false claims to the government] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.")

treble damages statute is a closer relation to those treble damages provisions whose function has

been deemed primarily compensatory.[8]

This, though, does not resolve the issue. The comparison of similar terms across different

statutes is a "relatively weak [interpretative] aid given that Congress may well have intended the

same word to have a different meaning in different statutes." Firstar Bank, N.A. v. Faul, 253

F.3d 982, 991 (7th Cir. 2001). This is particularly true given that the Supreme Court has

expressly found different compensatory and punitive rationales for different treble damages

provisions. PacifiCare Health Sys., Inc., 538 U.S. at 405. Thus, while the ATA's closet textual

relatives are compensatory, Chandler counsels that it is necessary to review the broader statutory

context and framework for a treble damages provision to mark it as compensatory or punitive.

538 U.S. at 132.

The proper statutory framework here is the one established to create civil liability for

terrorism. This includes both the statutes creating causes of action for terrorism, and the statutes

that support the satisfaction of judgments for these claims: TRIA § 201(a) and 34 U.S.C. §

20144, which created the U.S. Victims of State Sponsored Terrorism Fund ("VSSTF").

The three relevant statutes that provide terrorism-specific causes of action are: (i) the

ATA, 18 U.S.C. § 2333(a); (ii) the exception to foreign sovereign immunity and concomitant

---

[8] Indeed, when interpreting federal treble damages provisions, the FCA appears to be the only one that defies consistent treatment. Book is illuminating on this point. 538 U.S. 401. It begins by noting that "different statutory treble-damages provisions [exist] on different points along the spectrum between purely compensatory and strictly punitive awards. Id. at 405. As an example of a "punitive" treble damages provision, it cites Vermont Agency of Nat. Res., which suggested that "the current [treble damages] version of the FCA imposes damages that are essentially punitive in nature." 529 U.S. at 784. Conversely, Book describes the Clayton Act and RICO treble damages as "essentially," "in essence" or otherwise primarily remedial. 538 U.S. at 405–06. That, at least, would be a simple enough spectrum with RICO and the Clayton Act on the compensatory end, and the FCA on the punitive end. Chandler, though, decided just three years after Vermont Agency of Nat. Res., found that, far from being "essentially punitive" "the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive." 538 U.S. at 130. This would suggest that, rather than federal treble damages existing on a spectrum, it makes more sense to sort them into two camps. One camp would house the Clayton Act, RICO, and the ATA, which are textually similar and primarily remedial in their aims. The other would hold the FCA, which has a textually distinct treble damages clause, and which has been found to have a more fluid purpose.

cause of action at 28 U.S.C. § 1605A ("§ 1605A"), which targets state sponsors of terror; and (iii) the exception for foreign sovereign immunity and cause of action created by the Justice Against Sponsors of Terrorism Act (JASTA) at 28 U.S.C. § 1605B ("§ 1605B"), which targets support for terrorism by states who have not been designated state sponsors of terror.

Together, these three statutes form the nucleus of American civil liability for terrorism. JASTA explicitly imported § 2333(a) as the private right of action for § 1605B. 28 U.S.C. § 1605B(c) ("Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title . . . ."). It also modified 18 U.S.C. § 2333(d) to provide for aiding and abetting liability.

Moreover, because § 1605A and § 1605B are both part of the Foreign Sovereign Immunities Act and deal with the same subject matter, they are often referenced together or interpreted by reference to each other. See, e.g., A.A. v. Att'y Gen. United States, 973 F.3d 171, 184 n. 8 (3d Cir. 2020) (discussing both statutes in the context of judicial evaluation of foreign sovereign action); In re Terrorist Attacks on Sept. 11, 2001, 298 F. Supp. 3d 631, 645 (S.D.N.Y. 2018) (evaluating causation in § 1605B by reference to cases analyzing § 1605A); Gonzalez v. Google, Inc., 282 F. Supp. 3d 1150, 1160 (N.D. Cal. 2017) (assessing the scope of statutory immunity in § 1605B by reference to § 1605A); Bartlett v. Societe Generale de Banque au Liban SAL, No. 19-cv-007 (CBA)(TAM), 2021 WL 3706909, at *11 n.7 (E.D.N.Y. Aug. 6, 2021) (evaluating JASTA's statutory history with reference to § 1605A). These three statutes and the connective tissue between them created by JASTA are thus the appropriate statutory framework in which evaluate whether the ATA's damages are punitive or compensatory.

Of the three, only § 1605A explicitly provides for punitive damages ("damages may include economic damages, solatium, pain and suffering, and punitive damages"). JASTA does

not reference punitive damages. Instead, it waives sovereign immunity for cases in "which money damages are sought," § 1605B(b), and permits certain plaintiffs to bring the kind of § 2333(a) actions brought by Caballero, the Stansells, and the Pescatores against foreign states as well. § 1605B(c).

The difference is instructive. Section 1605A's explicit reference to punitive damages shows that Congress knows how to frame a terrorism liability statute to provide for punitive damages. That it did not do so suggests that it did not intend for the damages in § 2333(a) to be punitive. See, e.g., Meghrig v. KFC W., Inc., 516 U.S. 479, 485 (1996) ("Congress thus demonstrated in [one statute] that it knew how to provide for the recovery of cleanup costs, and that the language used to define the remedies under [an analogous statute] does not provide that remedy."), Whitfield v. United States, 543 U.S. 209, 216 (2005) ("Congress has included an express overt-act requirement in at least 22 other current conspiracy statutes, clearly demonstrating that it knows how to impose such a requirement when it wishes to do so.")

Moreover, recognizing that § 1605A provides for compensatory and punitive damages, while § 2333(a), and by extension § 1605B provides for compensatory treble damages reveals the elegance of Congress's civil liability for terrorism system. At first glance, this system would seem unfair to claimants under § 1605A (*i.e.*, victims of state sponsored terror) since only the compensatory part of their damages are collectable through TRIA, while JASTA and other § 2333 claimants could use TRIA to claim the whole of their damages.

But § 1605A claimants have a different advantage. Their compensatory damages may be fulfilled not only by pursuing the assets of terrorists and terror states, but through a claim to the VSSTF. This fund authorizes payments to people who hold an eligible judgment against a state sponsor of terrorism. See generally 34 U.S.C. § 20144. It is not similarly available to victims of

terrorism who were harmed by terrorist groups themselves or states that have not been

designated sponsors of terror. 34 U.S.C. § 20144(c)(2)(A).

Compensatory treble damages create an effective counterweight to this disadvantage and

balance terrorism litigants' advantages and disabilities. Victims of terror who bring suit under §

1605A have a safety net. Even if they can attach no assets, they can bring suit safe in the

knowledge that there is a reliable way to collect their compensatory damages. They cannot,

though, rely on TRIA § 201(a) to collect whatever punitive damages they are awarded. Those

that claim under § 2333(a) and by extension under § 1605B have no such security. If they want

to satisfy their judgments, they will have to find and attach assets. Compensatory treble damages

though, gives these plaintiffs an equal incentive to bring terrorism claims knowing that they may

rely on TRIA §201(a) to collect their entire judgment.

This incentive structure further marks § 2333(a)'s treble damages as compensatory. The

Supreme Court has found treble damages provisions compensatory where, in addition to

remedying a victim's harms, damages are also necessary to incentivize victims to bring

particularly challenging or socially beneficial suits. As the Court explained in Agency Holding

Corp. v. Malley-Duff & Assocs., Inc.:

> Both RICO and the Clayton Act are designed to remedy economic
> injury by providing for the recovery of treble damages, costs, and
> attorney's fees. Both statutes bring to bear the pressure of "private
> attorneys general" on a serious national problem for which public
> prosecutorial resources are deemed inadequate; the mechanism
> chosen to reach the objective in both the Clayton Act and RICO is
> the carrot of treble damages.

483 U.S. 143, 151 (1987). Chandler applied the same logic to "qui tam [FCA] cases [where] the

rough difference between double and triple damages may well serve not to punish, but to quicken

the self-interest of some private plaintiff who can spot violations and start litigating to

compensate the Government, while benefiting himself as well." 538 U.S. at 131.

The same is true here. "Like . . . antitrust, commodities fraud, and racketeering laws . . . the ATA's legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement." Linde v. Arab Bank, PLC, 706 F.3d 92, 112 (2d Cir. 2013). The Supreme Court has found treble damages clauses motived by similar goals in the antitrust and racketing statutes to be compensatory and remedial, rather than punitive. These additional damages compensate plaintiffs for the burdens and risks of being private attorneys general who are willing to bring challenging yet publicly beneficial lawsuits. It stands to reason that the ATA's treble damages provision, enacted for comparable reasons, functions comparably. There is no indication that Congress intended to shortchange its private attorneys general when they strike at terrorists rather than at antitrust violators or racketeers.

Conversely, labeling the ATA's damages even partially punitive would create a cascade effect that could destabilize the system of civil terrorism liability. Under 28 U.S.C. § 1606, "a foreign state . . . shall not be liable for punitive damages." This is no issue for claims brought under § 1605A, which expressly permits claimants to seek punitive damages. See, e.g., Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 74 (D.D.C. 2008) ("As amended, the FSIA now specifically allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism.") (citing 28 U.S.C. § 1605A(c)).

It is, however, a problem for § 2333(a) claims brought against foreign sovereigns under § 1605B. This statute, relying as it does on § 2333(a) for a cause of action, contains no similar carveout for punitive damages. If, as Caballero urges, some part of the ATA's treble damages are punitive, it would necessarily follow that a foreign state who carried out an act of terror would nonetheless be immune to the punitive component of those damages. But the point of the

sovereign immunity exceptions for terrorism is "permitting massive judgments of civil liability against nations that sponsor terrorism." Leibovitch v. Islamic Republic of Iran, 697 F.3d 561, 571 (7th Cir. 2012). Nowhere is this truer than with JASTA, whose "purpose . . . is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief" from foreign states and entities who support acts of international terror. JASTA, PL 114-222, 130 Stat 852 § 2(b) (emphasis added).

The Court acknowledges that opinion on this is not uniform. Numerous cases have described the ATA's treble damages as punitive. These opinions draw primarily on two arguments. The first argument relies on the ATA's legislative history. Ungar is the primary exemplar of this school. 304 F. Supp. 2d 232. It found that "the legislative history of Section 2333 shows an unequivocal congressional intent to deter acts of international terrorism and punish those who commit such acts against American citizens." Ungar, 304 F. Supp. 2d at 238. On that basis, it determined that "the treble damages provision of Section 2333 is overwhelmingly punitive." Id. at 237.[9] Caballero III relied on Ungar in similarly determining that § 2333's treble damages award was punitive. 2020 WL 7481302, at *6.

These interpretations, however, are inconsistent with Linde, 706 F.3d at 112, which found that Congress had substantial remedial and compensatory objectives for the ATA. Linde's assessment also aligns better with the text of the ATA and its broader placement in the statutory framework of civil liability for terrorism.

---

[9] Ungar references Smith ex rel. Smith v. Islamic Emirate of Afghanistan, as further support. 262 F. Supp. 2d 217 (S.D.N.Y. May 7, 2003). Smith, however, notes primarily that it is inappropriate to assess punitive damages where statutory treble damages are already provided for. Id. at 240 n.38. Smith is also referenced for the same purpose in Rosenberg v. Lashkar-e-Taiba, No. 10-cv-5381(DLI)(CLP), 2014 WL 12834840, at *27 n.33 (E.D.N.Y. Aug. 1, 2014), and Est. of Parsons v. Palestinian Auth., 715 F. Supp. 2d 27, 31 n.1 (D.D.C. 2010), aff'd, 651 F.3d 118 (D.C. Cir. 2011), each of which simply notes that separate punitive damages do not appear to be appropriate given the availability of a treble damages award.

The second line of argument discusses punitive damages in passing as part of a broader analysis of the mental state required for ATA liability. This reasoning begins with the premise that treble damages are generally punitive. These punitive damages, in turn, are usually only available if a tortfeasor acts with malice or some similar state of mind. Boim v. Holy Land Found. for Relief & Dev. is the leading case for this argument. 549 F.3d 685 (7th Cir. 2008). It notes that "[t]reble damages too, not being compensatory, tend to have a punitive aim." Id. Such damages, it notes, "are rarely if ever imposed unless the defendant is found to have engaged in deliberate wrongdoing." Id. at 692. The Court of Appeals for the D.C. Circuit, albeit in dicta, similarly noted that "[b]ecause treble damages usually have a punitive aim, several courts have also interpreted § 2333 to require that a defendant act with some scienter above negligence, independent of any scienter required to commit the predicate act of international terrorism." Owens v. BNP Paribas, S.A., 897 F.3d 266, 270 n.2 (D.C. Cir. 2018) (citing Boim, 549 F.3d at 692–93).

Several lower courts have adopted Boim's reasoning. See, e.g., Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 414, 428 (E.D.N.Y. Feb. 28, 2013) (referencing Boim in a discussion of "the punitive treble damages provision in Section 2333(a)"), Goldberg v. UBS AG, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) (referencing Boim in discussing treble damages as a having a "punitive element"); Kaplan v. Jazeera, No. 10-cv-5298 (KMW), 2011 WL 2314783, at *4 (S.D.N.Y. June 7, 2011) (adopting Boim and Goldberg's view of § 2333 damages as punitive).

Two issues render these cases unpersuasive. First, Boim's blanket labeling of treble damages as "not compensatory" is out of step with the Supreme Court cases identifying various

non-punitive rationales for imposing treble damages and finding several such statutes to be primarily remedial and compensatory.

Second, characterization of treble damages as punitive in Boim is dicta that was not only nonessential to the scienter question at issue, but has also been rendered progressively less relevant by subsequent legal developments. Decisions like Abecassis v. Wyatt, addressed the issue of scienter in the ATA without any discussion of treble damages. 704 F. Supp. 2d 623, 657 (S.D. Tex. 2010). Gill v. Arab Bank, PLC, while accepting that treble damages were punitive, noted that for primary ATA liability, "an ATA plaintiff will have to prove a violation of some federal or state criminal law. Presumably, it will usually be one or more of the federal material support statutes; each of those statutes, as noted, has its own requirements regarding the requisite mental state." 893 F. Supp. 2d 474, 504 (E.D.N.Y. 2012).

As well, Congress subsequently refined the scienter requirements in the ATA, addressing the secondary liability issues confronted in Boim. JASTA modified § 2333 to provide for secondary aiding and abetting liability for acts of terror and an explicit *mens rea* for that cause of action. JASTA, PL 114-222, 130 Stat 852 § 4(d). The issues that animated Boim have thus become less salient. Given that, as well as the friction between Boim's dicta and the Supreme Court's guidance on treble damages, the Court does not find it to be a sound basis for reengineering the ATA's damages provision and by extension, the framework for civil terrorism liability.

Nor is this Court the only one to find that the ATA's treble damages are not punitive. Of its fellow travelers, the most persuasive and relevant is Judge Brown's concurrence in Est. of Parsons v. Palestinian Auth., 651 F.3d 118 (D.C. Cir. 2011) (Brown, J., conc.). There, the Palestinian Authority argued that "it cannot be held vicariously liable for its employees' acts

because the ATA awards treble damages, which the Palestinian Authority equates with punitive damages . . . ." Id. at 148. This, Judge Brown found, "is false. Treble damages are statutory or liquidated damages—not punitive damages." Id. In support, Judge Brown notes that while the Restatement of Agency (Second) limits the award of punitive damages against a principal for the acts of an agent, treble damages are expressly excluded from this rule. Id. (citing Restatement (Second) of Agency § 217C, cmt. (c)). That concurrence acknowledged that while "courts have characterized treble damages as 'punitive' for other purposes," that rationale was inapposite given both the Restatement and the evidence from the ATA's legislative history that its rationale is similar to the nonpunitive rationale animating antitrust laws. Id. at 148 n.10.

This reasoning was subsequently approved in Sokolow, 60 F. Supp. 3d at 516. Similarly, the comparison of the ATA's treble damages clause to the compensatory damages provisions of RICO and the Clayton Act led the Stansell II court to determine that the Stansells' entire judgment was compensatory. 2020 WL 4692748, at *2. In short, courts that have explicitly contextualized the ATA's treble damages alongside comparable provisions in RICO and the Clayton Act have found them, as the Court does here, to be compensatory.

### B.  The Course of Litigation Reveals that the Stansell I Award Is Compensatory

The course of this litigation, the Supreme Court's second means of assessing the nature of treble damages, further confirms the compensatory nature of the Stansell I award.[10] The

---

[10] It is, admittedly, odd that ATA treble damages might be a sort of Schrodinger's Award, both compensatory and punitive until revealed by the course of litigation. If the ATA's treble damages are, as the preceding analysis indicates, compensatory, then it seems like that ought to remain so regardless of the course of litigation. The culprit behind this somewhat unusual test is likely the FCA. It was Chandler, 538 U.S. at 130, an FCA case, that created the test. The FCA, in turn, differs from the Clayton Act, RICO, and ATA because it includes qui tam provisions under which a private party may bring suit in the name of the United States. The Attorney General then has the option to adopt the action while still diverting a variable percentage of the damages to the person who brought the original action. See generally 31 U.S.C. § 3730(d). Thus, the nature of a FCA claim and the allocation of damages may indeed change, possibly substantially, over the course of the litigation depending on if and how the government adopts the suit. As a result, the degree to which an award is punitive or compensatory might change. No comparable provision exists in the Clayton Act, RICO, or ATA. Nonetheless, nothing in Chandler suggests that the "course of litigation" element is an FCA-only test in the realm of treble damages. Moreover, the parties have invested

phrase "punitive damages" is noticeably absent from opinions and moving papers. While the Stansells' June 7, 2010 motion for damages discussed various opinions awarding compensatory damages, its actual request was "that this court award non-economic damages . . . with each award then subject to trebling under § 2333 (a)." ECF No. 259-1 at 57. It did not request or insinuate that its damages should be divided into compensatory and punitive elements.[11]

As well, Stansell I made no reference to "punitive damages." 2010 WL 11507790, at *4. Instead, it settled on its award amount after analyzing various cases calculating how compensatory damages are assessed for terrorists' hostages. It determined that the standard formula involved a per diem sum per day of captivity plus an additional lump sum when those hostages are tortured, to account for their heightened pain and suffering. Id. at *3 (collecting cases). No part of that analysis suggested that punitive or deterrent purposes animated the court's reasoning. Instead, it identified the appropriate "non-economic damages" for each award "with each award then subject to trebling under § 2333(a)." Id. at *4. The resulting default judgment then described the full sum of these awards (i.e., the non-economic damages plus the trebling) as "compensatory damages." ECF No. 259-3 at 1-2

Were that not clear enough, more than a dozen subsequent orders on writs of garnishment issued under TRIA from the same judge who issued Stansell I (the Hon. Richard A. Lazzara) describe the Stansell judgment as purely compensatory. See ECF Nos. 252 at 3 ("Plaintiffs' Judgment is solely for compensatory damages."), 261 at 3 (same), 300 at 12 (same), 322 at 11

---

considerable energy in discussing the implications of prior litigation to their claims, so they have effectively briefed the question and the course of litigation test provides a suitable framework for analyzing these arguments. Finally, the ATA's text and structure as well as the course of the litigation point towards the same conclusion regardless.

[11] Since they did not request such a division, the Stansells are not, contrary to Lopez Bello's assertion at ECF No. 87 at 27, estopped from arguing that the whole of their damages are compensatory. Lopez Bello made this argument in Stansell III, and those arguments were rejected for similar reasons. No. 09-cv-2308, ECF No. 1222 at 15 n.5.

(same); see also ECF No. 323 at 10 ("Plaintiffs have a federal district court judgment for compensatory damages only under the Anti-Terrorist Act against the FARC . . . ."), 324 at 10 (same), 325 at 10 (same), 326 at 13 (same), 327 at 13 (same), 395 at 10 (same), 396 at 10 (same), 397 at 10 (same), 398 at 10, (same), 623 at 10 (same).[12]

Two subsequent orders by separate judges further confirm that the Stansell I damages are compensatory. First, in 2020, the Stansell Plaintiffs sought and obtained a declaratory judgment in the Southern District of Florida. Drawing on the compensatory nature of the Clayton Act and RICO statutes' treble damages provisions as well as Judge Lazzara's repeated confirmation that the Stansell I award was compensatory, the Stansell II court determined "that the $318,030,000 judgment is for compensatory damages." 2020 WL 4692748, at *1–2. Stansell II also noted that the Court of Appeals for the Eleventh Circuit (albeit in dicta) described Stansell I as "a default judgment against FARC for $318 million in compensatory damages." Id. at *2 (citing Stansell v. Revolutionary Armed Forces of Colombia, 704 F.3d 910, 913 (11th Cir. 2013)).

Then, a few months after Stansell II, the judge in the original Stansell case (now the Hon. Charlene E. Honeywell), denied a Rule 60(a) motion by Lopez Bello. See Stansell III, No. 09-cv-2308, ECF No. 1222. That motion sought to amend the judgment "to remove references to compensatory damages." Id. at 5 (internal quotations omitted). In rendering this decision, the Stansell III court found it insignificant that Stansell I sometimes referenced compensatory and treble damages separately. Rather, it concluded that these references were "subtotal compensatory awards" then subject to trebling. Id. at 9–10. Accordingly, "the Court's review suggests that the Court intended for the judgment to be entered in an amount of compensatory

---

[12] All ECF numbers in the preceding sentences refer to the docket for Stansell et al. v. Revolutionary Armed Forces of Colombia (FARC) et al., No. 09-cv-2308 (CEH)(AAS) (M.D. Fla. Nov. 12, 2009).

damages," and that Lopez Bello "fail[ed] to demonstrate that the Court intended for the treble damages to serve a purpose other than compensatory damages . . . ." Id. at 15.[13]

In sum, even discounting the dicta from the Court of Appeals for the Eleventh Circuit, three judges across two districts have determined that the full sum of Stansell I was for compensatory damages. They have done so in two well-reasoned orders and more than a dozen garnishment orders. Not once during the years of Stansell litigation has a court described the Stansell I damages as anything but compensatory.

Thus, both tests discussed in Chandler mark the Stansell I award as compensatory. The ATA's treble damages provision is compensatory and judges in the Stansell litigation have awarded compensatory damages accordingly, so the whole judgment is collectable through TRIA § 201(a).

## V.    Resolution of Crossclaims

Both parties sought declaratory judgments establishing the enforceability of their judgment and the unenforceability of their opponents'. The Stansells and Pescatores sought that declaration on the grounds that the Caballero III court lacked subject matter or personal jurisdiction, and that regardless, the judgment was satisfied. These claims are without merit. Caballero sought to dismiss the claims against him on the grounds that, owing to the nature of the ATA's treble damages clause, he was the only person entitled to collect on the assets at issue here. This claim, as well, fails.

To apply these findings to the remainder of this litigation, the Court recommends granting in part and denying in part the Stansells' and Pescatores' motion for judgment on the pleadings by entering a declaratory judgment holding that:

---

[13] The Court also noted that Lopez Bello's proposed relief was beyond what was permissible under Rule 60(a).

1.  The full $318,030,000 sum of the <u>Stansell I</u> award is for compensatory damages;

2.  The <u>Caballero III</u> judgment is not void as a matter of law for lack of subject matter jurisdiction or personal jurisdiction; and

3.  Caballero is entitled to collect both the economic and non-economic compensatory damages awarded in <u>Caballero III</u>.

It recommends that the Caballero's, the Stansells', and the Pescatores' crossclaims be dismissed to the degree that they are inconsistent with this judgement. This declaratory judgment partially addresses the issues raised by Lopez Bello and Yakima. The Court recommends addressing the question of whether Lopez Bello and Yakima are agents or instrumentalities of FARC in a subsequent opinion. Lopez Bell and Yakima may, however, object to this Report and Recommendation exclusively to address the issue of treble damages under the ATA.

## CONCLUSION

The Court recommends entering a declaratory judgment that (1) the full $318,030,000 award of <u>Stansell I</u> is for compensatory damages; (2) Caballero's ATA judgment is not void as a matter of law for lack of subject matter jurisdiction or personal jurisdiction; and (3) Caballero is entitled to collect both the economic and non-economic compensatory damages awarded in his judgment. To the degree that the Stansell, Pescatore, and Caballero crossclaims are inconsistent with this declaratory judgment, it recommends that they be dismissed. It recommends that the outstanding issues raised by Lopez Bello and the Yakima Trading Company be addressed in a subsequent opinion. Lopez Bello and the Yakima Trading Company are permitted, however, to address the issue of treble damages in the ATA as part of any objection to this Report and Recommendation.

As oral argument is not necessary to resolve this motion, the Court respectfully directs the Clerk of the Court to deny the motion at ECF No. 373 and to terminate the motion at ECF No. 330.


DATED:   March 29, 2022
             New York, New York

SARAH NETBURN
United States Magistrate Judge

\*                    \*                    \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Schofield. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Appendix A

| colspan=7 | Table 1: <u>Stansell</u> Third-Party Complaints, Answers, and Crossclaims<br>*Documents that address multiple filings may appear on this table more than once.*<br>*Numbers reflect the document's ECF number on No. 16-mc-405.* |

| Third-Party Garnishee | Third-Party Complaint | The Stansells' and Pescatores' Answer to the Third-Party Complaint and Crossclaim Against Caballero | Caballero's Answer and Crossclaim Against the Stansells and Pescatores | The Stansells' and Pescatores' Amended Answer to the Third-Party Complaint and Crossclaim Against Caballero | The Stansells' and Pescatores' Answer to Caballero's Crossclaim | The Stansells' and Pescatores' Amended Answer to Caballero's Crossclaim |
|---|---|---|---|---|---|---|
| Equiniti | 208 | 254 | 376 | 268 | N/A | 390 |
| Citibank | 225 | 256 | 258 | 273 | N/A | N/A |
| | 227 | 255 | 261 | 272 | 279 | 390 |
| | 229 | 257 | 266 | N/A | 279 | N/A |
| | 280 (amending 229) | 310 | 301 | 318 | N/A | 318, 390 |
| | colspan=6 | *A separate line of filings concerns Citibank's answer to a writ of garnishment transferred from the Southern District of Florida. This line begins at ECF No. 93, with Citibank's second amended answer, followed by a third amended answer at ECF No. 324. Caballero answered at ECF No. 335, and the Stansells and Pescatores included a response to that in their omnibus answer at ECF No. 390.* |
| Sumitomo Mitsui | 234 | 251 | 262 | 269 | 279 | 390 |
| | 236 | 252 | 263 | 270 | 279 | 390 |
| | 238 | 253 | 264 | 271 | 279 | 390 |